## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **RALPH NADER,** | : | |
| **53 Hillside Avenue** | : | |
| **Winsted, Connecticut 06098** | : | |
| | : | |
| **PETER MIGUEL CAMEJO,** | : | |
| **1760 Barhead Court** | : | |
| **Folsom, CA 95630** | : | |
| | : | |
| **D.B. FANNING** | : | |
| **827 West Summit Avenue** | : | |
| **Flagstaff, AZ 86001** | : | |
| | : | |
| **C.K. IRELAND** | : | |
| **827 West Summit Avenue** | : | |
| **Flagstaff, AZ 86001** | : | |
| | : | |
| **JULIE COYLE** | : | |
| **4101 Drummond Road** | : | |
| **Toledo, OH 43613** | : | **AMENDED COMPLAINT** |
| | : | |
| **HERMAN BLANKENSHIP** | : | **Case No. 08-cv-00589-RMU** |
| **235 East Oakland** | : | |
| **Toledo, OH 43608** | : | |
| | : | |
| **LLOYD MARBET** | : | |
| **19142 Southeast Baker's Ferry Road** | : | |
| **Boring, OR 97009** | : | |
| | : | |
| **GREGORY KAFOURY** | : | |
| **320 Stark Street** | : | |
| **Portland, OR 97204** | : | |
| | : | |
| **PLAINTIFFS,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE DEMOCRATIC NATIONAL** | : | |
| **COMMITTEE** | : | |
| **430 South Capitol Street, SE** | : | |
| **Washington, DC 20003** | : | |
| | : | |

**KERRY-EDWARDS 2004 INC.**                          :
    **10 G Street, NE, Suite 700**                   :
    **Washington, DC 20002**                         :
                                                     :
**REED SMITH, LLP**                                  :
    **435 Sixth Avenue**                             :
    **Pittsburgh, Pennsylvania, 15219**              :
                                                     :
**JOHN KERRY**                                       :
    **United States Senate**                         :
    **304 Russell Building, Third Floor**            :
    **Washington, DC 20510**                         :
                                                     :
                                                     :
           **DEFENDANTS.**              :
                                                     :

Plaintiffs bring this action against Defendants to redress the deprivation of rights secured them by the First and Fourteenth Amendments, the Qualifications Clause and other provisions of the United States Constitution, and 42 U.S.C. § 1983. Plaintiffs seek damages, injunctive and declaratory relief and such other further relief as this Court shall deem necessary and proper, and allege the following:

## NATURE OF THE ACTION

1.      Defendants Democratic National Committee (DNC), Kerry-Edwards 2004, Inc., Reed Smith, LLP and John Kerry (the "Defendants") are members, allies or agents of the Democratic Party who combined and conspired with other such parties (the "co-Conspirators" and, together with Defendants, the "Conspirators") to bankrupt the 2004 independent presidential campaign of Plaintiffs Ralph Nader and Peter Miguel Camejo (hereinafter, "Nader-Camejo"). Defendants' purpose was to prevent Mr. Nader and Mr. Camejo from running for President and Vice President of the United States in the 2004 general election, and to deny Plaintiff-voters and others the choice of voting for them. Defendants and co-Conspirators blamed Mr. Nader for the Democrats' loss in the 2000 presidential election, and they worried that he would "steal" votes from the Democratic candidates if he ran again in 2004. Defendants and co-Conspirators therefore agreed and conspired that if Mr. Nader did run in 2004, they would launch a massive, nationwide unlawful assault on his candidacy, using unfounded litigation to harass, obstruct and drain his campaign of resources, deny him ballot access and effectively prevent him from running for public office. Defendants and co-Conspirators reached this agreement and formed this conspiracy with wrongful intent, before they could possibly have any reason to believe such litigation was warranted or justified.

1

2.      As the 2004 election approached, Terry McAuliffe, then-Chair of Defendant DNC, publicly appealed to Mr. Nader on numerous occasions not to run. "I wanted to convey to Ralph Nader that…if he were to get in the race again, he could pull votes away from the Democratic nominee. … We can't afford to have Ralph Nader in the race," Mr. McAuliffe told CNN's Wolf Blitzer in February 2004. When Mr. Nader announced his candidacy shortly thereafter, on February 22, 2004, Defendants and co-Conspirators set their obstructive plans and conspiracy in motion.

3.      In a telephone conversation with Mr. Nader on June 23, 2004, Mr. McAuliffe made one last effort to dissuade Mr. Nader. This time, Mr. McAuliffe asked Mr. Nader voluntarily not to campaign in certain so-called "battleground" states. If Mr. Nader agreed, Mr. McAuliffe said, he would support Mr. Nader's campaign in the remaining states. Mr. Nader declined, and objected to the Democratic Party's effort to deny his candidacy ballot access in various states. That same day, Defendants or co-Conspirators filed their first lawsuit against his campaign.

3.      Within the next 12 weeks, between June and September of 2004, Defendants and co-Conspirators filed 24 complaints against the Nader-Camejo Campaign in 17 states, including Arizona, Arkansas, Colorado, Florida, Illinois, Iowa, Maine, Michigan, Mississippi, New Hampshire, Nevada, New Mexico, Ohio, Pennsylvania, Washington, West Virginia and Wisconsin, and intervened in proceedings to remove Nader-Camejo from the ballot in Oregon. Conspirators also filed five complaints before the Federal Election Commission (FEC). In each state court lawsuit, Conspirators challenged Nader-Camejo's nomination papers and asked state elections officials not to certify them as candidates for President and Vice President in the 2004 general election.

4.    The Conspirators' admitted purpose for bringing these lawsuits, however, was not to vindicate valid legal claims, but rather to bankrupt Nader-Camejo's campaign by forcing the candidates to spend their limited resources of time, talent and money on the defense of unfounded lawsuits. The Conspirators' motive, which they also admitted, was to help Democratic candidates John Kerry and John Edwards win the election by forcing their political competitors from the race.

5.    Defendants and co-Conspirators dedicated millions of dollars' worth of illegal and unreported campaign contributions to their conspiracy. They recruited at least 95 lawyers from 53 law firms to pursue their unfounded and abusive litigation and organized hundreds of Democratic Party operatives to provide support. Defendants and co-Conspirators also incorporated several Section 527 political organizations, including one called The Ballot Project, which they incorporated specifically for the purpose of coordinating and financing their nationwide assault of unfounded and abusive litigation.

6.    In addition to filing 24 state court complaints and five FEC complaints against the Nader-Camejo Campaign within 12 weeks, Conspirators organized and conducted campaigns of harassment, intimidation and sabotage to prevent the Nader-Camejo Campaign from complying with election laws in several states, and to manufacture grounds for the Conspirators' subsequent lawsuits. In one state, for example, Conspirators acting fraudulently and under false pretenses took seats in Nader-Camejo's nominating convention but refused to sign their petitions, causing the convention to fall short of the requisite number of validated attendees. In other states, Conspirators sabotaged Nader-Camejo's nomination papers by crossing names out or otherwise invalidating their petitions and, on information and belief, by signing fake names.

7.    In violation of state rules of professional conduct, the conspiracy's bar members sent misleading letters to campaign petitioners, falsely threatening them with heavy fines and jail sentences if signatures they collected were invalidated, and also sought subpoenas ordering campaign petitioners on short notice to attend depositions and produce unreasonably burdensome amounts of personal documents. On numerous occasions, the Conspirators, including members of the bar, called campaign petitioners' homes, and even the homes of citizens and potential voters who signed Nader-Camejo's petitions. Private detectives also visited petitioners' homes, unannounced, and claimed to be investigating them. All of this activity was intended to harass and intimidate said petitioners and prevent them from collecting signatures – an effort that succeeded on dozens of occasions.

8.    In spite of a multi-million dollar legal team of co-Conspirators, and coordinated campaigns of harassment, intimidation and sabotage specifically intended to prevent Nader-Camejo from complying with state election laws, the Conspirators eventually lost the great majority of lawsuits they filed. In addition, the FEC dismissed all five of Conspirators' FEC complaints without taking action. Defendants and co-Conspirators nevertheless succeeded in draining Nader-Camejo's campaign of time, money and other resources, and in preventing them from gaining ballot access in several states, thereby denying voters in these states the choice of voting for them, as was their intent. Defendants and co-Conspirators also caused financial injury and other damages to Mr. Nader and Mr. Camejo personally, and did severe damage to the third-party and independent candidacy structure which Mr. Nader had built at great expense in time, money and other resources.

9.      Although the 2004 election ended more than three years ago, Defendants continue to pursue their wrongful litigation against Mr. Nader to the present day. To force Nader-Camejo off the ballot in Pennsylvania, Defendants and co-Conspirators enlisted at least 22 lawyers from five law firms, hired handwriting experts and other consultants, and recruited support from approximately 170 Democratic Party operatives. Afterwards, Defendant Reed Smith, a law firm retained by Defendant DNC, which has close ties to Defendants John Kerry and Kerry-Edwards 2004, Inc., submitted a bill of costs in the amount of $81,102.19. No state in the nation has ever assessed such a post-election penalty against candidates who defend their right to appear on the ballot, but the Commonwealth Court of Pennsylvania approved the bill without opinion. Misreading the plain meaning of the statute, a divided Pennsylvania Supreme Court affirmed without citing a single case in which a candidate had been assessed such costs.

10.     In September 2007, Plaintiffs discovered that, while this case was before the Pennsylvania Supreme Court, Defendant Reed Smith began representing the Chief Justice as his defense counsel in an ethics investigation before the Pennsylvania Judicial Conduct Board. In addition, Reed Smith and Conspirators' second law firm gave $10,000 in campaign contributions to a second Justice, who authored the majority opinion. Reed Smith also has close and long-standing ties with a third Pennsylvania Supreme Court Justice, who served as of counsel at the firm immediately before joining the court. Reed Smith did not disclose any of these facts during the proceedings before the Pennsylvania Supreme Court, nor thereafter, when the firm induced Mr. Camejo to pay $20,000 to settle its claim against him. Reed Smith subsequently filed Writs of Attachment against Mr. Nader's personal accounts, and currently seeks to condemn $61,638.45 of Mr.

5

Nader's personal funds in satisfaction of its unprecedented fraudulently and wrongfully obtained judgment.

11.     In December 2007, as part of an ongoing Grand Jury investigation into the misappropriation of taxpayer funds and resources, Pennsylvania State Attorney General Thomas Corbett reportedly uncovered email records and other materials indicating that many of the Democratic Party operatives working with Defendants and co-Conspirators were employees of the state of Pennsylvania who received taxpayer-funded compensation specifically for their efforts to remove Nader-Camejo from the ballot. Pursuant to this investigation, on July 10, 2008, Attorney General Corbett announced a Grand Jury presentment (attached hereto as "Exhibit A") and filed charges against 12 prominent Pennsylvania Democrats, including former Pennsylvania House Minority Whip Mike Veon and Michael Manzo, the former Chief of Staff to Pennsylvania House Majority Leader H. William ("Bill") DeWeese. According to their own press releases (attached hereto as "Exhibit B"), Mr. Veon and Mr. DeWeese spearheaded the effort to remove Nader-Camejo from Pennsylvania's ballot, and "helped to organize a corps of volunteers across the state to review [Nader-Camejo's] petitions." Ex. B ("DeWeese/Veon weigh Nader factor," Nov. 5, 2004).

12.     The Grand Jury's 75-page presentment describes a massive conspiracy, far more widespread than previous media reports suggested, pursuant to which Pennsylvania Democrats misappropriated millions of dollars' worth of taxpayer funds and public resources for the personal and political gain of Democratic Party officials and candidates, including Defendant John Kerry. The indictment includes an entire section entitled "Nader Petition Challenge," which states that "a veritable army" of state

employees dedicated "a staggering number of man-hours" to prepare the challenge to Nader-Camejo's Pennsylvania nomination petitions. Ex. A at 56. These employees worked directly with "a law firm which was ultimately involved in filing the challenge" on August 9, 2004 – an apparent reference to Defendant Reed Smith, which filed Defendants' challenge on that day. Ex. A at 55. The presentment makes clear that this challenge was funded by the state of Pennsylvania and executed by no fewer than 50 state employees. Ex. A at 4-8, 54-58.

13.    Attorney General Corbett charged the defendants named in the Grand Jury presentment with numerous counts of theft, criminal conspiracy and conflict of interest. The Attorney General's press release emphasized that these charges represent the first phase of an ongoing investigation, and "more arrests are expected."

14.    According to Federal Election Commission (FEC) reports, Defendant Reed Smith prepared its challenge to Nader-Camejo's Pennsylvania nomination petitions at the same time that Defendant DNC had retained the firm for unspecified "political consulting" and "legal consulting" services. In addition, newspaper reports indicate that Defendant Reed Smith represents or has represented Defendant John Kerry and his wife Teresa Heinz Kerry in numerous matters, including at least one matter arising directly from the 2004 election. Finally, email records of Defendant DNC and Defendant Kerry-Edwards 2004, Inc. indicate that both Defendants directly participated in efforts to deny Nader-Camejo ballot access in other states. The sworn testimony of a DNC official corroborates this fact, and FEC reports confirm that the DNC retained several firms that sued Nader-Camejo. On information and belief, therefore, Defendant Reed Smith prepared and filed its challenge to Nader-Camejo's Pennsylvania nomination papers

pursuant to an agreement with its clients and co-Defendants, the DNC, Kerry-Edwards 2004, Inc. and John Kerry.

15.    Defendants and co-Conspirators conspired to and did in fact abuse judicial processes and engage in other unlawful conduct in an effort to bankrupt the Nader-Camejo Campaign and terminate Nader-Camejo's candidacy during the 2004 presidential election. Conspirators filed 24 state law complaints and five FEC complaints in less than 12 weeks, with the specific intention of causing Plaintiffs financial injury and other damages and violating their constitutional rights. Defendants and co-Conspirators did in fact cause such damages, and they continue to cause such damages by pursuing their unfounded and abusive litigation to the present day, in an effort to enforce a judgment that was fraudulently procured pursuant to a conspiracy that has already led to the criminal indictment of 12 co-Conspirators.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the matter raises federal questions under 42 U.S.C. § 1983, and 28 U.S.C. § 1332(a), as the matter in controversy exceeds $75,000, exclusive of interest and costs, and diversity of citizenship exists among the parties. Jurisdiction is further conferred on this Court pursuant to 28 U.S.C. §§ 1343 and 2201. Jurisdiction supporting Plaintiffs' claim for attorney fees is conferred by 42 U.S.C. § 1988.

17.    Venue in the District of Columbia is appropriate pursuant to 28 U.S.C. 1391(b).

## THE PARTIES

8

18.     Unless otherwise stated, the charges alleged herein do not necessarily apply to every Defendant and every Conspirator or co-Conspirator named in this complaint.

19.     Plaintiff Ralph Nader is a consumer advocate and 2004 independent candidate for President of the United States. Mr. Nader's address is 53 Hillside Avenue, Winsted, Connecticut, 06098.

20.     Plaintiff Peter Miguel Camejo is an entrepreneur and 2004 independent candidate for Vice President of the United States. Mr. Camejo joins this complaint as to all Defendants except he asserts no claims against Defendant Reed Smith. Mr. Camejo's address is 1760 Barhead Court, Folsom, California, 95630.

21.     Plaintiff D.B. Fanning is a registered voter in the state of Arizona. Mr. Fanning's address is 827 West Summit Avenue, Flagstaff, Arizona, 86001.

22.     Plaintiff C.K. Ireland is a registered voter in the state of Arizona. Ms. Ireland's address is 827 West Summit Avenue, Flagstaff, Arizona, 86001.

23.     Plaintiff Julie Coyle is a registered voter in the state of Ohio. Ms. Coyle's address is 4101 Drummond Road, Toledo, Ohio, 43613.

24.     Plaintiff Herman Blankenship is a registered voter in the state of Ohio. Mr. Blankenship's address is 235 East Oakland Street, Toledo, Ohio, 43608.

25.     Plaintiff Lloyd Marbet is a registered voter in the state of Oregon. Mr. Marbet's address is 19142 Southeast Baker's Ferry Road, Boring, Oregon, 97009.

26.     Plaintiff Gregory Kafoury is a registered voter in the state of Oregon. Mr. Kafoury's address is 320 Stark Street, Portland, Oregon, 97204.

27.    Defendant Democratic National Committee is the national head of the Democratic Party, and works with national, state and local Democratic Party organizations to elect Democratic candidates. The DNC's address is 430 S. Capitol Street SE, Washington, D.C., 20003.

28.    Defendant Kerry-Edwards 2004, Inc. is the principal campaign committee of the Kerry-Edwards Campaign. The committee's address is 10 G Street NE, Suite 710, Washington, D.C., 20002.

29.    Defendant Reed Smith, LLP is a law firm headquartered in Pittsburgh, Pennsylvania. Reed Smith's address is 435 Sixth Avenue, Pittsburgh, Pennsylvania, 15219.

30.    Defendant John Kerry is a United States Senator from Massachusetts and the 2004 Democratic Party candidate for President. Mr. Kerry's address is United States Senate, 304 Russell Building, Third Floor, Washington, D.C., 20510.

## NON-DEFENDANT CO-CONSPIRATORS

31.    Non-defendant co-Conspirator The Ballot Project is a Section 527 organization established on June 2, 2004 to coordinate and finance Defendants' and co-Conspirators' litigation against Nader-Camejo. The organization's address is that of consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

32.    Non-defendant co-Conspirator Service Employees International Union (SEIU) is a labor union with headquarters in Washington, D.C. SEIU's address is 1313 L Street NW, Washington, D.C., 20005.

33.     Non-defendant co-Conspirator America Coming Together (ACT) is a Democratic Section 527 organization, funded in part by SEIU, which organized a campaign of harassment, intimidation and sabotage in an effort to deny Nader-Camejo ballot access. ACT's current address is 1101 Vermont Avenue NW, 9th Floor, Washington, D.C., 20005.

34.     Non-defendant co-Conspirator Jack Corrigan is a lawyer who worked for the DNC and the Kerry-Edwards Campaign to plan and execute Defendants' and co-Conspirators' wrongful litigation against Nader-Camejo. Mr. Corrigan also served as John Kerry's personal liaison to the 2004 Democratic National Convention. Mr. Corrigan's address is 896 Beacon Street, Boston, Massachusetts, 02215.

35.     Non-defendant co-Conspirator Toby Moffett is president of The Ballot Project and a lobbyist with the Livingston Group. Mr. Moffett's address is 499 South Capitol Street SW, Suite 600, Washington, D.C., 20003.

36.     Non-defendant co-Conspirator Elizabeth Holtzman is director of The Ballot Project and a lawyer. Ms. Holtzman's address is 2 Park Avenue, New York, New York, 10016.

37.     Non-defendant co-Conspirator Robert Brandon and his firm Robert Brandon and Associates are consultants to the DNC and other clients. Mr. Brandon's firm housed The Ballot Project in its offices. Mr. Brandon's address is 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

38.     Non-defendant co-Conspirator Mark Brewer is Chair of the Michigan Democratic Party and Vice Chair of the DNC. Mr. Brewer's address is 606 Townsend, Lansing, MI, 48933.

39.     Non-defendant co-Conspirators include the state Democratic Party affiliates of the national Democratic Party who combined and conspired with Defendants to achieve Defendants' unlawful objectives as herein alleged.

40.     Non-defendant co-Conspirators include the law firms and lawyers who combined and conspired with Defendants and who, acting as Defendants' agents, implemented Defendants' illegal scheme in various states nationwide.

41.     Non-defendant co-Conspirator Americans for Jobs is a Section 527 organization established by Timothy Raftis and David W. Jones in 2003 "to accept contributions and make expenditures to influence the election of federal candidates." Americans for Jobs' address is 2000 M Street NW, Suite 800, Washington, D.C., 20036.

42.     Non-defendant co-Conspirator The National Progress Fund is a Section 527 organization established on May 4, 2004 "to engage in election-related activity for the purpose of supporting progressive issues." The organization was officially terminated on December 31, 2005. The National Progress Fund's address was PO Box 57154, Washington, D.C., 20037.

43.     Non-defendant co-Conspirator United Progressives for Victory is a political committee registered on June 16, 2004 and terminated on September 21, 2005. The organization's address is that of DNC consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

44.     Non-defendant co-Conspirator Uniting People for Victory is a Section 527 organization founded by United Progressives for Victory and registered with the IRS on July 21, 2004. The organization's address is that of DNC consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

45.     Non-defendant co-Conspirator Citizens for Responsibility and Ethics in Washington (CREW) is a 501(c)(3) organization that claims to promote "ethics and accountability in government and public life by targeting government officials – regardless of party affiliation – who sacrifice the common good to special interests." The overwhelming majority of individuals and organizations CREW targets, however, are real or perceived competitors of the Democratic Party. CREW's address is 1400 Eye Street NW, Suite 450, Washington, D.C., 20005.

46.     Non-defendant co-Conspirator Kathleen Sullivan is former Chair of the New Hampshire Democratic Party and a DNC official. Ms. Sullivan's address is 95 Market Street, Manchester, NH 03101.

47.     Non-defendant co-Conspirator Daniel Schneider is, on information and belief, an attorney in Washington, D.C. who filed an FEC complaint against the Nader-Camejo Campaign. Mr. Schneider's address is unknown.

48.     Non-defendant co-Conspirators include the officers and affiliates of the Section 527 organizations and 501(c)(3) organization named herein, including: David W. Jones; Tricia Enright; Chris Kofinis; Karl Frisch; Ginny Hunt; John Hlinko; Katie Aulwes; Karen Mulhauser; Helen Hunt; and Melanie Sloane.

49.     Non-defendant co-Conspirators include any other individuals or entities who combined and conspired with Defendants to restrain Plaintiffs' lawful participation as qualified candidates and voters in the 2004 general election.

## FACTUAL ALLEGATIONS

I.    <u>**Defendants Conspired to Abuse Judicial Processes with Intent to Cause Plaintiffs Financial Injury and Other Damages and Violate Their Constitutional Rights.**</u>

13

50.     After the Democrats' defeat in the 2000 election, Defendants and co-Conspirators decided to try to prevent Mr. Nader from running for president if he announced his candidacy in 2004. The Conspirators had already settled on a strategy to accomplish this goal when Mr. Nader made his announcement on February 22, 2004. "Our intent was to drain and distract him," The Ballot Project president Toby Moffett later explained to the *Hartford Courant*. Defendants and co-Conspirators therefore agreed and conspired to launch a nationwide legal assault on Mr. Nader's campaign, which would drain the campaign of money, time and other resources, in a deliberate attempt to use the sheer burden of litigation itself as a means to prevent Mr. Nader from running for public office. Defendants and co-Conspirators reached this agreement with wrongful intent, before they could possibly have any reason to believe litigation against Mr. Nader was warranted or justified, and before there was any colorable or potential legal basis for such litigation.

51.     Having settled on that strategy, the organizers and leaders of the conspiracy met privately to discuss their plans on July 26, 2004, at the Four Seasons Hotel in Boston. DNC consultant Robert Brandon organized the meeting and, on information and belief, the DNC paid for it. Approximately three dozen people attended, including The Ballot Project president Toby Moffett, The Ballot Project director Elizabeth Holtzman and Democratic consultant Stanley Greenberg.

52.     At said Four Seasons meeting, the leaders and organizers of the conspiracy discussed polling, research, and strategy to undermine the Nader-Camejo Campaign in key states where they believed it would adversely affect Democratic candidates John Kerry and John Edwards most, including Arizona, Florida, Iowa,

Michigan, Nevada, Oregon, Pennsylvania, Virginia, West Virginia and Wisconsin. The leaders and organizers of the conspiracy specifically agreed to sue and otherwise obstruct Nader-Camejo not only in these "battleground" states, but also in as many other states as possible. According to Mr. Moffett, the purpose of this litigation was simply "to drain [Mr. Nader] of resources and force him to spend his time and money."

53.    Mr. Moffett had conducted a limited campaign against Mr. Nader's candidacy in the 2000 election. Mr. Moffett considered that effort a failure, however, because Mr. Nader was listed on most state ballots in 2000. "We're not going to let him do it again," Mr. Moffett vowed at the said Four Seasons meeting.

54.    The Democratic National Convention began the same day as the Conspirators' Four Seasons meeting, and was taking place across town at Boston's Fleet Center. The Conspirators planned to use the convention as a platform to introduce their litigation strategy to delegates from state Democratic Parties, and to solicit financial support from major party donors.

55.    The Conspirators prepared a memo for this purpose, which they planned to circulate at the convention. This memo outlined the Conspirators' comprehensive plan of attack against the Nader-Camejo Campaign, which involved not only a nationwide legal assault, but also a communications campaign intended to convince voters not to vote for Nader-Camejo. The memo further stated that Conspirators would coordinate and finance their activities with three 527 organizations they had established. One was The Ballot Project, and the other two were called the National Progress Fund and Uniting People for Victory.

15

56.     The Conspirators distributed their memo to donors and delegates at the convention and discussed the perceived threat of Nader-Camejo's candidacy. They briefed donors and delegates about their litigation plans and solicited contributions to their 527 organizations. The Conspirators also recruited state Democratic Party officials to join their effort, and specifically instructed the officials to bring groundless and abusive lawsuits in their states as part of a nationwide strategy to bankrupt the Nader-Camejo Campaign and force Nader-Camejo from the race. "This guy is still a huge threat," Mr. Moffett said at the convention, in reference to Mr. Nader. "We're just not going to make the same mistake we made in 2000."

57.     Mr. Moffett told New Mexico Democratic Party Chair and DNC official John Wertheim that he should appoint someone to spearhead the effort to keep Nader-Camejo off the ballot in that state. Mr. Wertheim agreed to do so. "This is a central focus of my own duties as chairman," Mr. Wertheim told *The New Mexican*.

58.     At the close of the Democratic convention, on July 29, 2004, Mr. McAuliffe reiterated his claim that "We can't afford to have Ralph Nader in the race." *Business Week* reported Mr. McAuliffe's statement under the headline, "The Dems' Game Plan to Create a Two-Man Race." That "Game Plan," which Defendants jointly planned and executed with their co-Conspirators, was to file groundless and abusive lawsuits and otherwise obstruct the Nader-Camejo Campaign as many times in as many states as possible during the 2004 election.

59.     Eighteen state or local Democratic Parties eventually joined Defendants' and co-Conspirators' conspiracy and either initiated or materially supported unfounded and abusive lawsuits filed against the Nader-Camejo Campaign, or intervened in

proceedings to deny Nader-Camejo ballot access. The state Democratic Parties of Arkansas, Colorado, Florida, Maine, Michigan, Mississippi, Nevada, New Hampshire, Washington and Wisconsin initiated such lawsuits, while the state Democratic Parties of Arizona, Illinois, Iowa, New Mexico, Ohio, and Pennsylvania materially supported such lawsuits filed in their states. In Oregon, state Democratic Party officials intervened in proceedings to deny Nader-Camejo ballot access. In West Virginia, local Democratic Party officials filed a complaint seeking to compel the Secretary of State to refer Nader-Camejo's nomination papers to the Attorney General's office for investigation.

60.    In addition to the state law complaints, Conspirators filed five FEC complaints against the Nader-Camejo Campaign. CREW filed two complaints, Michigan Democratic Party Chair Mark Brewer filed one, New Hampshire Democratic Party Chair Kathleen Sullivan filed one, and District of Columbia-based attorney Daniel Schneider filed Conspirators' fifth FEC complaint.

61.    Of the 24 state court complaints Conspirators filed against Nader-Camejo nationwide, DNC officials filed seven in their own names, including Scott Maddox of Florida, Dorothy Melanson of Maine, Mark Brewer of Michigan, Wayne Dowdy of Mississippi, Kathleen Sullivan of New Hampshire (two) and Paul Berendt of Washington. In addition, DNC official James Edmundson of Oregon intervened in the proceedings filed in that state, and on information and belief, DNC officials Michael Madigan of Illinois and John Wertheim of New Mexico assisted in complaints filed in their states. Finally, DNC official Anna Burger is Secretary-Treasurer of SEIU, which helped execute Defendants' and co-Conspirators' unlawful plans and moved to intervene in proceedings to remove Nader-Camejo from the ballot in Oregon. Thus, on information

and belief, at least ten DNC officials directly participated in the Conspirators' nationwide assault of unfounded and abusive litigation.

62.    Furthermore, according to the sworn testimony of former Maine Democratic Party Chair and DNC official Dorothy Melanson, unidentified DNC officials specifically directed state party officials to initiate litigation against Nader-Camejo. The DNC also hired and paid for several state parties' lawyers and, on information and belief, coordinated with The Ballot Project to secure *pro bono* counsel in other states. High-level DNC staff developed and coordinated the conspiracy's nationwide litigation strategy, while rank-and-file DNC staff helped prepare the Conspirators' complaints.

63.    For example, an email DNC employee Caroline Adler sent to DNC staff contained an attachment entitled "Script for Nader Petition Signers", which DNC employees used to help Conspirators manufacture evidence upon which to challenge Nader-Camejo's nomination papers. The electronic document's properties indicate that DNC and Kerry-Edwards Campaign consultant Jack Corrigan authored this document. Ms. Adler's bio on her former employer's website states that she "worked in the CEO's office of the Democratic National Convention in Boston and then with the legal team of the Kerry campaign in Washington, D.C."

64.    The Kerry-Edwards Campaign also joined the conspiracy, coordinating with lawyers and directly participating in the conspiracy's litigation. For example, an email from Kerry-Edwards Campaign deputy national director for northern New England Judy Reardon indicates that Ms. Reardon herself drafted one of the Conspirators' complaints and coordinated with the Democratic Party officials and attorneys who filed it, including New Hampshire Democratic Party Chair Kathleen Sullivan. In addition,

several attorneys affiliated with Lawyers for Kerry, a group recruited by the Kerry-Edwards Campaign "to monitor elections and enforce the law," represented parties that sued Nader-Camejo in New Mexico, Ohio and Pennsylvania. These Lawyers for Kerry-affiliated attorneys are: Eric Sedillo Jeffries (NM); John Gilligan (OH); Gregory Corbett (OH); and William S. Gordon (PA). The Lawyers for Kerry sign-up form on Defendant Kerry-Edwards 2004, Inc.'s website states, "We may provide your contact information to the Democratic National Committee for ballot protection efforts."

65.    The Ballot Project directed the conspiracy in conjunction with the DNC and the Kerry-Edwards Campaign, all headquartered in the District of Columbia, and coordinated with state Democratic Parties to recruit attorneys to provide counsel for the conspiracy's nationwide legal assault. As Mr. Moffett told the *New York Times*, "We're doing everything we can to facilitate lawyers in over 20 states."

66.    At least 95 lawyers from 53 law firms eventually joined the litigation. The DNC, state Democratic Parties and The Ballot Project collectively paid these firms nearly $1 million, while their co-Conspirator bar members contributed in excess of $2 million in *pro bono* legal services.

67.    Despite their massive expenditure of resources and their campaigns of harassment, intimidation and sabotage, the Conspirators eventually lost the great majority of lawsuits they filed. The FEC also dismissed all five complaints Conspirators filed. The Conspirator's intent, however, was not to vindicate valid claims, but to use the sheer burden of litigation itself as a means to bankrupt and disrupt the Nader-Camejo Campaign, to keep Nader-Camejo off the ballot, and to suppress the candidates' speech and the Plaintiff-voters' rights of association. As Mr. Moffett admitted to the *Washington*

*Post* in August 2004, "We wanted to neutralize his campaign by forcing him to spend money and resources defending these things, but much to our astonishment we've actually been more successful than we thought we'd be in stopping him from getting on at all."

68.     After the 2004 election, Mr. Moffett reaffirmed Defendants' and co-Conspirators' unlawful intent. "We had a role in the ballot challenges," Mr. Moffett told *The Guardian UK* in December 2004. "We distracted him and drained him of resources. I'd be less than honest if I said it was all about the law. It was about stopping Bush from getting elected."

69.     During the election, however, Defendants and co-Conspirators denied and fraudulently concealed their involvement in Conspirators' groundless and abusive litigation against Nader-Camejo. In September 2004, for example, DNC spokesman Jano Cabrera told the Associated Press, "Our state parties made the decision to make sure that if Ralph Nader wanted to get on the ballot, that he was playing by the rules." Mr. Cabrera also specifically denied that the DNC was funding the state parties' litigation. In fact, FEC records now confirm, the DNC hired several of the state parties' law firms.

70.     John Kerry likewise denied involvement in Conspirators' wrongful litigation. "I respect [Mr. Nader]. I'm not going to attack him in any way," Mr. Kerry told the Associated Press in April 2004. "I'm just going to try to talk to his people and point out that we've got to beat George Bush. And I hope that by the end of this race I can make it unnecessary for people to feel they need to vote for someone else." In May 2004, Mr. Kerry reportedly told the Associated Press that he respected other Democrats' efforts to get Nader out of the race, but that he would never ask another candidate to abandon an

election bid. In fact, however, despite Mr. Kerry's prior disavowals, the Kerry-Edwards Campaign directly participated in at least one lawsuit Conspirators filed against Nader-Camejo, and Lawyers for Kerry-affiliated attorneys participated in at least three more. Moreover, on information and belief, the Kerry-Edwards Campaign coordinated such efforts with the DNC through Jack Corrigan, Caroline Adler and other employees with ties to both organizations.

71.    Defendants' conspiracy against the Nader-Camejo Campaign in 2004 was unprecedented in its magnitude and scope. The DNC, the Kerry-Edwards Campaign, The Ballot Project, 18 state or local Democratic Parties, at least 95 lawyers from 53 law firms, and hundreds if not thousands of Democratic Party operatives conspired with the specific intent of using legal and administrative processes to bankrupt the Nader-Camejo Campaign and prevent Nader-Camejo from running for President and Vice President, thereby denying millions of Americans the choice of voting for them. Accordingly, Defendants unlawfully conspired to abuse legal and administrative processes to achieve four distinct but related improper purposes:

i.    Defendants unlawfully conspired to cause financial injury and other damages to the Nader-Camejo 2004 presidential campaign;

ii.    Defendants unlawfully conspired to cause financial injury and other damages to Mr. Nader and Mr. Camejo personally;

iii.    Defendants unlawfully conspired with state actors and acted under color of state law to violate Nader-Camejo's constitutional rights by preventing them from appearing on the ballot as candidates in the 2004 presidential election;

iv.    Defendants unlawfully conspired with state actors and acted under color of state law to violate Plaintiff-voters' constitutional rights, and those of others similarly situated, by denying voters their free choice of candidates in the 2004 presidential election.

21

II.     **Defendants or Their co-Conspirators Engaged in Acts of Harassment, Intimidation and Sabotage in Furtherance of Their Conspiracy.**

72.     The Conspirators knew that litigation alone would be insufficient to prevent Nader-Camejo from gaining ballot access in certain states. Therefore, to support their legal assault, Conspirators in these states engaged in acts of harassment, intimidation and sabotage, often under fraudulent or false pretenses. These acts were specifically intended to prevent Nader-Camejo from complying with state election laws, and to manufacture legal grounds for the Conspirators' otherwise baseless claims.

73.     In Ohio, where Mr. Nader received 117,857 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by collecting 5,000 signatures, Conspirators orchestrated a massive campaign of harassment and intimidation to prevent Nader-Camejo petitioners from collecting signatures. Defendants or co-Conspirators hired private investigators to visit petitioners' homes and warn them that they were the subject of a "background check" the investigators were conducting. Conspirators' lawyers also attempted to subpoena 27 different petitioners, and repeatedly called them at home to demand their compliance. The subpoenas' demands were so unreasonable and burdensome that compliance would have prevented petitioners from doing anything else – including collecting signatures. Specifically, the subpoenas demanded that petitioners on short notice report to the offices of law firms throughout the state and produce:

> (1) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, and part-petitions, relating to the obtaining of signatures from Ohio residents for part-petitions and/or the Statement of Candidacy and Nominating Petition filed by Ralph Nader;

> (2) All documents, including but not limited to correspondence, memoranda, notes, and/or electronic mail, relating to communications with: any persons affiliated with Ralph Nader; and any persons acting as solicitors to obtain

signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio;

(3) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, contracts, bank checks, and bank account statements, relating to your being paid for obtaining signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio;

(4) All documents, including but not limited to, voter registration cards, drivers' licenses, bank account statements, leases, deeds, property tax assessments, and utility bills, evidencing your residence since January 1, 2000; and

(5) All documents, including but not limited to, voter registration cards, evidencing the states in which you have been registered to vote."

74.    In Oregon, where Mr. Nader received 77,357 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by holding a nominating convention with 1,000 attendees, Conspirators openly admitted their intention to interfere. "If we think it gets to a point where we need to step in and mobilize to make sure he doesn't get on the ballot, then we will," a spokesperson for America Coming Together (ACT), a Democratic 527 founded by SEIU, told CBS News in April 2004. ACT, SEIU, Oregon Democratic Party members and at least one local Oregon Democratic Party official subsequently engaged in a coordinated effort to disrupt two Nader-Camejo nominating conventions, held in April and in June, causing them to fail. When Nader-Camejo later tried to gain ballot access by collecting signatures on nominating petitions, ACT and SEIU organized teams of operatives to sabotage the petitions under false pretenses, by deliberately signing them in the wrong place, thereby invalidating the entire sheet. Conspirators then resorted to the same harassment and intimidation tactics they employed in Ohio. Private detectives visited petitioners' homes and threatened them with jail time, while their co-Conspirator attorneys sent misleading letters falsely threatening petitioners with

"conviction of a felony with a fine of up to $100,000 or prison for up to five years" if they submitted signatures that were later invalidated.

75.     In Pennsylvania, where Mr. Nader received 103,392 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by submitting 25,697 signatures, on information and belief Conspirators sabotaged Nader-Camejo's petitions under false pretenses by signing thousands of fake names. Nader-Camejo petitioners expunged approximately 7,000 such names, but did not detect a small number (687 or 1.3% of the total) among the 51,273 signatures they submitted. The Conspirators later used this manufactured evidence as a basis for their lawsuit and subsequent demand for $81,102.19 in litigation costs.

76.     The Conspirators' campaign of harassment, intimidation and sabotage was decisive to the success of their litigation against Nader-Camejo. The Conspirators won their lawsuits in Ohio, Oregon and Pennsylvania, and Illinois, but lost in every other state. Nader-Camejo also withdrew in Arizona, where the Conspirators sued first, due to the prohibitive cost of defending the litigation. Mr. Nader was on the ballot in each of these states as a candidate in the 2000 presidential election, and Nader-Camejo would have been in 2004 but for the Conspirators' unlawful interference.

III.    **Defendants and Co-Conspirators Acted in Concert with Officials and Employees of the State of Pennsylvania to Remove Nader-Camejo From Pennsylvania's Ballot.**

77.     On August 9, 2004, Philadelphia resident Ralph Dade filed a class action complaint against the Nader-Camejo Campaign in Philadelphia Court of Common Pleas, alleging that he and several others were owed approximately $200 each for signatures

they had collected for the campaign. The complaint identified Louis Agre, a Philadelphia Democratic Party Ward leader, and Thomas Martin as attorneys for the plaintiffs. Nader-Camejo disputed the claim on the ground that plaintiffs had submitted invalid signatures, and the complaint was dismissed.

78.     On August 9, 2004, Linda S. Serody, Roderick J. Sweets, Ronald Bergman, Richard Trinclisti, Terry Trinclisti, Bernie Cohen-Scott, Donald G. Brown and Julia O'Connell, registered Democrats in Pennsylvania, filed a second complaint in the Pennsylvania Commonwealth Court, challenging Nader-Camejo's nomination papers under 25 PS § 2937. The complaint identified Gregory Harvey, another Philadelphia Democratic Party Ward leader, and Efrem Grail, Daniel Booker, Cynthia Kernick, Brian A. Gordon, Reed Smith LLP, Montgomery McCracken, Walker and Rhoads LLP, and the law offices of Brian A. Gordon as attorneys for the plaintiffs.

79.     The complaint challenged approximately 35,000 of the 51,273 signatures on Nader-Camejo's nominating petition on technical grounds, and alleged numerous procedural grounds for disqualifying Nader-Camejo from Pennsylvania's ballot. The Pennsylvania plaintiffs' attorneys prepared the complaint in cooperation with Pennsylvania Democratic Party leaders, including state House Minority Leader Bill DeWeese and former Democratic Whip Mike Veon, and with support from approximately 170 Democratic Party operatives Mr. DeWeese and Mr. Veon recruited.

80.     In December 2007, an ongoing investigation by Pennsylvania State Attorney General Thomas Corbett revealed emails and other documents indicating that many of the operatives that Mr. DeWeese and Mr. Veon recruited to join Defendants' conspiracy were actually paid employees of the state of Pennsylvania, who received

25

taxpayer-funded compensation for their effort to remove Nader-Camejo from Pennsylvania's ballot. According to the *Pittsburgh Post-Gazette*:

> E-mail messages exchanged by top aides in the Democratic caucus starting in 2004 make clear that taxpayer-funded bonuses were given to legislative employees for their work on election campaigns.

> The messages, obtained by the Post-Gazette, are a key component in an investigation by Attorney General Tom Corbett into the bonuses and whether they constituted an illegal use of state money for political work.

> In startlingly blunt language, a group of aides, at points working under the direction of then-House Minority Whip Michael Veon, D-Beaver, rated the political work of state employees, sometimes adjusting the amounts of the bonuses based on time they spent in the field or, in one instance, in getting presidential candidate Ralph Nader off the Pennsylvania ballot. …

> The records obtained by the Post-Gazette show that in 2004 managers working inside the Democratic caucus based year-end payroll bonuses on time spent working political campaigns. A year later, the same group employed a spreadsheet that logged political work performed by the employees and used that data in deciding pay bonus amounts.

> A trio of spreadsheets attached to an Aug. 31, 2005 e-mail by Mr. Webb, who kept track of volunteer hours, ranked caucus employees as "rock stars," "good," and "OK" and assigned bonuses according to the rankings. In another e-mail, dated Nov. 22, 2004, a House aide advised Mr. Veon that a list of year-end bonuses was based on "performance during session" and "Outside activities" which included election work that encompassed, "specials, general, Nader effort."

> The "Nader effort" is an apparent reference to a Democratic project to challenge the ballot petitions of the independent presidential candidate, who they feared would peel away votes from Democratic nominee Sen. John F. Kerry. Mr. Nader's ballots were later thrown out as a result of the petition challenge and the state Supreme Court later ordered Mr. Nader to pay the Democratic party's legal costs.

> The e-mail messages also show apparent widespread use of the Democratic caucus employees, offices and computer systems for political work.

81.    On numerous occasions before, during and after the litigation, Mr. DeWeese, Mr. Veon and other party officials stated that the purpose of their lawsuit was to help John Kerry win the election. In July 2004, before Plaintiffs filed their complaint,

Pennsylvania Democratic Party Executive Director Don Morabito told the *Philadelphia City Paper*, "we want to make sure" Nader-Camejo doesn't detract votes from Mr. Kerry. On August 2, 2004, Mr. DeWeese told the *Pittsburgh Post-Gazette*, "Working with the AFL-CIO, we will do everything humanly possible to fight [Nader-Camejo]….You don't need a Ph.D in mathematics to understand that 100 percent of the vote [Nader-Camejo] gets will be skimmed from Senator Kerry's total." On August 9, 2004, the day plaintiffs filed their complaint, Mr. DeWeese told the *Post-Gazette*, "We are being completely open about our intentions. Our goal is to help elect John Kerry the next President of the United States." After the election, Mr. DeWeese and Mr. Veon issued a press release stating, "our efforts to strike [Nader-Camejo] from the ballot proved successful for John Kerry in Pennsylvania." Ex. B ("DeWeese/Veon weigh Nader factor," Nov. 5, 2004).

82.     On August 30, 2004, the Pennsylvania Commonwealth Court set aside Nader-Camejo's nomination papers and ordered their names stricken from the Pennsylvania ballot, because they were running as independent candidates in Pennsylvania and as candidates of a political party in other states.

83.     On September 2, 2004, Nader-Camejo appealed to the Pennsylvania Supreme Court. The Pennsylvania Supreme Court reversed and vacated the Commonwealth Court's order on September 20, 2004, and remanded to the Commonwealth Court for hearings. The Commonwealth Court immediately scheduled hearings in approximately 48 counties and 13 courtrooms; seven hearings were scheduled simultaneously in six different counties, with two hearings in Philadelphia.

84.     On September 22, 2004, Nader-Camejo's attorneys notified the court that they lacked staff to attend voter review hearings in 48 counties, and that they lacked

attorneys to appear in 13 different courtrooms, because Defendants' nationwide legal assault had severely depleted the campaign's resources. Nader-Camejo's attorneys therefore requested the court to hold hearings in only one or two courtrooms. The Commonwealth Court rejected this request on September 23, 2004. Several hearings thus proceeded without counsel present on behalf of Nader-Camejo.

85.     To prepare for these hearings, Defendants simply recruited more attorneys and, on information and belief, Pennsylvania state employees. On August 19, 2004, attorney Daniel Booker of Reed Smith told the *New York Times* that "eight to ten lawyers in his firm were working on the case, 80 hours each a week for two weeks, and could end up working six more weeks." Attorney Booker indicated that his firm had also taken on more than 100 "volunteers" to work on the case. According to *American Lawyer* magazine, these "volunteers" worked on the case "holed up in Reed Smith conference rooms." On information and belief, such "volunteers" were actually employees of the state of Pennsylvania, who received taxpayer-funded compensation for their joint effort, in concert with Defendants and co-Conspirators, to remove Nader-Camejo from Pennsylvania's ballot.

86.     Reed Smith eventually dedicated even more resources to Defendants' effort than Attorney Booker previously estimated: Reed Smith attorneys Ira Lefton, Christopher K. Walters, Milind Shah, Jeremy Feinstein, Mark Tamburi, James Doerfler, John McIntyre, Lisa Campoli, Barbara (Kiely) Hager, Andrea (Simonson) Weingarten, Jeffrey Bresch, Kim Watterson, Melissa Oretsky and James Williamson joined the litigation, for a total of at least 17 Reed Smith attorneys. On October 1, 2004, *American*

*Lawyer* reported that these attorneys had logged 1,300 *pro bono* hours on the case. "And that's just the pre-election challenge," the magazine reported.

87.    On October 13, 2004, following three weeks of hearings in counties across Pennsylvania, Commonwealth Court Judge James Gardner Colins, who was elected to the bench as a Democrat, issued an opinion invalidating more than 30,000 of Nader-Camejo's signatures on technical grounds. For example, approximately 9,000 signatures were invalidated because qualified electors – who could vote – had not yet registered on the day they signed Nader-Camejo's nomination petition (even though Pennsylvania law specifies no such requirement). Another 6,000 signatures were invalidated because voters' current addresses didn't match their registered addresses. Thus, after striking a total of 32,455 signatures on these and other technical grounds, Judge Colins concluded that only 18,818 signatures were valid, and set aside Nader-Camejo's nomination papers.

88.    On October 14, 2004, Judge Colins issued an order directing Mr. Nader and Mr. Camejo personally to pay all litigation costs arising from plaintiffs' challenge. No state in the nation – including Pennsylvania – has ever ordered candidates to pay such costs after defending their right to ballot access.

89.    On October 19, 2004, a divided Pennsylvania Supreme Court affirmed the Commonwealth Court's order removing Nader-Camejo from the Pennsylvania ballot. The United States Supreme Court denied Nader-Camejo's petition for a writ of certiorari on October 23, 2004. Nader-Camejo did not appear on the Pennsylvania ballot as candidates in the 2004 presidential election.

90.    On December 3, 2004, attorneys Efrem Grail, Daniel Booker and Cynthia Kernick of Reed Smith, Gregory Harvey of Montgomery, McCracken, Walker and Rhoads, and Brian A. Gordon, a solo practitioner, submitted a bill of costs to the Commonwealth Court of Pennsylvania in the amount of $81,102.19. The attorneys claimed that the bill "is true and correct and accurately reflects costs incurred by [plaintiffs]." In fact, however, the plaintiffs did not incur any costs, being nominal parties Conspirators recruited to sue the Nader-Camejo Campaign. As the true party in interest seeking to collect the costs, Reed Smith nevertheless submitted its bill on the plaintiffs' behalf, claiming "Justice requires that this Court award [plaintiffs] the costs incurred." Reed Smith's attorneys never informed the Pennsylvania Commonwealth Court that Defendant DNC had already paid the firm $136,142, nor did they clarify or correct their many public claims to be working on the case pro bono. For example, on November 2, 2004, the *Legal Intelligencer* reported:

> The so-called "objectors" – registered voters named in the case caption – received logistical support from the state House Democratic committee in organizing volunteers. [Attorney] Booker said his friend, state Rep. H. William DeWeese, D-Greene, Democratic leader in the state House of Representatives, knew of the project and thought it a valuable one. But Reed Smith and other "objector" attorneys said neither the Democratic Party nor anyone else paid them. While they didn't take leaves of absence from their firms, the lawyers didn't bill any client for the thousands of hours they spent together working on the case.

91.    Reed Smith lawyers also falsely claimed, in the brief they filed before the Pennsylvania Supreme Court in support of their bill of costs, that Nader-Camejo's nomination papers included "literally thousands of forged petition signatures." In fact, however, Judge Colins counted only 687 out of 51,273 signatures (or 1.3 percent) as "forgeries," which were submitted by people engaged in mischief or sabotage. Pennsylvania Supreme Court Justice Thomas Saylor previously emphasized this fact in a

dissenting opinion, in an effort to correct prior distortions of the record. Justice Saylor also noted that the record contained "no evidence" to support Reed Smith's allegations of fraud by anyone associated with the Nader-Camejo Campaign.

92.    To the contrary, Nader-Camejo Campaign staff voluntarily expunged approximately 7,000 apparently fictitious names from Nader-Camejo's nomination petitions, in an effort to lessen the Commonwealth Court's burden. On information and belief, Conspirators including Ralph Dade and the other plaintiffs in the dismissed class action complaint signed these names under false pretenses, in a deliberate attempt to sabotage Nader-Camejo's petitions and manufacture evidence to support their Commonwealth Court complaint.

93.    On January 14, 2005, Judge Colins entered an order approving the bill of costs without opinion, despite the fact that the record contains "no evidence" – much less a finding – of wrongdoing by anyone associated with the Nader-Camejo Campaign. A divided Pennsylvania Supreme Court nevertheless affirmed without citing a single case as precedent for the order, thus upholding what appears to be the first post-election penalty assessed against a candidate in the history of American jurisprudence.

94.    During the proceedings before the Pennsylvania Supreme Court, Reed Smith never disclosed several ties the firm had with Justices of the court, which give rise to an obvious appearance of impropriety that would have provided grounds for Nader-Camejo to seek the Justices' disqualification. Specifically:

- Reed Smith represented Chief Justice Ralph Cappy as his defense counsel in an ethics investigation that was ongoing while this case was before the Pennsylvania Supreme Court;

- Reed Smith and Montgomery, McCracken, Walker and Rhoads gave $10,000 in campaign contributions ($5,000 from each firm) to Justice Sandra Newman,

who authored the majority opinion, in November 2005, while this case was before the Pennsylvania Supreme Court, and Reed Smith gave Justice Newman another $6,100 during her previous election;

- Reed Smith extended an open-ended offer of employment to Justice Ronald Castille in 1985, which he accepted in 1991 and served as of counsel at Reed Smith for nearly three years immediately before he joined the Pennsylvania Supreme Court in 1993;

- Reed Smith and Montgomery, McCracken, Walker and Rhoads gave at least $67,900 in campaign contributions to four out of five Justices who voted to affirm judgment in Reed Smith's favor, and to one Justice who concurred and dissented; at least $58,900 of this total came from Reed Smith and its lawyers.

95.    The appearance of impropriety arising from these ties between Reed Smith and the Justices of the Pennsylvania Supreme Court is manifest. In this case, moreover, the appearance of impropriety is compounded by Reed Smith's status not merely as plaintiffs' counsel, but also as the true party in interest seeking to collect a money judgment in the proceedings. Nevertheless, at no time during these proceedings did Reed Smith disclose its ties with four out of five Justices who voted to affirm the unprecedented $81,102.19 judgment in Reed Smith's favor.

96.    By contrast, the lone dissenter, Justice Thomas Saylor, has no apparent ties to Reed Smith. Justice Saylor dissented on the ground that Pennsylvania law – like the laws of every other state in the nation – simply does not authorize a taxation of costs against candidates who defend their nomination papers, but only against parties who challenge candidates' nomination papers.

97.    Reed Smith's concealment of its ties with the Pennsylvania Supreme Court Justices thus constitutes a fraud upon the court, because the firm induced its judgment in a manner that deprived Nader-Camejo of the opportunity to move for the

Justices' disqualification, in violation of basic principles of fairness, impartiality and due process.

98.    Even while concealing their own fraud, Reed Smith's attorneys repeatedly slandered Mr. Nader in the news media with accusations of fraud, and libeled him on the *pro bono* page of their website, where they published the following defamatory statement:

> Our intensive effort to remove Ralph Nader from the 2004 Presidential ballot in Pennsylvania won national headlines, with the courts upholding our claim that 30,000 signatures supporting Mr. Nader were forged or otherwise fraudulent.

99.    On March 8, 2007, Mr. Nader wrote to the partners of Reed Smith to protest this ongoing defamation, as well as the fraud and misrepresentation by which the firm obtained its judgment. Mr. Nader had not yet discovered that the judgment itself was tainted by Reed Smith's undisclosed ties with the Pennsylvania Supreme Court Justices, nor that the judgment appears to be the direct consequence of a criminal conspiracy. Reed Smith immediately removed the libelous language from its website, but otherwise did not respond.

100.    Neither Mr. Nader nor Mr. Camejo discovered Reed Smith's ties to the Pennsylvania Supreme Court Justices until September 2007. Thus, prior to that time, Reed Smith induced Mr. Camejo to pay the firm $20,000 to settle its claim, without disclosing the fraud upon the court the firm had perpetrated. Mr. Nader did not settle. Reed Smith therefore commenced attachment proceedings against his personal accounts.

101.    On July 13, 2007, Reed Smith served Amalgamated Bank with an Application for Writ of Attachment, filed with the Superior Court of the District of Columbia, stating that "any money, property or credits of Ralph Nader in Amalgamated

Bank's possession are hereby seized by this Writ of Attachment." In fact, however, the Superior Court had entered no such writ. Amalgamated Bank nevertheless froze Mr. Nader's accounts on July 13, 2007.

102.    On July 17, 2007, the Superior Court of the District of Columbia entered writs of attachment against Amalgamated Bank, M&T Bank and PNC Bank as garnishees of Mr. Nader's accounts. Pursuant to these writs, Amalgamated Bank froze $27,420.16, and PNC Bank froze $34,218.29, for a total of $61,638.45. Reed Smith filed a motion to condemn these funds on August 28, 2007, which was denied, and another on September 25, 2007. On October 25, 2007, the Superior Court of the District of Columbia entered judgment in Reed Smith's favor. On November 7, 2007, after discovering Reed Smith's misconduct, Mr. Nader filed a motion to vacate the judgment, which is pending.

103.    Reed Smith attorneys repeatedly told the news media in 2004 that the Democratic Party had not retained or paid Reed Smith, thereby fraudulently concealing the firm's involvement in Defendants' conspiracy. In fact, however, the DNC retained Reed Smith and paid the firm $136,142 for "political consulting" and "legal consulting" during the 2004 general election. In addition, Reed Smith has represented John Kerry, Teresa Heinz Kerry, the HJ Heinz Corporation and the Heinz Family Foundation. Reed Smith most recently defended Senator Kerry in a civil lawsuit for defamation, which arose out of the 2004 election and was decided in August 2006. Furthermore, "Heinz is still a major and active client," *Legal Business* reported in December 2006/January 2007.

104.    On August 3, 2004, The Ballot Project paid attorney Gregory Harvey's firm Montgomery, McCracken, Walker and Rhoads $6,000 for reimbursed costs. In October and November of 2004, the DNC paid Reed Smith $136,142 in legal and

34

political consulting fees. In addition, in 2004 the DNC transferred at least $182,825 to the Pennsylvania Democratic Party, and at least $5,132,220 to Pennsylvania Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### IV.    Defendants' Conspiracy to Deny Nader-Camejo Ballot Access in Pennsylvania Was Funded By the State and Executed By No Fewer Than 50 State Employees.

105.    The Grand Jury presentment announced by Pennsylvania Attorney General Corbett on July 10, 2008 includes extensive findings of fact and conclusions that support Plaintiffs' allegations, and which specifically indicate that Defendants' effort to deny Nader-Camejo ballot access in Pennsylvania was funded by the state of Pennsylvania and executed by no fewer than 50 state employees, who were working in their official capacity, and making widespread use of state resources. Plaintiffs thus incorporate and adopt the presentment herein, and particularly the following allegations:

> Over the course of a number of years, former Representative Mike Veon and others, some named herein and others yet un-named, engaged in a concerted pattern of illegal conduct in which millions of dollars in taxpayer funds and resources were misdirected to campaign efforts. Ex. A at 1.

> Many…former staffers/employees provided sworn testimony before the Grand Jury, wherein they described a consistent culture of employing taxpayer funding and resources for campaign purposes. Campaign work was simply expected as part of one's employment…. Ex. A at 2.

> Michael Manzo, chief of staff to the Minority Leader of the House Democratic Caucus [Bill DeWeese], …acted directly in concert with Veon's illegal use of taxpayer funds and resources. Ex. A at 2.

> [T]he award of bonuses was but a single facet of the concerted effort to employ taxpayer funds and resources for campaign purposes. The actual diversion of resources and employees to campaigns and political endeavors was of no less prominence. The subversion of taxpayer funds and resources was extensive and ranged from the obvious – directing public employees to

conduct campaign work while paid by the taxpayers, to the subtle – issuing taxpayer paid contracts for campaign work disguised as legitimate legislative work. Ex. A at 3.

It was clearly understood by all these employees that the campaign work in question was part of their public employment and not something to relegate to after work hours or personal time. …[T]he "volunteer" list was specifically designed to act as the foundation for an "incentive" structure to entice Caucus employees to commit greater efforts and time on political endeavors and campaigns. Ex. A at 4.

This 2004 "volunteer" list chronicled the efforts of 458 Caucus employees who worked on campaigns or political endeavors. There is not a single entry on this list, or any of the subsequent lists over the following years, for legitimate legislative work or constituent service. Indeed…such work was completely irrelevant to the purpose of the list, or to those who directed its employment. Ex. A at 5.

[W]hile there were many elections at play in any given election year, only selected "volunteer" efforts would be tracked on the list. Veon and Manzo were the primary directors of those efforts worthy of notation on the list. …[T]his was designed to control and specifically direct the "volunteer" efforts to those endeavors deemed most important. …[E]mails regularly sent from Manzo/Veon and/or the House Democratic Campaign Committee, ask[ed] for volunteers on the specific endeavors and direct[ed] those Volunteers to coordinate and report their efforts through [state employee] Eric Webb. In this manner, it would become clear to Caucus employees which political endeavors and campaign work were likely to result in an incentive. Ex. A at 5.

Following the 2004 general election in November…Webb and many others received bonus checks and it became very clear that the people on the list had, indeed, been rewarded. Ex. A at 5.

In a series of emails commencing on November 22, 2004, entitled "Caucus Bonus"… Veon specifically points out that the Caucus bonuses in question are not the Christmas bonuses and are to award those who performed extra work on campaign efforts. Ex. A at 5-6.

In another series of emails…Manzo, under the subject "bonus", writes to Mike Veon, [Veon staffer] Brett Cott and [chief counsel to House Democratic Whip] Jeff Foreman:

> "This is a comprehensive list of suggested year end bonuses. It is a compellation of thoughts between Jeff, Brett and I and is based upon several factors.
>> 1. Performance during session (sine die, gaming, budget, etc.)

2.  Outside activities (specials, general, Nader effort)." Ex. A at 6.

[A]fter election day on November 2, 2004, Eric Webb was asked by Mike Manzo, to forward, from his volunteer list, the names of those who had provided the most valuable assistance on campaigns. Eric Webb prepared a table of [88 state employees] he described as "superstars" and forwarded it to Manzo and Veon. This table listed:… whether [the employees] assisted on the challenge of Ralph Nader's petitions to be placed on the Pennsylvania ballot for the Presidential election. Ex. A at 7.

The vast majority of the bonus checks, issued for campaign work, were delivered from the Pennsylvania Treasury…on or about December 16, 2004. … . A total of $188,800.00 in taxpayer funded bonuses was issued to these individuals as a reward for the conduct of political endeavors and campaign work. Ex. A at 8.

[A memo from Mr. DeWeese and Mr. Veon to bonus recipients dated September 27, 2005 states] "*we cannot stress strongly enough the need for you* not *to discuss this with any other staff person or Member.*" Ex. A at 12.

[F]ollowing the public disclosure of the bonuses…Webb…received an email from [director of staffing and administration for the House Democratic Caucus] Scott Brubaker asking him to come to Brubaker's office. When Webb arrived, Brubaker asked him if he still had the list information. When Webb responded in the affirmative, Brubaker told him to "get rid of it because there may be discovery." Brubaker wasn't the only one to approach Webb about the list. He testified that [executive director of the House Democratic Policy Committee] Rachel Manzo also advised him to do as she had and get rid of the list. Webb did attempt to delete and destroy his copies of the list. However, agents of the Office of Attorney General's Computer Forensics Unit were able to successfully recover the lists. Ex. A at 26.

The campaign benefits derived from the bonus "incentive scheme", by no means constituted the only illegal use of taxpayer resources for campaign purposes. The Grand Jury found a great many other acts, schemes and attempts to use taxpayer resources for illegal purposes. Ex. A at 26.

Every former member of Mike Veon's capitol office, who testified before the Grand Jury, identified a culture wherein no distinction was made between campaign and legislative work. Karen Steiner testified that it was clear "from the interview on" that campaign work would be part of your job. Melissa Lewis testified that employees were simply required to help on campaign work. She stated that the culture was to use the state to pay for as much campaign work as possible. … Consistent with the above descriptions, the Grand Jury has discovered and reviewed an extraordinary history, dating back

37

many years, of consistent abuses of taxpayer resources by Representative Veon and his staff. Ex. A at 28.

[T]here was no separation between legislative and campaign work. Ex. A at 29.

[I]n 2004 and 2005, there was no effort to…separate the hours spent on campaign work or to take time off from legislative pay for those hours. Ex. A at 30.

Veon, Foreman and Cott could…direct…employees to "volunteer" for work on chosen political campaigns. These employees would have accumulated days or weeks of phony comp time hours, so they could spend time away from their desks and still be paid their legislative salaries. … The underlying rationale was the following: for a candidate to hire ten, fifty, or a hundred campaign workers, for even a week, would be an expensive undertaking. But if those campaign workers could be paid by another entity, and put to work for days, weeks, or even months, then the ability of a candidate to campaign would not be limited by his campaign budget. In this case, the campaign workers were legislative employees and they would be paid their regular legislative salaries while they did campaign work. By implementing this system, Veon could make certain that the legislative employees in his office would continue to be available as political campaign workers at no cost to the political candidates. Thus, Veon had at his disposal a stockpile of political campaign workers, paid for by the taxpayers. Ex. A at 31-32.

[E]mployees and resources of the House Democrat Caucus historically and routinely were utilized to conduct petition challenges against candidates who were opponents of Caucus incumbents or the Democratic Party. Meetings with employees regarding petition challenges, and the participation of Caucus employees therein, were typically conducted by Brett Cott and Michael Manzo. At the meetings, the employees would receive instructions as to how to review petitions for improprieties. The employees would conduct reviews during regular working hours at their Caucus workplaces, utilizing their Caucus computers to research information on individuals whose names appeared as signators on the petitions, through the Constituent Tracking Service ("CTS"), a program which was designed and intended for legitimate legislative use, and which included voter registration information. The Caucus computers were further utilized to compile and transmit the information which would be used to challenge the signatures or petition pages. The Caucus employees were not required to, and did not, take leave for the time spent during their regular work hours on such endeavors. The two most outstanding examples of misappropriation of taxpayer resources in petition challenges were found in the challenges to the candidacies of Ralph Nader, for President of the United States in 2004, and Carl Romanelli, for the United States Senate in 2006. Ex. A at 54-55.

It was generally assumed, in Democratic Party circles, that Nader's appearance on the ballot would be detrimental to Democratic Presidential Candidate John Kerry….[T]he Caucus quest to remove Nader from the ballot began before his petitions were even filed…. [A] veritable army of Caucus staffers was enlisted. The petition pages were divided among the staffers in the Capitol complex, the members of Veon's Beaver Falls District Office staff, and a law firm which was ultimately involved in filing the challenge. Manzo directed the day-to-day operation, with assistance from Jeff Foreman, and appointed a staffer who, along with Melissa Lewis from Veon's District Office, coordinated the dissemination of materials and information to the aforementioned law firm. Ex. A at 55.

As many as fifty Caucus staff members participated in the challenge effort, and contributed a staggering number of man-hours. As [one employee] stated…referring to his fellow staffers, "Everybody was working on this." It was virtually a Caucus-wide endeavor. Many of the Caucus employees spent an entire week on it. Melissa Lewis, along with two other members of Veon's District Office, even drove boxes of materials necessary for the challenge filing to Harrisburg, where they were delivered to the challenge attorney. Since the work was being done in Caucus offices, the tradition of not taking leave was, almost invariably, honored. None of the aforementioned supervisors who were directing the operation ever requested or instructed any of the staffers to take leave. Ex. A at 56.

Veon lauded the Nader challenge efforts and result in an October 13, 2004 email addressed to…[his] 22-member Caucus staff. In that email, Veon stated:

> "FYI… great job by our staff! This would never ever have been successful without your work. You have given John Kerry an even better opportunity to win this state… one of the most 5 [*sic*] important states to win this year.
>
> That is a very significant fact and significant contribution by each one of you to the Kerry for president campaign… you should take great pride in your efforts."

Jeff Foreman expressed similar sentiments in a November 3, 2004 email to Veon staffers, by stating: "…clearly the volunteer effort regarding the challenge to Nader was a critical piece of the Kerry victory in Pa., and our staff…was essential in that effort…". The Nader effort was further acknowledged, and rewarded, by Scott Brubaker, Manzo, Foreman, Brett Cott and Veon, as indicated in…emails regarding the campaign-related 2004 bonuses. Ex. A at 56.

Based on the evidence presented to us, we have been able to identify, by name, [36 staff employees and four supervisors] who were involved with the

Nader challenge. This list is certainly not exhaustive…. As to the first twenty-nine listed individuals, their Nader efforts merited inclusion in the above-referenced 2004 campaign bonus list. Ex. A at 56-58.

106.    Based on the foregoing allegations and on information and belief, Defendant Reed Smith worked on the Nader-Camejo Pennsylvania petition challenge jointly and in concert with employees of the state of Pennsylvania, and pursuant to an agreement with its clients, Defendant DNC and Defendant John Kerry.

## V.    Defendants' and co-Conspirators' Conspiracy Caused Plaintiffs Financial Injury and Other Damages and Violated their Constitutional Rights.

107.    Defendants' conspiracy caused severe financial injury to Nader-Camejo's 2004 presidential campaign. Defendants' and co-Conspirators' nationwide legal assault in the form of abuse of process and malicious prosecution forced Nader-Camejo to secure counsel in 18 states, while their campaign of harassment, intimidation and sabotage consumed Nader-Camejo Campaign staffers' time. Nader-Camejo's campaign manager herself was personally compelled to attend depositions and other legal proceedings rather than running the campaign. In short, Defendants' and co-Conspirators' efforts to bankrupt the Nader-Camejo Campaign produced its intended effect: in October 2004, Mr. Nader was forced to loan the campaign $100,000 to cover legal bills, staff salaries and operating expenses. The campaign has not repaid this loan.

108.    Not content merely to try to bankrupt Nader-Camejo's campaign, Defendant Reed Smith sought to collect payment from Mr. Nader and Mr. Camejo personally on an unprecedented judgment ordering the candidates to pay $81,102.19 in litigation costs. Not only was this judgment fraudulently procured by virtue of Reed Smith's undisclosed representation of a presiding judge, but now the judgment also

appears to be the direct result of a criminal conspiracy. Nevertheless, having previously induced Mr. Camejo to pay $20,000 to settle its claim, Reed Smith currently seeks to condemn $61,638.45 from Mr. Nader's personal bank accounts, which the firm attached over one year ago, and which remain frozen. Reed Smith partners have publicly confirmed on several occasions that they seek to collect the judgment on behalf of themselves and their firm.

109.    Furthermore, although Nader-Camejo prevailed in the great majority of lawsuits filed against them, Defendants' conspiracy largely succeeded in achieving its unlawful objectives. Five states denied Nader-Camejo ballot access as a direct result of Defendants' and co-Conspirators unlawful conduct. Moreover, the burden of defending their right to ballot access in lawsuits in 18 states – many of them simultaneous – prevented Nader-Camejo from dedicating resources necessary to gain ballot access in a dozen others. Denial of ballot access in these states also deprived Nader-Camejo of valuable fundraising opportunities to solicit voters for contributions as qualified candidates.

110.    More than 1.3 million Americans living in the 17 states that denied Nader-Camejo ballot access in 2004 voted for Mr. Nader in 2000. Hundreds of thousands signed Nader-Camejo's petitions in 2004. Defendants and co-Conspirators therefore denied Plaintiff-voters and every other voter similarly situated in 17 states their free choice of candidates in the 2004 presidential election. Defendants' conspiracy thus violated not only Mr. Nader's and Mr. Camejo's constitutional rights, but also those of Plaintiff-voters and millions of other voters.

111.    In summary: Defendants and co-Conspirators conspired to and did in fact cause financial injury and other damages to Ralph Nader's and Peter Miguel Camejo's 2004 presidential campaign and to the third-party and independent candidacy structure previously built by Mr. Nader; Defendants and co-Conspirators conspired to and did in fact cause financial injury and other damages to Mr. Nader and Mr. Camejo personally; Defendants and co-Conspirators conspired to and did in fact violate Ralph Nader's and Peter Miguel Camejo's constitutional rights by unlawfully interfering with and obstructing their campaign in the 2004 presidential election; and Defendants and co-Conspirators conspired to and did in fact violate Plaintiff-voters' and millions of other voters' constitutional rights by denying them their free choice of candidates in the 2004 presidential election, all in an effort to preserve their electoral monopoly and perceived entitlement to votes.

112.    The 2004 election has long since concluded, yet Defendant Reed Smith persists in its flagrant and willful abuse of process in an effort to enforce its unprecedented and fraudulently procured judgment against Mr. Nader. Reed Smith persists in this effort even now, after the announcement of numerous criminal charges against 12 of Defendants' co-Conspirators arising from their use of state funds, employees and resources to deny Nader-Camejo ballot access in Pennsylvania.

113.    Before Plaintiffs filed any legal action against Defendants, Mr. Nader notified Defendant DNC and Defendant John Kerry that Defendant Reed Smith was seeking to enforce its unprecedented and fraudulently procured judgment. Mr. Nader first informed DNC Chairman Howard Dean of Reed Smith's actions by telephone on January 17, 2007. Chairman Dean replied, "We're not behind this, are we?" Mr. Nader responded

that the DNC had retained Reed Smith during the 2004 General Election, and had paid the firm approximately $140,000. Chairman Dean stated that he would investigate the matter.

114.    On February 23, 2007, Attorney Joseph Sandler called Mr. Nader on behalf of Chairman Dean and stated that he needed to speak with Attorney Jack Corrigan to determine whether the DNC had retained Reed Smith. On February 28, 2007, Mr. Sandler called Mr. Nader and said that he had spoken to Mr. Corrigan, who had been monitoring the Democratic Party's nationwide litigation against the Nader-Camejo Campaign for the DNC. Mr. Sandler confirmed that the DNC had paid Reed Smith approximately $140,000 during the 2004 general election, but stated that the payment was unrelated to the lawsuit Reed Smith filed against the Nader-Camejo Campaign.

115.    On May 10, 2007, Mr. Nader called Defendant John Kerry and informed him of the foregoing facts. Mr. Nader memorialized this conversation in a follow-up email sent to Defendant Kerry the same day. On May 22, 2007, Defendant Kerry responded to Mr. Nader's email by letter, stating:

> [A]s I indicated over the phone, I am not a party in any of the lawsuits that you mentioned. Nor do I have any direct knowledge of how these lawsuits are progressing. I have not played any role in directing Reed Smith or any other lawyer or law firm on these matters – nor do I think it would be appropriate to do so. Regardless of my personal feelings on electoral procedures, I believe that I must not involve myself with any private dispute over payment of legal fees and judgments.

116.    Defendants' groundless and abusive litigation, first initiated in 2004 to restrain Plaintiffs' lawful participation as qualified candidates and voters in a federal election, remains ongoing in 2008. Defendants thus leave Plaintiffs no alternative but to seek relief from this Court.

**COUNT I**

**Conspiracy To Violate 42 U.S.C. Sec. 1983, The Qualifications Clause And The First And Fourteenth Amendments Of The United States Constitution**

117.    Plaintiffs incorporate by reference paragraphs 1 through 116 as if set forth fully herein.

118.    Defendants conspired and agreed with co-Conspirators to use court processes and other means to violate Plaintiffs' constitutional rights guaranteed by the Qualifications Clause, the First and Fourteenth Amendments, and otherwise secured by the United States Constitution.

119.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

120.    In furtherance of the conspiracy, the DNC, among other things, directed and agreed with state Democratic Party officials to file unfounded and abusive lawsuits against the Nader-Camejo Campaign in their states. Eighteen state or local Democratic Parties did in fact sue or materially support such litigation against the Nader-Camejo Campaign with the aid and assistance of the DNC, the Kerry-Edwards Campaign and The Ballot Project.

121.    Defendants engaged in state action and acted under color of state law and acted jointly and in concert with individuals who acted under color of state authority. Defendants' actions unlawfully burdened Plaintiffs' constitutional rights guaranteed to them through the Fourteenth Amendment and 42 U.S.C. §1983.

122.    Plaintiffs were damaged by Defendants' acts.


## COUNT II
### Violation of 42 U.S.C. Sec. 1983, The Qualifications Clause And The First And Fourteenth Amendments Of The United States Constitution

123.    Plaintiffs incorporate by reference paragraphs 1 through 122 as if set forth fully herein.

124.    Defendants abused court processes and engaged in malicious prosecution and used other means to violate Plaintiffs' constitutional rights and cause them financial injury and other damages. Defendants violated Plaintiffs' rights guaranteed by the Qualifications Clause, the First and Fourteenth Amendments, and otherwise secured by the United States Constitution.

125.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

126.    In furtherance of the conspiracy, the DNC, among other things, directed and agreed with state Democratic Party officials to file unfounded and abusive lawsuits against the Nader-Camejo Campaign in their states. Eighteen state or local Democratic Parties did in fact sue or materially support such litigation against the Nader-Camejo Campaign with the aid and assistance of the DNC, the Kerry-Edwards Campaign and The Ballot Project.

127.    Defendants engaged in state action and acted under color of state law and acted jointly and in concert with individuals who acted under color of state authority.

45

Defendants' actions unlawfully burdened Plaintiffs' constitutional rights guaranteed to them through the Fourteenth Amendment and 42 U.S.C. §1983.

128.    Plaintiffs were damaged by Defendants' acts.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1) Compensatory damages in an amount to be determined at trial;

2) Punitive damages in an amount to be determined at trial;

3) Permanent injunctive relief against all ongoing and future violations of law by Defendants and co-Conspirators as set forth herein;

4) Attorneys' fees pursuant to 42. U.S.C. § 1988(b) and as otherwise permitted;

5) Court costs; and

6) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action.

Dated: Washington, D.C.                          Respectfully Submitted,
      July 21, 2008
                                                /s/ Oliver B. Hall

                                                Oliver B. Hall, Esquire
                                                D.C. Bar No. 976463
                                                1835 16th Street NW
                                                Washington, D.C. 20009
                                                (617) 953-0161
                                                oliverbhall@gmail.com
                                                *Counsel of Record*

Bruce Afran, Esquire
10 Braeburn Drive
Princeton, NJ 08540

*Of Counsel*

Mark R. Brown, Esquire
303 East Broad Street
Columbus, OH 43215
*Of Counsel*

Carl J. Mayer, Esquire
Mayer Law Group, LLC
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
*Of Counsel*

Matt Gonzalez, Esquire
G. Whitney Leigh, Esquire
Brian Vereschagin, Esquire
Gonzalez & Leigh, LLP
Two Shaw Alley
San Francisco, CA 94105
*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of July 2008, I electronically served a copy of the foregoing Amended Complaint by means of the Court's CM/ECF system upon the following parties:

Joseph E. Sandler
D.C. Bar No. 255919
John Hardin Young
SANDLER, REIFF & YOUNG
50 E Street, S.E. #300
Washington, D.C. 20003
*Attorneys for Defendant Democratic
National Committee*

Mark E. Elias
D.C. Bar No. 442007
PERKINS COIE
607 14th St., N.W.
Washington, D.C. 20005
*Attorneys for Defendants Kerry-Edwards
2004, Inc. and John Kerry*

Douglas K. Spaulding
D.C. Bar No. 936948
REED SMITH, LLP
1301 K Street N.W.
Suite 1100 – East Tower
Washington, D.C. 20005
*Attorneys for Defendant Reed Smith, LLP*

/s/ Oliver B. Hall
Oliver B. Hall

48

<u>EXHIBIT A</u>

Harrisburg Grand Jury Presentment – July 10, 2008

## INTRODUCTION

We, the members of the 28th Statewide Investigating Grand Jury, having received and reviewed evidence regarding allegations of violations of the Pennsylvania Crimes Code and related laws, occurring in Dauphin County, Pennsylvania, pursuant to notice of submission of Investigation No. 4, do hereby make the following findings of fact, conclusions, and recommendation of charges.

## FINDINGS OF FACT

This investigation was commenced as the result of public allegations of potential public corruption and criminal misconduct within the Pennsylvania Legislature. This Grand Jury Investigation was initially commenced before the 25th Statewide Investigating Grand Jury, in August of 2007, and, upon the expiration of that Grand Jury, this matter was transferred to the attention of the 28th Statewide Investigating Grand Jury in March of 2008. The 28th Statewide Investigating Grand Jury issues this Presentment in furtherance of its ongoing investigation of the Pennsylvania Legislature.

## I.    BONUS PAYMENTS FOR CAMPAIGN WORK

### A. Idea and Implementation

Inquiries into allegations of misconduct within the Pennsylvania Legislature were initially sparked by a series of newspaper revelations, commencing at the end of January, 2007, that significant sums of taxpayer funds were secretly paid, in the form of bonuses, to employees of the Pennsylvania Legislature. Thereafter, the Office of Attorney General conducted a review, and initial investigation, into concerns raised by the public, and members of the legislature, about the propriety of these bonus payments. In its ensuing investigation, this Grand Jury has uncovered a concerted plan to use taxpayer funds, employees and resources for political campaign purposes. Over the course of a number of years, former Representative Mike Veon and others,[1] some named herein and others yet un-named, engaged in a concerted pattern of illegal conduct in which millions of dollars in taxpayer funds and resources were misdirected to campaign efforts. In furtherance of its investigation, the 28th Statewide Investigating Grand Jury has reviewed

---

[1] The list of individuals who are the subjects of this Presentment are attached hereto and incorporated herein in the Appendix. The Appendix also contains pertinent information about the positions, supervisors and compensation of these subjects during the relevant periods of their employment with the legislature.

extensive documentary evidence as well as testimony from numerous current and former House Democratic Caucus employees, Special Agents from the Office of Attorney General, and other pertinent witnesses.

The House Democratic Caucus is one of four caucuses that comprise the primary membership and employees of the Pennsylvania Legislature. Each political party has a caucus in each chamber of the Pennsylvania Legislature. (At all times hereinafter, references to "Caucus" in this Presentment shall be for the House Democratic Caucus unless otherwise specifically stated). From 1998 to the end of 2006, former representative Mike Veon was the minority whip for the House Democratic Caucus. As minority whip, Veon had very large staffs both in his district and in Harrisburg. His Harrisburg staff fluctuated between 15 and 20 employees and his district office staff varied between 12 and 16. Many of these former staffers/employees provided sworn testimony before the Grand Jury, wherein they described a consistent culture of employing taxpayer funding and resources for campaign purposes. Campaign work was simply expected as part of one's employment on Veon's staff. Veon had kindred spirits in individuals employed as de facto chiefs of staff in his district and Harrisburg offices, Anna Marie Perretta-Rosepink and Jeff Foreman, respectively. Similarly, Veon employed on his Harrisburg staff, an individual named Brett Cott as a policy analyst, but who, according to numerous witnesses, was hired because of his campaign prowess, and who served as one of the lead promoters of this culture. Another adherent to this culture was Michael Manzo, chief of staff to the Minority Leader of the House Democratic Caucus, who acted directly in concert with Veon's illegal use of taxpayer funds and resources.

In 2004, Veon and Manzo directed a Caucus employee by the name of Eric Webb to create and maintain a list of all House Democratic Caucus employees who assist on political and campaign related work. He was directed to track not only campaign work performed by "volunteers" in the field, but, to track all manner of campaign work, as directed by Veon, Manzo, and others. Webb was directed to not only classify the type of work performed, but to monitor and critique the efforts and time committed by Caucus employees.

2

Pursuant to a grant of immunity, Eric Webb provided extensive and detailed testimony about his, and others, work, maintaining this list from 2004 until early in 2007. The Grand Jury has also reviewed the "volunteer" lists from 2004, 2005 and 2006. These lists, as well as other testimony and numerous emails that corroborate Eric Webb, have been entered as evidence before the Grand Jury.

All emails reviewed and placed into evidence before the Grand Jury were either obtained through Grand Jury subpoena or from former or current employees of the Caucus who voluntarily provided copies. All emails obtained by subpoena from the Caucus have been authenticated as having originated from the computer network and backup tapes of the House Democratic Caucus. Those emails received from individuals have been authenticated by those individuals. Additionally, all emails cited herein were sent on the taxpayer funded legislative email system, unless otherwise specifically noted.

It must be noted that the award of bonuses was but a single facet of the concerted effort to employ taxpayer funds and resources for campaign purposes. The actual diversion of resources and employees to campaigns and political endeavors was of no less prominence. The subversion of taxpayer funds and resources was extensive and ranged from the obvious - directing public employees to conduct campaign work while paid by the taxpayers, to the subtle - issuing taxpayer paid contracts for campaign work disguised as legitimate legislative work.

Scott Brubaker, the Director of Administration for the Caucus, conducted an email exchange with Jennifer Brubaker, the Director of the Legislative Research Office for the Caucus, on December 30, 2003, that is demonstrative of the priorities that existed with many in the caucus. The pertinent discussion begins when Scott Brubaker writes asking for those employees of the Legislative Research Office who Jen Brubaker would recommend for raises. Jen Brubaker responds with a chart of all of her employees wherein she provides brief statements about her appraisal of their abilities. Beside the names of Stephen Webb and Karen Steiner she wrote only "great politico." She also went on to write, outside of her chart, the following:

"In all honest [sic], I cannot think of any to recommend for bumps. The only ones that I think may be really deserving are Steve Webb and Karen Steiner. Each went on LWOP [leave without pay] to help earlier. Steve's out again.

3

Both are very good analysts and good soldiers. As far as legislative superstar, my number one pick is Kelly O'Connor ...."

To which Scott Brubaker responded:

"Absolutely. While we can't promise bumps will be offered regularly, I'm a firm believer in giving bumps to those you want to keep in the first year. After all, that is when they progress the fastest down the learning curve, $2k or $3k for each won't make them rich, but they will sure appreciate it. Also, since there are no secrets, word will get around that others may wish to emulate their behaviors-if you know what I mean?"

The Grand Jury finds that the aforementioned exchange is an example of a culture that consistently sought to promote and reward, with taxpayer monies, those engaged in political endeavors and campaign work as opposed to those engaged solely in work on behalf of the taxpayers (legislative and constituent work).

Webb testified that creation and maintenance of the "volunteer" lists was part of a larger effort to mobilize caucus resources to not only assist incumbent campaigns of Democratic representatives but to assist in campaigns that would increase the number of seats held by the Caucus in the legislature. Webb further testified that this larger effort involved distributing a variety of political and campaign duties to a number of employees of the caucus beside himself. It was clearly understood by all these employees that the campaign work in question was part of their public employment and not something to relegate to after work hours or personal time. Webb also detailed how the "volunteer" list was specifically designed to act as the foundation for an "incentive" structure to entice Caucus employees to commit greater efforts and time on political endeavors and campaigns.

### B. The 2004 Bonuses

The initial 2004 "volunteer" list, as explained by Eric Webb, was created by use of a computer software program known as Access. This program allowed Webb to create a list of volunteer names, followed by columns detailing the various efforts and noteworthy endeavors of the volunteers. On the 2004 list, these columns included, but were not limited to: a column noting if the volunteer went on leave without pay as part of his or her campaign efforts; a column for the number of days spent on campaign services;

4

a column listing the dates spent on campaign services; a column noting if they had worked on a specific election in the 109th Legislative District; a column noting whether they conducted opposition research; a column noting whether they circulated nominating petitions; a column noting campaign contributions to Minority Leader DeWeese, Minority Whip Veon or the House Democratic Campaign Committee, and if so, the amount contributed; a column noting whether they worked on overnight trips; when they worked on day trips; whether they worked on election day; etc. This 2004 "volunteer" list chronicled the efforts of 458 Caucus employees who worked on campaigns or political endeavors. There is not a single entry on this list, or any of the subsequent lists over the following years, for legitimate legislative work or constituent service. Indeed, Eric Webb testified that such work was completely irrelevant to the purpose of the list, or to those who directed its employment.

Webb also testified that, while there were many elections at play in any given election year, only selected "volunteer" efforts would be tracked on the list. Veon and Manzo were the primary directors of those efforts worthy of notation on the list. Webb testified that this was designed to control and specifically direct the "volunteer" efforts to those endeavors deemed most important. Webb, along with numerous other witnesses, testified about emails regularly sent from Manzo/Veon, and/or the House Democratic Campaign Committee, asking for volunteers on the specific endeavors and directing those volunteers to coordinate and report their efforts through Eric Webb. In this manner, it would become clear to Caucus employees which political endeavors and campaign work were likely to result in an incentive.

Following the 2004 general election in November, Manzo requested that Webb provide a breakdown of those who excelled as volunteers on the selected campaigns and political endeavors. When Webb complied, highlighting those who had done the most, Manzo told Webb that these people were going to receive some kind of award for their campaign efforts. Subsequently, Webb and many others received bonus checks and it became very clear that the people on the list had, indeed, been rewarded.

The emails from 2004, introduced into evidence before this Grand Jury, provide extensive insight into the plan to issue bonuses for political and campaign work. In a series of emails commencing on November 22, 2004, entitled "Caucus Bonus", Mike

5

Veon and Anna Marie Perretta-Rosepink discussed which members of his district office staff should receive bonuses. Veon specifically points out that the Caucus bonuses in question are not the Christmas bonuses and are to award those who performed extra work on campaign efforts.[2] It is noteworthy that the bonus effort was not limited to caucus employees. In this exchange of emails, Perretta-Rosepink includes the compensation information for employees of three alleged non-profit entities; the Beaver Initiative for Growth, the Lend-A-Hand Network and Bridge, and notes the employees of these non-profits who helped out on campaigns. These three alleged non-profits were funded almost exclusively through Veon directed state grants. In the emails, Veon directs, for these nonprofit employees who conducted campaign work, bonuses from the funds of the non-profit entities.

In another series of emails, also dated November 22, 2004, at 3:46 PM, Manzo, under the subject "bonus", writes to Mike Veon, Brett Cott and Jeff Foreman:

> "This is a comprehensive list of suggested year end bonuses. It is a compellation of thoughts between Jeff, Brett and I and is based upon several factors.
>
> 1. Performance during session (sine die, gaming, budget, etc.)
> 2. Outside activities (specials, general, Nader effort)
>
> Let me know what you think. Would like to have it processed this week so that our superstars can enjoy a brighter Xmas."

Veon then wrote back to Manzo, Cott and Foreman that the "list looks good..." and that he wants to add a number of the members of his district staff for the "extra nights and weekends" they worked on a variety of campaign efforts. Several minutes later, Manzo writes back to Veon, Cott and Foreman that he will add them and concludes "I think this will go a long way for caucus loyalty for encouraging wider participation."

On November 23, 2004, Scott Brubaker, the Director of Administration for the caucus, sent an email to Earl Mosley, the Director of the Personnel Office, with copies to Jeff Foreman, Brett Cott and Mike Manzo, forwarding a list of Caucus employees and the

---

[2] The Grand Jury, in this Presentment, only addresses the propriety of taxpayer funded bonuses for campaign work. The expenditure of taxpayer funds for other types of bonuses is reserved for future consideration of the Grand Jury.

6

amounts of bonuses they were to receive at the end of 2004. This initial email spawned a series of emails between Scott Brubaker and Earl Mosley wherein Earl Mosley asked whether he, and one of his employees, will be receiving bonuses. Brubaker responded by asking how much campaign work had been performed by Mosley and his employee. Mosley then detailed the various campaign efforts performed in 2004, including campaign trips to Montgomery County and Bloomsburg, in Columbia County. Brubaker said that he would look into it but noted that Earl's employee had not made any political contributions to the House Minority Leader or the House Democratic Campaign Committee.

On December 1st, 2004, Michael Manzo, at 12:47 PM, sent a quick email to Scott Brubaker, entitled "bonuses", directing:

"I forgot Melanie Brown. She was out knocking doors in Shapiro (with her kids!) . . .great gal. lets do 1k."

As previously noted, after election day on November 2, 2004, Eric Webb was asked by Mike Manzo, to forward, from his volunteer list, the names of those who had provided the most valuable assistance on campaigns. Eric Webb prepared a table of those he described as "superstars" and forwarded it to Manzo and Veon. This table listed: the name of each individual; the office to which they were assigned in the caucus; supervisors; whether they went on leave without pay for campaign purposes; the number of days they worked on political endeavors and campaigns; the dates that they worked on political endeavors or campaigns; whether they worked on the 109th special election; whether they conducted opposition research; whether they circulated petitions for selected democratic candidates; whether they assisted on the challenge of Ralph Nader's petitions to be placed on the Pennsylvania ballot for the Presidential election; whether they worked on post election issues; and, whether they contributed to the William DeWeese campaign committee or the House Democratic Campaign Committee. Eric Webb submitted 88 "superstars" in this table. Subsequently, a number of other names were added, such as those individuals who worked in Veon's Harrisburg and district offices.

7

The vast majority of the bonus checks, issued for campaign work, were delivered from the Pennsylvania Treasury to Earl Mosley on or about December 16, 2004. These checks were subsequently distributed to a number of supervisors who then distributed them directly to the individual recipients.    For example, Jeff Foreman, former Representative Veon's chief of staff in Harrisburg, distributed the checks allocated to Veon's Harrisburg staff members. Likewise, Mike Manzo distributed many of the checks to individuals and supervisors within his chain of command. Numerous individuals have testified about the personal receipt of these checks, in 2004, from Messrs. Foreman and Manzo. The checks distributed to former Representative Veon's district office staffers were provided to Mike Veon who distributed them to the district office recipients. A total of $ 188,800.00 in taxpayer funded bonuses was issued to these individuals as a reward for the conduct of political endeavors and campaign work.

### C.  The 2005 Bonuses

In accordance with his supervisor's directions, Eric Webb continued his tracking of "volunteers" by creating a new Access spreadsheet for tracking the chosen political endeavors and campaigns of 2005. Although 2005 was an off year for legislative elections, caucus "volunteers" were directed to a number of endeavors, including three campaigns. As explained by Eric Webb before the Grand Jury, the 2005 tracking list again contained the standard listings of volunteer names, offices and supervisors. However, by this time, Webb had modified the list to also include the position held by each volunteer within the Caucus, telephone number of each volunteer (at their desks in the Caucus) and the email address for each volunteer (again, for their Caucus email account).

The "volunteer" work tracked in 2005 revolved primarily around a special election held in July of 2005 in the 131st Legislative District between Linda Minger and Karen Beyer (located in the Allentown area of Lehigh County). The list tracked all volunteers in this election, the number of days each volunteer worked in this election, whether any of the volunteers went on leave without pay on this election, and whether they worked on mailings, opposition research and other particulars for this election. In addition, the 2005 list tracked volunteers who worked on a phone bank for a special election in the 189th Legislative District and volunteers who worked on a special election

8

to fill a senate seat in Allegheny County that was held on May 17, 2005 (Fontana v. Diven).

Numerous witnesses testified that by the time of the Minger v. Beyer special election in July of 2005, the word had spread among caucus employees that work on campaigns was the best method to obtain a bonus. In this regard, the scheme to promote "volunteers" from among legislative employees, by use of an incentive plan, was a success. Indeed, in 2005, despite it being an off year for legislative elections with few campaigns to work on, the Caucus produced more volunteers than it had in 2004 – a legislative election year. The Minger v. Beyer race, in particular, produced a tremendous turnout employing in excess of 170 volunteers from the Democratic Caucus.

The Grand Jury reviewed numerous emails from 2005 that corroborate the use of taxpayer funds to pay bonuses to legislative employees as rewards for campaign work. The Grand Jury reviewed a series of emails dated August 31, 2005, between Scott Brubaker and Michael Manzo. The emails commenced with a discussion about a request by the Director of Personnel of the Democratic Caucus, Earl Mosley, about raises and bonuses for some of his staff members. Brubaker forwarded a list to Manzo and asked for his review. Manzo responded:

> RE: Mosley requests for raises and bonuses for his staff.
>
> > "Fine with these as well…. if you wish, you can nominally increase Saunders, Cassaro and Wilt (maybe another $500)… for efforts in the field…"

Brubaker responded approximately two minutes later, with:

> > "I'd rather have that come through with all the others. It will have a more direct link in their minds if we do it that way. What do you think?"

A moment later, Manzo wrote back:

> > "Sure can. That list will be ready shortly."

The same day, on the afternoon of August 31, 2005, at 3:09 PM, Eric Webb sent an email to Mike Manzo entitled "rankings." The text of this email was follows:

> "Good, Bad and the Ugly… Or in this case: 1-ROCK STARS, 2-GOOD, 3-OK."

9

"Namely, I based my decisions on the number of days people spent in the field, but a few people were bumped up or down based on other circumstances. For example, some folks were bumped up for extra efforts, like being a Phone Bank Captain, helping with the Spanish phone bank, or really helping Dan and Jess.

Dan took a look at the list and he made four recommendations to bump some folks up in rank. He made good calls on each and I made changes based on what he thought.

Let me know what you think. Also, let me know if the list has all the criteria you need. It is originally in Access format, so I can manipulate the data in a lot of ways, as well convert it to Excel."

Attached to Eric Webb's email were three attachments entitled: ROCKSTAR; GOOD; and OK. Each attachment was an alphabetical listing of caucus employees who received the different rankings (ROCKSTAR, GOOD or OK) by Webb. In addition, the lists included: whether or not the individual had volunteered on the Minger v. Beyer special election in the 131st district; the number of days they worked in that election; and, a "comments" section describing any noteworthy or special campaign effort performed by the individual. Eric Webb testified that the references to "Dan and Jess" pertained to Dan Weidemer and Jess Walls, "the two individuals in charge of the House Democratic Campaign Committee." Webb also confirmed that the information on all of these rankings lists pertain only to campaign work.

The next day, September 1, 2005, Manzo forwarded Webb's email and the attached rankings to Scott Brubaker and asked:

"Was thinking about $1k for the ROCKSTARS...$500 for the GOOD...$250 for the OK. Thoughts?"

Brubaker wrote back:

"OK with me. The amounts aren't excessive, but they reinforce the point. I did note that some folks on the ROCKSTAR list did far more than others. You may wish to consider a category of *super* rock stars (eg., those who spent more than 2 weeks in the field, particularly if they were burning their leave) and give them $2k. After taxes, these amounts don't leave much (60% of gross maybe). Just a thought."

Manzo then replied:

10

"Good point...I will yank a few names out and get back to you."

On September 2, 2005, at 11:58 AM, Lauren McClure sent an email to Earl Mosley and Scott Brubaker entitled "bonus payments for special election volunteers" and wrote:

"I have a big list of employees who will get bonus payments for their participation during the special election. There are several summer interns on the list that have since been taken off the payroll, can we still issue them a check for their efforts even though they are no longer on the payroll?"

In a response, sent solely to McClure, Brubaker wrote:

"Yikes. Be careful what you write. The less said about the reason, the better."

Mosley responded to McClure and Brubaker with:

"I am sure we can, but is it sound policy?"

Brubaker responded to both:

"You know, the more I think about this, the more I am convinced that it doesn't make much sense to do these for interns. They've left. Hard to reinforce behavior when they aren't going to be around to help again in the future.
What do you both think?"

McClure then responded:

"I don't think the bonuses are necessary."

On September 6, 2005, at 10:28 AM, Lauren McClure forwarded, by email, three charts to Lori Wilt (a staffer in the Personnel Office), Scott Brubaker and Earl Mosley. The title of her email was "bonus payment information." The text of the email stated:

"Attached are three documents that list the employees who will receive the
bonus payments as well as the letter to go along with the checks. Chart A list
indicates the amount of bonus by color. Charts B & C note the amount at the
top and list the names for that amount. Please get the change sheets in by the
next cut-off so the checks are ready for the pay of September [sic] 27[th]. As
discussed last week, please send each person an email and ask them to pick
up the check and letter in Personnel. Please let me know if you have any
questions. Thanks!"

The attached charts listed those individuals whom Webb had categorized as
ROCKSTARS, GOOD or OK. Their individual bonuses ranged from $250 to $2,000.
The letter, also attached to the email, that would accompany these bonus checks, read as
follows:

### MEMORANDUM

Date: September 27, 2005
To:
From: H. William DeWeese and Mike Veon
        Minority leader and Minority Whip

Special Meritorious Bonus Payment

We want to take this opportunity to thank you for your extra efforts
this year on behalf of the Democratic Caucus. In special recognition of
your work, we have approved the enclosed special meritorious bonus
payment for you. We consider you an asset to the caucus and want you to
know how much your assistance is appreciated by us.
_Since this bonus payment is of an extraordinary nature and not
widely received by your colleagues, we cannot stress strongly enough the
need for you not to discuss this with any other staff person or Member._

Again, many thanks for your fine efforts. We know we can count on
you in the coming battles we face this year and into the future.

Cc:    Mike Manzo
        Earl Mosley

Earl Mosley forwarded the above email and attachments to Lori Wilt, at 10:44 AM
and directed:

"Please complete as requested. Thanks."

12

On September 7, 2005, Michael Manzo sent an email to Scott Brubaker entitled "131", and wrote:

"Was Mary Isenhour on the bonus list? If not, she should be. I often forget she works for the Caucus. But she knocked some good doors, so let me know tomorrow."

Brubaker then forwarded Manzo's email to Lauren McClure and directed:

"Please respond"

The next day, September 8, 2005, McClure responded:

"Yes, she's on the $500 list."

Lori Wilt, on September 27, 2005, at 9:42 AM, emailed Scott Brubaker and wrote:

"Hi Scott, please review the verbiage below for approval to send in the email for the bonus checks. Thanks.

A special meritorious check has been issued in your name. Your signature is required to pick up this check. To pick up your check, please see me, Lori Wilt, in the Democratic Personnel Office, 124 Irvis Office Building.

*Since this bonus payment is of an extraordinary nature not widely received by your colleagues, we cannot stress enough the need for you to not to discuss this with any other person or Member.*"

Five minutes later Brubaker wrote back:

"The letter from the leaders is stuffed in the envelope, correct?

I changed person to employee in the last sentence. One presumes spouses will be informed – unless they want to go secretly buy an expensive toy.☺"

13

On November 14, 2005, at 10:24 AM, Michael Manzo sent an email to Scott Brubaker and wrote:

"Bonuses. Mike and I spoke last week about the 5k we are going to implement each December 1 for senior staff. Wanna give me your thoughts on who should get what at what level?"

Several minutes later, now including Earl Mosley, Brubaker wrote:

"The directive I took in the meeting was to give $5k to those on the list for a special bump. It included us, Foreman, Cott, and the senior office directors. I will pull the list again and get Earl's input too. As a stream of consciousness thing, it doesn't seem necessary to give Casper one due to his high salary, so I wouldn't advocate that every office director get one. It was intended to be very senior staff, so we need to exercise some discipline on recommendations. If Veon is thinking more broadly, then we can go down that path."

Manzo wrote back:

"I agree. We need to be careful not to cast too wide of a net."

Brubaker responded:

"Yup, because folks can't keep their mouths shut. Or am I the only one who has noticed that? :) (wink)"

On or about September 27, 2005, consistent with the above referenced testimony and emails, bonus checks were issued to all of the individuals listed as Rockstars, Good or OK. To reward those who performed campaign work in 2005, over $106,000.00 in bonuses were paid in taxpayer funds. An additional $61,500.00 in taxpayer funds were paid, in December, in the form of "executive bonuses" to those supervisors in the caucus who were most intimately involved in the conduct and furtherance of campaign work. By the end of 2005, the success of the "incentive scheme" through the use of bonuses had become clear. As Eric Webb testified:

"it became apparent in 2005 in the special when we got another bonus that this thing might be here to stay and that this is something to encourage volunteering."

14

Dan Reese, the Programming and Web Supervisor for the Democratic Caucus Office of Information and Technology, testified before the Grand Jury about his realization that the bonuses were directly tied to campaign work. He testified that, in 2005, there was an extremely large push to get "volunteers" to go to the Allentown, Pennsylvania, area and work a special election on behalf of Democratic candidate Linda Minger. He traveled to the 131st Legislative District with two other employees of the office. They took their fishing gear. Once there, they were given campaign literature and directed to distribute it. However, Reese and his two co-workers instead went to breakfast, threw away the campaign literature and went fishing. About a month later, all three got an identical $250 bonus. Reese stated to the Grand Jury:

"We joked. When we got the bonus --we're not idiots -- we figured out what it was for. We all joked that we are professional fishermen now."

As the caucus moved into the legislative election in 2006, the word had, as anticipated, spread among the employees and the caucus was now ideally situate to have large "volunteer" turnout that year.

### D. The 2006 Bonuses

The election year of 2006 would prove to be the largest effort yet expended as part of the incentive scheme. Eric Webb testified that in 2006 the pay raise vote had "changed the whole map." He testified that there were many "more seats in play" requiring more volunteers to do everything from opposition research to campaign work in the field. It was also a unique year because both Caucus leaders, Veon and DeWeese, had serious challengers. As a result of these factors, the campaign efforts started in earnest very early in the year.

Whether measured by the effort expended in tracking the campaign work of Caucus employees, the number of bonus recipients or the amounts expended on bonuses, 2006 far exceeded the prior years. Webb told the Grand Jury that after everyone who worked on the special election in 2005 got bonuses, "it became very apparent" to the Caucus employees that "if they volunteer, they get a bonus." As a result, when the election cycle of 2006 started, Webb stated: "more and more people are volunteering that

15

I haven't seen before because of the incentive structure." This increased his burden of accurately maintaining the list. At that time, Webb testified that maintenance of the list:

"was very involved. And responding to emails, and getting emails, took a lot of time. This was actually worse than working the regular job."

Around August or September of 2006, Michael Manzo came to Eric Webb and told him that his wife, Rachel Manzo-then the Executive Director for the Minority Chairman of the House Tourism Committee, was "bored" and would be helping Eric out on the volunteer effort. Webb described how Rachel Manzo kept her own, duplicate, copy of the volunteer list and was assigned specific races to monitor. Webb testified that they were in constant contact for several months, exchanging the list back and forth with updates and additions. This was the only way to insure that accurate records of the "volunteer" efforts were being maintained. Webb also discussed how Rachel Manzo had prepared her own "variation" of the list during the 2006 Veon primary race where she had been assigned as coordinator of all the "volunteers" sent to that campaign.

Some time in October of 2006, Webb was again assigned sole responsibility for maintaining the list when Rachel Manzo was sent to 151st Legislative District to take charge of Fred Taylor's campaign in southeast Pennsylvania. A number of emails regarding the campaign "volunteer" efforts sent by Rachel Manzo from a campaign web site - rachel@mikeveon.com - during work hours, corroborate her involvement over the summer and fall of 2006.

Again, as in the past years, "volunteers" for campaign work were solicited through emails from leadership figures, such as Manzo or Veon, and emails from department supervisors. Additionally, once specific individuals were targeted for particular campaign duties because of particular talents or knowledge - calls, personal approaches and direct pressure would be brought to bear.

2006 was also unique in that bonuses for campaign work were issued twice, first in August 2006 and later at the end of 2006. They had decided to expand the "incentive structure" to now reward the "volunteers" after the primary elections as a means to further drive turnout in the general election.

16

The prominence of campaign work as a measure of value and success within the Caucus was, in many ways, encapsulated in the employment history of Michele Borlinghaus. Ms. Borlinghaus, a graduate from college in May of 2005, came to the Caucus as an intern during the summer of 2005. In August of that year, she was provided with full-time employment within the Legislative Research Office under director Jennifer Brubaker. From June of 2005 until November of 2006, a span of 17 months, she spent at least six of those months on campaign work. Borlinghaus worked in the field on the following campaigns: the Minger v. Beyer special election in the 131st Legislative District; the Flaherty special election in the 30th Legislative District (ironically, this was the special election to replace former representative Habay who had been convicted of using taxpayer resources for campaign purposes); the primary challenge to Mike Veon in the 14th Legislative District; and, for the Siptroth campaign in the 189th Legislative District.

A series of emails during the summer of 2006 provided telling insight into the dominate role campaign work played in the evaluation and compensation of caucus employees. On July 3, 2006, Jennifer Brubaker wrote Michael Manzo the following email:

> "Michelle Borlinghaus' annual review is pending. I am currently working to finish the evaluation. While her enthusiasm and willingness to volunteer is worth applauding, her performance as an analyst is less than stellar. At this point, I cannot recommend that she get a full 3% meritorious increment. Every manager has encountered significant problems with her work product. Unfortunately, her written communication often contains problems with spelling and grammar. In addition, her attention to detail is seriously lacking. We have found glaring errors in her work. I am planning to arrange remedial writing training for her.
>
> Personally, I believe her sacrifices and volunteer efforts may be worthy of a bonus payment. Her performance as an analyst, however, is not worthy of a full increment. Before proceeding to giving her a 1% or 2%, I was hoping to get your input. If there is any reason to believe that my recommendation could be reversed by the Leaders, I would prefer not to go through the painful process of delivering the bad news. Any thoughts?"

On July 5, 2006, Manzo responded to Jennifer Brubaker:

> "Can't do it. I would have a discussion with her and be frank as possible. But given what she has done and how pleased Veon was with her Beaver effort, it would send the wrong signal. I am fine with any training you have in mind."

Several minutes later, Jennifer Brubaker forwarded Manzo's email to her husband, Scott Brubaker, and wrote:

> "Before I bug him again...do you have any idea what the heck this means?"

Scott Brubaker then responded to his wife:

> "It means that he is putting you in the untenable position of giving her a 3% due to her helping Veon, but still suggesting that you put on some type of performance improvement plan which indicates that she is performing at less than is expected. It is crazy from a management standpoint. It sends the signal that sub par performance is accepted."

> "It's clear that he values sending the signal about campaigning outweighs any concern for sending a signal concerning incompetence. And he feels that she will bitch to Veon and he will not be pleased. I am not sure he is correct, but that is how he must feel about it."

> "I much prefer your proposal on the bonus payment. Otherwise, you won't really be heard or listened to by Michele."

Borlinghaus, who had been hired, in August of 2005, into the legislative research office with a salary of approximately $29,000 with full benefits, received promotions and raises that ultimately increased her compensation to approximately $44,000 with full benefits. Additionally, she received over $16,000.00 in bonuses in 2005 and 2006.

Eric Webb testified that after the primary elections and during the summer of 2006 he was again requested to forward his list, along with his rankings of campaign performance, to Mike Manzo. He did so and subsequently, on August 1, 2006, bonus checks were distributed to the Caucus employees. Again, these checks were accompanied by a letter instructing the bonus recipients "not to discuss this with any other staff person or Member." Also consistent with past years, the amounts of the bonuses were consistent with Webb's rankings. Hence, those classified as "Rockstars"

received the highest bonus amounts; those classified as "Good" received the median of the bonus range and those classified as "OK" received amounts at the lower end of the bonus spectrum. A total of $402,250.00 in taxpayer funds were distributed in bonuses for campaign work during this period of bonus distribution.

Following the initial distribution of the bonuses, Veon sent an email, dated August 29, 2006, to Scott Brubaker and Michael Manzo entitled "Staff Bonuses." Therein, he wrote:

"In reviewing the list over the weekend again...I determined that I should have given a higher amount to some of my distrcit [sic] staff...

The following DO Staff should receive the $2k bonus instead of the $750 bonus:

Angela Hayden
Joanna Mangelli
John Milkovich
Janet Nero
Genora Nesmith
Mike Romigh
Tom Woodske

Make the adjustment and send them a check for the difference..."

That same day, Scott Brubaker forwarded Veon's email to director of personnel Earl Mosley and instructed him: "Please implement." Shortly thereafter, Earl Mosley forwarded the emails to his staff member, Lori Wilt and instructed her: "Please implement giving the difference. Thanks." Subsequently, consistent with Veon's directions, additional bonus checks were cut to the aforementioned district office staff members.

Following the general election in 2006, Mike Manzo directed Eric Webb to provide the "volunteer" list with his rankings, to himself and Brett Cott. Eric Webb did so and the process for the distribution of bonuses was again implemented. Subsequently, on December 6, 2006, Scott Brubaker forwarded information from Mike Manzo to Earl Mosley and wrote:

19

"Earl, see below message from Manzo. Get this in the pipeline today if possible. Some of these folks will be off the payroll at years end. I will get the letter to Manzo and back to you for inclusion in the envelopes, Scott."

The message from Manzo read as follows:

"Ok, let's start to get these bonuses done and out the door. Send me the letter we used in the springtime. Attached is the Veon list. He wants you to send the checks confidentially to Jeff. Unless marked with a dollar amount, here is what we have:"

5 X – $7,500
4 X – $5,000
3 X – $2,500
2 X – $1,000
 X – $500

| | | | |
|---|---|---|---|
| Xxx | | Reever | Esther |
| Xxx | | Smith, L | Lori |
| Xxx | | Thompson, N | Nancy |
| Xxx | | Cook | Patrick |
| Xxx | | Giles | Sandra |
| 10k | TOP STAFFER | Bliss | David |
| Xxxxx | TOP STAFFER | Caton | Robert |
| Xxxxx | | Foreman | Jeff |
| 10k | TOP STAFFER | Lavelle | Patrick |
| 10k | TOP STAFFER | Cott | Brett |
| Xxx | | Bedwick | George |
| Xxx | | Clark | Lawrence |
| X | | Lewis | Melissa |
| X | | Phoenix | Zane |
| X | | Pronesti | Richard |
| 10k | TOP STAFFER | Steiner | Karen |
| xxxxx | TOP STAFFER | Wagner | Jeb |
| 5k | | Orelli | Chet |
| 5k | | O'Malley | Brian |
| 5k | | Nesmith | Gee |
| 5k | | Hayden | Angela |
| | | Heyman | Tim |
| 5k | | Jarbeck | Julie |
| 5k | | Mangelli | Jojo |

| 2k | | | Milkovich | Shakey |
|---|---|---|---|---|
| 5k | | | Nero | Janet |
| | | | Opalka | Paul |
| | | | DeMarco | Marie |
| 10k | | | Perretta | Annamarie |
| 5k | | | Pietrandrea | Dennis |
| 2k | | | Pietrandrea | Teresa |
| 2k | | | Romigh | Mike |
| | | | Trayter | Lori |
| 2k | | | Vordebrueggen | Sandy |
| | | | Woodske | Tom |
| | | | Woodske | Dan |
| | | | Vannoy | Cindy |
| | | | Sobielski | Pam |

Mosley then forwarded the list and messages to Lori Wilt and instructed her:

"Please let Jodi know that these need to be in for the 19[th] pay. Thanks."

On December 14, 2006, Scott Brubaker sent another email to Earl Mosley under the subject "list for Earl 12-2006.xls". The text of the email read:

"Earl, bonus time. Make sure to exclude the Veon folks who already got something. There are a few folks on here who are not employees or aren't employed with us any longer. The formula for the xxxx stuff is at the bottom of the spreadsheet. Hopefully, you can get this done for cut off on Monday.

Discretion is necessary here.

I have got the memo and will get that to you for inclusion.

Thanks. I am off tomorrow, Scott"

Consistent with past practice, Mosley then forwarded the list to Lori Wilt for implementation. The attached list was composed of 333 names. Each name was marked with one to five x's. At the end of the list there was a key that defines the rating system as 5X=$7,500; 4X=$5,000;3X=$2,500;2X=$1,000; and, 1X=$500.

In addition to the lists forwarded for payment on December 6th and December 14th, a number of additions and adjustments were made resulting in even larger numbers of recipients. Ultimately, $883,000.00 in taxpayer funds would be dispersed in bonuses

21

for campaign efforts. The total public expenditures in 2006 for these secret bonuses amounted to $1,285,250.00.

Again, each bonus check was accompanied by a letter from the caucus leadership instructing the recipient *"since this bonus payment is of an extraordinary nature not widely received by your colleagues, we cannot stress strongly enough the need for you to* **not** *discuss this with any other staff person or Member"*.

A number of former Veon staffers testified that Jeff Foreman presented them with large checks in December of 2006 as a "thank you" from Veon. He also told them about the need for confidentiality.

By the end of 2006, the "incentive structure" had become significantly institutionalized. Both knowledge of the program and expectation of the reward had become commonplace among Caucus staff. Many individuals relayed stories before the grand jury about these expectations. In fact, when many of the bonuses did not get issued by Christmas of 2006, it caused a fair amount of alarm among employees who had come to expect and rely upon this extra money. (Many of the bonuses ended up not being distributed until the first two weeks of January, 2007).

In one instance, the Grand Jury heard testimony about Michelle Borlinghaus' alarm at the end of 2006 when she did not receive her anticipated bonus for campaign work. She had made an expensive purchase of furniture, in anticipation of receiving a bonus, so she sought out Eric Webb and asked him why she had not yet received a bonus check.

The Grand Jury also reviewed emails that clearly demonstrate the widespread knowledge and expectation of bonuses at the end of 2006. On January 1, 2007, a Caucus employee named Stacey King emailed another caucus employee named Almeda Evans and wrote:

"Did you get a check for volunteering? Some folks got checks this past weekend. I hope I get one. I need it."

Almeda Evans wrote back:

"Yes, it definitely came in handy...."

Stacey King then wrote back:

22

"I hope I am on the list."

Perhaps one of the most extraordinary bonus stories involved Democratic Caucus employee Eric Nelson. Eric Nelson testified before the Grand Jury that following his graduation from college in August, 2005, he obtained a paid internship with the Legislative Publications Office of the House Democratic Caucus. He was being paid approximately $10 per hour for doing basically "grunt work." During the spring of 2006, he traveled to Beaver County and worked on Mike Veon's primary campaign for several days. With his internship coming to an end in June 2006, he interviewed with the Legislative Research Office for the House Democratic Caucus.

In August, while he was on vacation, he received a call from Jennifer Brubaker telling him that he was being hired full time in the Legislative Research office and that Mike Manzo asked her to inquire if Eric would be willing to go out and work on a campaign for two months prior to the November general election in 2006. He accepted the job and was immediately salaried at $36,500.00 per year plus full benefits. When he showed up on the first day of work in the Legislative Research office, Jen Brubaker told him that he would only be there for one week. She told him that, following a week of work, he was to go "right out on the campaign trail." Brubaker also told him that he would be working for candidate Mike Pastin in the 157th Legislative District. She then directed him to another employee who gave him research about Pastin and his opponent.

He was given little work to do that first week and testified that he did "maybe one or two assignments that week," comprising writing two letters. In September of 2006, Nelson went on leave without pay, and worked on the Pastin campaign until after Election Day in November. Nelson, like all Caucus employees who went on leave without pay for campaign purposes, maintained his full benefits during that time. He then returned to the Legislative Research Office and worked the remaining approximately six weeks of 2006. (It should be noted that this period of time included the holiday seasons of Thanksgiving and Christmas).

By the end of 2006, Nelson had worked full time less than seven weeks for the taxpayers of Pennsylvania. He received a bonus of $7,500.00 at the end of 2006. Nelson testified that during the weeks in 2006 that he worked in the Legislative Research Office

23

he worked on "pretty much small things" and did nothing special or extraordinary to deserve a bonus.

The bonus program had clearly achieved its objective of instilling in the Caucus employees that campaign work would result in a financial reward. It had become absolutely clear that if an employee wanted to get ahead and receive financial rewards, he or she would need to be responsive to leadership requests for "volunteers" on campaign endeavors.

### E. Discovery of the Bonus Program

On January 27, 2007, the Harrisburg Patriot-News newspaper broke the story of a previously undisclosed bonus program within the Democratic Caucus of the Pennsylvania Legislature. A few days later, a citizen named Gene Stilp filed a lawsuit against the Pennsylvania Legislature and the Caucuses seeking information about these bonuses. Over the ensuing weeks and months, the scope of the program within the Democratic Caucus, and within the other caucuses of the legislature, would be partially discovered. Subsequently, in February of 2007, the now majority leader of the House Democratic Caucus, H. William DeWeese, cancelled all bonus programs within the Caucus.

Many Caucus employees testified about the alarm that spread through the Caucus following the public disclosure of the bonuses. Webb described how he received an email from Scott Brubaker asking him to come to Brubaker's office. When Webb arrived, Brubaker asked him if he still had the list information. When Webb responded in the affirmative, Brubaker told him to "get rid of it because there may be discovery." Brubaker wasn't the only one to approach Webb about the list. He testified that Rachel Manzo also advised him to do as she had and get rid of the list.

Webb did attempt to delete and destroy his copies of the list. However, agents of the Office of Attorney General's Computer Forensics Unit were able to successfully recover the lists.

The public disclosure of these bonuses also caused a great deal of consternation and dismay within the Caucus - even among those most intimately involved in the "incentive scheme." On February 2, 2007, Mike Manzo sent an email to: Christina Zarek; Clayton Dressler; Scott Brubaker; Eric Webb; Steve Keefer; Brett Cott; Tom Andrews; Bob Caton and, Barb Grill, wherein he wrote:

24

"While we watch the media rip us to pieces over the legislative bonuses, I just wanted to take a moment to kind of focus back to why our staff was treated so well: because they, and you, earned it!

Over the past four years, no staff in this building has worked harder, longer, faster, or smarter than ours. These huge victories we achieved in the minority did not just fall out of the sky. We made them happen through amendment strategy, floor strategy, legal strategy, press strategy...time after time, the House Dems drove the train.

Minimum wage, growing greener, slots, property taxes, economic development... the list is endless. Do not let anyone, from the press to Stilp, make you think that we did not earn our keep.

The press will eventually find something else to occupy its time, certainly, in the meantime, keep your chin up and keep your staff motivated, we have a ton more to do."

Tom Andrews, a press secretary with the Caucus, replied to all the email recipients with:

"Thanks,...and I am trying to make those points to each and every reporter. I spoke for at least 30-45 minutes yesterday and they chose to use 1 or 2 sentences."

Jennifer Brubaker then responded to all of the recipients with:

"I am convinced that if these folks dedicated as much time and energy on attacking drug companies and insurance companies and their junkets to Barbados while they charged grandma $100 bucks for a pill then we would solve the healthcare crisis."

Andrews then wrote back:

"But Jen, those companies aren't spending taxpayer dollars!!! That was the response I got yesterday when I explained why Charlie Thompson shouldn't tell Jan Murphy about his bonus."

(Thompson and Murphy are reporters).

Scott Brubaker then responded:

"Yea, why don't we just send the capitol news room in the chamber to vote and we can all go home. They know best, of course."

25

Steve Keefer then responded to all:

> "How much is stilp and crew costing us in wasted staff time and frivolous law suits...that's gotta be at least a million."

In a similar vein, caucus employee Chet Orelli, who had served on Veon's district office staff in Beaver Falls, Beaver County, Pennsylvania, sent an email on February 28, 2007, to Mike Veon and wrote, regarding the press coverage with the bonuses that: " I am getting fuckin hammered." Later that day, Veon responded and wrote:

> "Yes...newspapers will do that...
>
> As you know, you worked very hard in my office everyday you were there...and none of that hard work had anything to do with campaigning...
>
> You worked many extra hours...you very often stayed late...you worked many weekends...and you did a great job everyday...
>
> In reality you should have been making a higher salary given your work load and the hours you put in...instead you got a bonus that probably still did not compensate you for all of the extra work you did everyday and every year...
>
> You have nothing to be ashamed of while earning that bonus...you earned every dollar and then some...you put more hours in than 99% of other DO staff in the entire state...that's a fact..."

Chet Orelli would later testify before the Grand Jury, pursuant to a grant of immunity, and detail the extensive campaign work he did while employed by the taxpayers as part of Veon's legislative district office staff. Much of these campaign efforts were directly assigned and/or orchestrated by Mike Veon.

## II.    OTHER USES OF TAXPAYER RESOURCES FOR CAMPAIGN WORK

### INTRODUCTION

The campaign benefits derived from the bonus "incentive scheme", by no means constituted the only illegal use of taxpayer resources for campaign purposes. The Grand Jury found a great many other acts, schemes and attempts to use taxpayer resources for illegal purposes. In its investigation, the Grand Jury was guided by the words of the

26

Pennsylvania Superior Court when it stated that an elected representative is "not allowed to direct state paid employees under his authority to conduct campaign/or fundraising related work, during state paid time, for his personal benefit." Such actions secure "a private monetary advantage" for an elected representative because, "by having state employees work for him on his campaign and/or fundraising task while they were being paid by the State, he obtained the benefit of free campaign work funded by the taxpayers."

Commonwealth v. Jeffrey Habay, 934A2d,732, 738(Pa.Super.2007)

## A. USE OF VEON'S CAPITOL OFFICE AND STAFF

Every former member of Mike Veon's capitol office, who testified before the Grand Jury, identified a culture wherein no distinction was made between campaign and legislative work. Karen Steiner testified that it was clear "from the interview on" that campaign work would be part of your job. Melissa Lewis testified that employees were simply required to help on campaign work. She stated that the culture was to use the state to pay for as much campaign work as possible. Former staffer Richard Pronesti testified that Veon's culture was that campaign work was simply expected. David Bliss, a research analyst on Veon's capitol staff from the spring of 2001 until December of 2006, was personally assigned to Veon and worked closely with him on a daily basis. His desk was located immediately outside of Veon's office door and he acted as Veon's scheduler, driver and personal assistant. He also handled all of his incoming phone calls and was directly responsible for submitting all of the grant paperwork approved by Veon for his district. Bliss testified that Veon's philosophy was "all hands on deck" when it came to any campaign work. When asked, before the Grand Jury, about the difference between legislative and campaign work, Bliss responded:

" they knew the difference but in practicality there wasn't much difference at all."

Consistent with the above descriptions, the Grand Jury has discovered and reviewed an extraordinary history, dating back many years, of consistent abuses of taxpayer resources by Representative Veon and his staff.

27

### *Veon's Capitol Staff*

Veon had, if not the largest, the second largest legislative staff in the Caucus. At the end of 2006, he had at least seventeen full time employees in his Capitol offices. These individuals, along with their 2006 salaries and bonuses are listed below:

| Name | Position | Salary | Bonus |
|------|----------|--------|-------|
| George Bedwick | Legal Counsel to floor leader | $107,172 | $ 8,160 |
| David Bliss | Research Analyst | $ 49,504 | $15,185 |
| Bob Caton | Press Secretary | $ 69,316 | $12,685 |
| Larry Clark | Leadership Legal Counsel | $100,022 | $ 4,750 |
| Patrick Cook | Messenger | $ 32,552 | $ 4,685 |
| Brett Cott | Policy Analyst to floor leader | $ 87,412 | $25,065 |
| Jeff Foreman | Chief of Staff to Minority Whip | $126,204 | $14,815 |
| Sandra Giles | Administrative Assistant | $ 38,662 | $ 4,565 |
| Patrick Lavelle | Research Analyst | $ 58,084 | $17,565 |
| Melissa Lewis | Research Analyst | $ 39,494 | $ 1,315 |
| Zane Phoenix | Policy Analyst to Floor Leader | $ 90,064 | $ 1,565 |
| Richard Pronesti | Research Analyst | $ 47,034 | $ 1,315 |
| Ester Reever | Administrative Assistant | $ 31,772 | $ 4,685 |
| Lori Smith | Legislative Assistant | $ 32,682 | $ 4,685 |
| Karen Steiner | Research Analyst | $ 48,178 | $15,065 |
| Nancy Thompson | Administrative Assistant | $ 54,054 | $ 7,648 |
| Jeb Wagner | Research Analyst | $ 44,278 | $ 9,565 |

There were many other employees who preceded the above employees, but with one exception, they will not be listed here. That exception is Stephen Keefer who served on Veon's staff from 2002 until 2005 when he became Director of Information Technologies for the Caucus. While employed on Veon's staff, he served first with the title of Graphic Artist and later as a Communication Specialist.

28

### Veon's Capitol Offices

Veon's Capitol offices were located in two different places. Veon was personally located on the 5th floor. Located immediately outside of his office were David Bliss, Brett Cott and Jeff Foreman. Foreman, Cott and Bliss were separated by a door from the outer office that contained Nancy Thompson, Zane Phoenix, Larry Clark and George Bedwick. Also shielded from the outer office, and the public, was a large conference room by Veon's personal office. Veon's personal office was also adjacent to Michael Manzo's personal office – indeed, they shared a door that was often utilized. Upstairs, in room 626, were the remaining Veon capitol staff members. In the 626 suite there was a single office behind a closed door. That office was occupied by Patrick (P.J.) Lavelle. When Keefer was on the staff he had also sat in the 626 suite.

### The Culture

When new employees were hired onto the Veon legislative staff, they were informed that campaign work would be part of the job. Karen Steiner interviewed with Jeff Foreman, Chief of Staff for State Representative Michael Veon from 2004 through 2006, for a job in Representative Veon's office. During the interview, Foreman made it clear to Steiner that campaign work would be expected, it was part of the job. Furthermore, because of the prevailing culture in Veon's office, Steiner knew that if she refused to do campaign work, she would not be hired by the Veon office.

Before coming to the Veon office, Steiner had worked in the Caucus Legislative Research Office (LRO). At one point after she began working in the Veon office, Ms. Steiner brought some leave slips to Foreman so that she could have her time recorded. Foreman refused to accept the leave slips and informed Steiner that the personnel in the Veon office did not track leave time.

### Leave and Compensatory Time

As previously stated, there was no separation between legislative and campaign work. This culture was exemplified in 2004 and 2005 by the policy (or lack thereof) regarding leave-tracking. Within the Caucus, leave-tracking encompasses two concepts: first, leave-tracking is the process by which an employee uses and keeps track of his paid days off, whether those days are vacation days, sick days, or some other form of leave. For example, if an employee wanted to take a week of vacation, the employee would

29

submit a leave slip to his or her supervisor, requesting that week off and stating that the employee was using paid vacation time for that week.

The second major component of leave-tracking is the process by which an employee recorded compensatory time ("comp time"), which the employee could receive by working more than the required daily hours. For example, if an employee was normally required to work from 9:00 a.m. to 5:00 p.m., and the employee stayed at work until 7:00 p.m., the employee could then submit a leave slip requesting two hours of comp time. Comp time hours could be accumulated, apparently without limit, to be used as paid time off at a later date. All comp time claimed had to be approved by an employee's supervisor. For the staffers of Veon's capital offices, this was Chief of Staff, Jeff Foreman.

Within the Veon office, in 2004 and 2005, there was no effort to keep track of time off or comp time earned. Nor was there any effort to separate the hours spent on campaign work or to take time off from legislative pay for those hours. In      2006, Foreman began to require the Veon office employees to keep track of some leave time, however, Veon did not make this change for altruistic reasons. As Foreman explained to Veon's staffers, Veon was under a lot of scrutiny in the 2006 elections requiring them to be more careful. Of course, this would not prevent the staff from performing campaign work at the expense of the taxpayers.

Veon Staff members testified about how Veon and Foreman implemented changes in fear of that public scrutiny. According to Veon employee Richard Pronesti, after Representative Veon voted for the legislative pay raise, Veon and Foreman realized that the election in 2006 would be a difficult contest. According to Mr. Pronesti, Foreman told Mr. Pronesti that Veon's pay raise vote would cause greater public scrutiny of the Veon office, and therefore they all had to be careful to earn and use comp time so that a facade of propriety could be presented when the legislative employees were working out of the office on political campaigns.

At Foreman's directive, then, the Veon office adopted the tactics in effect in many other Caucus offices: have the employees accumulate comp time, and then have the employees use that time to "volunteer" on campaigns. In this action, Foreman acted in

30

concert with other Caucus supervisors, including Jennifer Brubaker of the Legislative Research Office and Eric Webb at the Office of Member Services, and others.

Mr. Robert Caton testified in regard to how, in 2006, Jeffrey Foreman implemented the change in leave-tracking. According to Mr. Caton, Foreman quietly implemented this change, coming individually to each employee and instructing the employee that they would now have to keep track of leave taken and comp time accrued. (However, as Mr. Caton testified, an important distinction was made between campaign work done outside the office and campaign work done inside the office: When going outside the office to do campaign work, in the public eye, the employees put in for leave from their legislative jobs, but when doing campaign work at their desks, away from the public eye, there was no need to put in for leave.)

Other former Veon staffers echoed Robert Caton in describing how Foreman came around the office to each desk, telling each employee that now, in 2006, comp time would be recorded, and leave time would be tracked.

Veon, through Foreman, began to use an artificial system of compensatory time accumulation that was already in place in other offices of the Caucus. In this system, employees were required to stay late at work, doing little or nothing, but accumulating comp time hours that would later be used for campaign work. Comp time would also be fabricated or accumulated by doing campaign work after hours.

To accomplish the accumulation of comp time, management simply required all employees to stay late if the legislature was in Session, telling the employees that they had to be nearby in case they were needed. This fictional "need" resulted in employees staying well past quitting time, sometimes into the early morning hours, earning large amounts of comp time and doing little or no actual work. According to Melissa Lewis, Jeff Foreman made sure that employees earned their phony comp time by staying late. Melissa Lewis further testified that the employees were not actually working twelve to sixteen hours per day, rather, they were "just in attendance." Robert Caton, another Veon employee, testified that Jeff Foreman directed the Veon office employees to stay late so that they would build up comp time.

Veon, Foreman and Cott could then direct those employees to "volunteer" for work on chosen political campaigns. These employees would have accumulated days or

31

weeks of phony comp time hours, so they could spend time away from their desks and still be paid their legislative salaries.

The underlying rationale was the following: for a candidate to hire ten, fifty, or a hundred campaign workers, for even a week, would be an expensive undertaking. But if those campaign workers could be paid by another entity, and put to work for days, weeks, or even months, then the ability of a candidate to campaign would not be limited by his campaign budget. In this case, the campaign workers were legislative employees and they would be paid their regular legislative salaries while they did campaign work. By implementing this system, Veon could make certain that the legislative employees in his office would continue to be available as political campaign workers at no cost to the political candidates. Thus, Veon had at his disposal a stockpile of political campaign workers, paid for by the taxpayers.

### Directing Employees to "Volunteer" on Campaigns

Richard Pronesti, a former Veon staff member, stated that the majority of the time, Foreman was the one who asked staff employees to volunteer for campaign duty. Nancy Thompson, a Veon staff member, confirmed that Foreman asked the employees to volunteer for campaign work.

Foreman was often forceful in asking employees to volunteer for campaign work. He was, as described by another employee, "persistent" in his requests. According to this employee, when Foreman asked her to volunteer, he "would not take no for an answer." She further testified that if the employee was not available to travel for campaign work, Foreman would ask the employee to volunteer for campaign work in Harrisburg.

Former staffers described how Foreman would move from desk to desk, asking each employee to "volunteer." One former employee described how she dreaded Foreman's approach, envisioning him as "the grim reaper," moving from desk to desk and spreading sorrow by asking employees to give up portions of their lives. She described one incident when Foreman asked another employee to volunteer in October, and that employee then cried because she knew that she would have to miss trick-or-treat with her young son in order to comply with Foreman's "volunteer" request.

Veon also reached into other Caucus offices to obtain campaign volunteers. Stephen Webb (no relation to Eric Webb) was an employee of the Legislative Research

Office (LRO) who had previously demonstrated that he was a hard-working and skilled campaign worker. In 2006, Webb received a promotion to become a Project Manager within the LRO. Mr. Webb was excited about this promotion and thought that with this promotion he would finally be able to leave campaign work behind and focus on his career goal of legislative work. Then he was called to meet with Foreman. Foreman told Webb, "We need you now," to work on the Veon primary campaign in Beaver County. Foreman told Webb that he should use comp time and vacation time.

Mr. Webb thought that he did not have enough comp time and vacation time to be able to leave Harrisburg and do the many weeks of campaign work for Veon. Webb called Foreman and told him this, stating that he could postpone his departure for a few days so that he would not have to take time off that he did not have. Foreman responded: "Steve, you're a smart guy. You're there all the time. I'm sure if you go back through your records, you will be able to find some comp time and submit that and make up those couple days." Webb did not want to "find" more comp time, but he agreed, complied with Foreman's directive, and went to Beaver County to work on the 2006 Veon primary campaign for approximately forty-five days.

Nora Sabo was an employee in another Caucus office, the Office of Member Services (OMS). Foreman asked Ms. Sabo to volunteer in Beaver County on the 2006 Veon primary campaign. Sabo was able to comply with Foreman's request because she had accumulated approximately three weeks of comp time. (Ms. Sabo testified that she had accumulated the comp time in the previously described manner, that is, by staying long after regular hours, during which she did very little legislative work.)

This type of activity was not limited to Veon's staff. Lauren McClure, a former Administrative Specialist who worked for Scott Brubaker, testified about Brubaker's criticism of her in a performance evaluation for not sufficiently performing campaign work. She described how she had booked a vacation trip that ended up coinciding with an election he felt she should work. He told her that campaign work was part of her job. After she repeatedly protested, he removed the reference from her evaluation. However, she testified that she remained pressured to perform campaign work.

### *Fundraising*

Veon and his Lieutenants created and operated a massive fundraising operation within the Capitol. Karen Steiner testified that it was "a complete West Wing style fundraising operation." Testimony and evidence introduced to the Grand Jury revealed that this fundraising operation was fueled almost exclusively by personnel and resources paid for by the taxpayers.

The headquarters for the fundraising operation was located in Suite 626 of the Capitol. Primary responsibility for maintaining the operation was vested, by Veon, in Patrick Lavelle. Indeed, Lavelle, titled as a Research Analyst and paid by the taxpayers a total of $176,943.12 with full benefits, from 2004 to the end of 2006, appeared to have no other duties beyond fundraising. Testimony before the Grand Jury established that Lavelle was simply known as "the fundraiser" for Mike Veon. Many of those who worked around him every day testified that they had never seen him do anything but fundraising. Testimony and records also established that Lavelle worked closely with, and received direction from, Veon, Foreman, Cott and Perretta-Rosepink.

One of the foundations of Veon's fundraising operation was the building of donor lists. The Grand Jury heard extensive testimony about the significant efforts that were invested to create, "build" and maintain donor lists. Many of Veon's employees were involved in this ongoing effort. Veon and his employees would constantly cull through their daily contacts for entities and individuals to assign to the different lists. The object of list building was to establish a database of individuals and entities that could be targeted for campaign contributions. Veon and his staff also endeavored to have the ability to create multiple lists from this data. This enabled them to target specific demographic groups and interests for campaign contributions at ideal times. Eventually, they established many different lists but foremost among them was the "green" list. This was the list of contributors.

Virtually every aspect of the fundraising operation was orchestrated out of Veon's Capitol offices. For example, all of his fundraisers were planned and organized from the Capitol. The Grand Jury heard detailed testimony about how Lavelle and others on Veon's staff would book locations, prepare menus, establish guest lists, and prepare the invitations for Veon's fundraisers. These efforts were conducted under the direct

34

supervision of Veon and Foreman. Veon was described as a "micro manager" on these events who was attentive to every little detail. Staff members not only arranged all aspects of Veon's fundraisers, but, upon their occurrence, were sent to staff the events.

Fundraisers in Veon's legislative district would be closely coordinated with Annamarie Perretta-Rosepink. She would assist with fundraising arrangements that required contacts and familiarity with the district. She also oversaw campaign contributions made in the district. Contributions received there would be: collected; deposited by an employee in Veon's campaign account; if notable, an email of the amount and contributor was sent to Lavelle; and, a copy of the check(s) and deposit slip sent to Lavelle each night in the legislative overnight mail. As evidenced by emails, Veon also included Perretta-Rosepink in many of his planning discussions and strategy decisions about fundraising.

Jeb Wagner, a former Veon staffer, testified about the fundraising efforts before the Grand Jury. He sat in the 626 suite, from July of 2005 until November of 2006. Within the 626 suite, Wagner was the only other person who sat with Lavelle in the only enclosed office. He detailed the effectiveness of the fundraising operation. He described how Lavelle used a specialized database, PT database, to track the campaign's income and expenditures. He testified that Lavelle, and other staffers who Lavelle directed, regularly received campaign contributions in the office. These would be input into PT database. Additionally, he explained how campaign expenditures and fundraisers were planned and executed from the office. He explained that Lavelle would meet with Foreman and Cott on fundraising plans and issues. However, he testified that ultimately nothing important was done without Veon's approval.

Wagner also described how, after an invitation to a fundraising event was sent out, a call list would be created to make phone calls to determine whether people plan to attend or make a contribution. Lavelle would provide the callers with a script. Wagner testified about how he and others in the office would make hundreds of these phone calls from the Capitol. The purpose of these calls was to encourage people to donate, even if they did not attend the fundraiser.

The Grand Jury heard lengthy and detailed testimony about two of Veon's largest fundraisers, which occurred in 2004 and 2006. These were particularly elaborate events,

35

taking place at a location known as the "Fez" in Beaver County. These events varied but were generally replete with offerings like: specialized food choices; ice sculptures; personalized cigars; personalized bottles of wine; personalized cork screws, and a tribute video to Mike Veon. These, and every other aspect of these events, were arranged by employees of the taxpayers during their work hours. Jeb Wagner, who traveled out to Beaver County and worked on the 2004 fundraiser, described how he and Melissa Lewis picked up cases of wine from the Lapic Winery in Beaver County and delivered them to the Fez. All told, records reveal that at least 6 Caucus employees traveled to the district for this fundraiser. This travel was charged to the taxpayers at an expense of $3,321.23. The invitations for the 2004 anniversary fundraiser announced that it as a Platinum Anniversary Celebration, to celebrate Veon's 20th anniversary in the legislature, costing "$1,000 for cocktail reception and dinner." According to the testimony, it was a huge success.

The Grand Jury acquired extensive documentation reflecting Veon's fundraising operations. These documents include fundraising schedules, fundraising lists, draft invitations and emails. These documents corroborate the testimony of eyewitnesses about: the extent and sophistication of the operation; the central role played by Lavelle; the significant involvements of Cott, Foreman and Annamarie Perretta-Rosepink; and, the direct control by Veon of this fundraising operation.

## Campaign and Fundraising Mailings

Another ongoing and significant operation of Veon's Capitol staff involved the writing, printing and folding of tens of thousands of fundraising and campaign mailings. Again, this work was all accomplished at the expense of the taxpayers. Also, as with so many aspects of Veon's campaign operations, this work occurred primarily behind closed doors in the 626 suite of the Capitol.

Numerous individuals testified about the scope of the mailing operation. Certain members of Veon's staff would be tasked with writing and producing the brochure or campaign piece. These duties were often fulfilled by Brett Cott, Patrick Lavelle and Steve Keefer. Graphic design work, such as using symbols, emblems or photographs, was almost always completed by Steve Keefer. A draft of the product would then be circulated for a review that often included Foreman and Veon. Veon would always

36

review invitations to his fundraisers. If possible, the mailing would be printed in the Capitol using the paper and resources of the taxpayers. If the item required a specialized printing, it would be sent out to a printer, however, once printed, these were often returned to the Capitol for folding and mailing.

Once an invitation or campaign mailer was finalized, it would need to be folded, placed in an envelope and mailed. As was explained to the Grand Jury, this was often an extremely time intensive project. For example, it was explained that fundraising invitations often had three or four parts. There could be a cover letter, an invitation, directions, and a return (R.S.V.P.) envelope. These would all need to be constructed and folded to fit in the envelope in a particular manner. The time and labor involved in folding thousands of such invitations by a deadline, was often substantial. All of this work would be done on taxpayer paid work hours and at taxpayer expense. Indeed, if public employees stayed late working on such a mailer, they would receive compensatory time for their extra hours, despite the fact that it was campaign work.

There was also a folding machine, equipment of the taxpayers, located in the 626 suite. This folding machine would be used to fold many, but not all, of the campaign mailers that were done in the Veon offices. Many former staffers testified that this machine seemed to be "constantly" running during the work day. The envelopes used for these mailings were usually addressed and printed in the office by use of the fundraising lists. The various lists contained mailing information that allowed the Veon staff to print envelopes and direct their campaign literature to the targeted lists. Once completed, it was not unusual for fundraising and campaign mailings to simply be taken to the mail room, or the post office, and mailed at taxpayer expense.

It should be noted that these mailing efforts were obvious and notorious among Veon's capitol staff. Many of the staffers were asked, at various times, to assist on mailings, especially when there was a short deadline. It should also be noted that these efforts were not limited to Veon's fundraising and reelection campaigns. Veon, Foreman and Cott utilized these resources for other candidates or campaign causes supported by Veon. Staff and resources were also used to prepare mailers on behalf of non-profit entities associated with Veon.

37

These efforts, while notorious within the Veon offices, were not to be disclosed outside of the office. The need for secrecy of these operations was repeatedly emphasized by Lavelle and Foreman to the staff. Staff members were also advised to make every effort to conceal their campaign work from others in the Caucus and, obviously, the public. For example, campaign or fundraising mailers were to be stacked, in closed or covered boxes, before being transported out of the 626 suite. Additionally, staff was advised that, if they needed to use a copy machine located outside of Veon's offices, for campaign purposes, they should be sure to stay by the machine and conceal what was being copied.

Former staffers testified these mailing efforts had been underway for many years and dated as far back as the mid-1990's. They also testified that, during campaign years, and particularly during campaign seasons, these efforts required large amounts of personnel and hours of work. On no occasion did they take leave and on no occasion were they asked to take leave. Their supervisor, Jeff Foreman, not only knew of these efforts, but actively promoted such work.

### *Various Political Endeavors*

Veon's use of staff and resources for campaign purposes was continuous and opportunistic. Former staffers testified to a seemingly endless number of campaign applications and projects to which they were assigned.

Former staffers testified to being sent to Veon's legislative district, as well as other locations within the state, to conduct nominating petition drives. This is the process whereby the candidate obtains enough signatures from registered voters in his or her party to be placed on the ballot. Veon would use his staff to not only accumulate large numbers of signatures for his own re-election efforts, but for other candidates for whom he was providing support.

Staffers also testified about the use of "testimonial letters" in campaigns. These letters are supposed to be expressions of support for a candidate by a citizen. In reality, Veon's staffers testified that these letters were often written by them, as directed by Veon, Cott or Foreman. For Veon's elections, many of these letters were written over the name of an actual voter from his legislative district. Thousands of copies would then

38

be made and distributed as part of Veon's campaign efforts. Of course, it was never revealed that Veon's staff actually wrote, copied and publicized many of these letters.

In another instance, former staffer Jeb Wagner testified about his work assisting in the preparation of video testimonials to be used in campaign commercials. Wagner testified that, in 2005, he and Richard Pronesti were sent to Beaver County to help create testimonial commercials in support of Mike Veon. He stated that he received an email from Jeff Foreman stating that this work needed to be done in preparation for Veon's primary election because, following the pay raise votes, it was likely to be a difficult one. Wagner described how he and Pronesti then went out to Beaver County for two nights to work on this effort. He stated that when he and Pronesti arrived at the district office, Annamarie Perretta-Rosepink provided them with a schedule for the filming of these testimonials. Consistent with the schedule, they then went to a location outside of the district office where a preselected group of district citizens were filmed encouraging people to support Veon. Neither Wagner nor Pronesti did any legislative or constituent work on this trip, yet all of the expenses were paid by the taxpayers. Their expenses for travel, meals and lodging exceeded $1,000.00.

A number of former employees of Veon also testified about the campaign work of Stephen Keefer. He was, throughout his employment with Veon, also Veon's Campaign Treasurer. He sat in the 626 suite with Patrick Lavelle. His duties, according to others in the suite, were limited to assisting Lavelle with fundraising and creating campaign brochures and mailers. As a graphic artist, he put his talents to use on many types of campaign work. The Grand Jury reviewed dozens of examples of his work recovered from emails. A notable bulk of these involved his own candidacy for Lebanon County Commissioner. These emails corroborate the testimony about his performance of these campaign endeavors in the Capitol, during work hours.

## B. ASSISTANCE RENDERED TO SPECIFIC CAMPAIGNS

### 1. 2004 Elections

During the 2004 election cycle, a number of Caucus employees testified that they were specifically directed to work on campaigns. Caucus employee Steven Webb provided detailed testimony about being specifically directed, by Mike Veon, to transfer to Veon's district office for the sole purpose of working on behalf of a legislative

39

candidate named Sean Ramaley, running for a seat in a legislative district adjoining Veon's. Webb was subsequently transferred to Veon's district office, remaining on the public payroll, where he worked exclusively on campaign matters. Later in the election season, Veon directed him to the 11th Legislative District to work on the campaign of an individual named Fred Vero who was running against Brian Ellis for a seat in the Pennsylvania Legislature. Webb went, as directed, to work on the Vero campaign but, uncomfortable with working from a campaign office while on the public payroll, he requested and was granted leave without pay status. However, he retained his taxpayer funded benefits, as did all others who campaigned while on leave without pay.

David Bliss testified to also being sent by Mike Veon to work for "two or three weeks" on the Vero Campaign. He testified that Brett Cott also worked on the Vero Campaign. They were not required to take leave and did not do so. (Veon did not have any opposition in the 2004 election cycle and hence, there was no need to direct legislative resources for his own campaign.)

Paul Martz testified that he was directed, in 2004, by Michael Manzo to transfer to the district office of Representative Tangretti, in the 57th Legislative District, in Westmoreland County. Martz testified that, while the official paperwork said he was working in Tangretti's district office, in fact, he did not even have a work station in that office. He testified that he worked exclusively from Tangretti's campaign office while being paid by the taxpayers. He further testified that in approximately September of 2004, he was also sent to work on the Vero campaign in Butler County. Again, he was not required to take leave and did not do so.

Significant resources were also directed to a special election in the 109th Legislative District, located primarily in Columbia County. This was an election that was specifically noted on the bonus list for 2004. Testimony and records reveal that at least twenty-nine Caucus employees conducted campaign work on behalf of the Caucus in the 109th Legislative District. A number of these were from Veon's Capitol office staff and none of Veon's staffer's submitted leave for their campaign work. Indeed, Cott, Keefer and Bliss submitted absolutely no leave for the entire year. A number of the staffers who worked on this special election campaign did not submit leave for their campaign work until 2007, after they became aware of this investigation.

### 2. 2005 Special Elections

By the summer of 2005 the new campaign scheme, fueled by compensatory time and taxpayer money, was working. The message was out: campaign work was the way to get a bonus and to move upward in the Caucus. Furthermore, the scheme was putting on muscle, and it could be directed to any political campaign in which Caucus leadership had an interest.

First up in the Spring of 2005 was a special election involving candidate Wayne Fontana, in Allegheny County, in May. This was a State Senate race which, normally, would not have involved House personnel. But according to Eric Webb, Fontana's opponent was one Mike Diven, and Diven had been a thorn in the side of House Majority Leader Bill DeWeese. Therefore, Mike Manzo directed that the Caucus campaign machine would be sent out to defeat Diven. It did.

Approximately seventeen Caucus employees went out, from the Capitol, to help in Allegheny County, including some of the Rockstar-level campaigners: Stephen Webb, Kevin Sidella, Erin Madison, Paul Martz, Jonathan Price, and others. Most of them used comp time to be away from their legislative desks. All of them received credit in a designated column on Eric Webb's "List" of campaign volunteer activity.

The second special election in the summer of 2005 was in Lehigh County, in July, where Linda Minger was the candidate for a State House of Representatives seat. According to Dan Reese, there was a "big push" to get as many Caucus employees out as possible. Karen Steiner told the grand jury how she was informed that it would look bad if "leadership staff" did not make a strong showing on the Minger campaign. Everyone, from interns to long-time employees, was expected to volunteer.

The big push generated a response: Robert Caton described the turnout for this campaign as the time when "the turnout of bodies from the Democratic Caucus really started to ramp up." Virtually all of the Caucus' reliable campaigners went out on the Minger campaign. Stephen Webb went out for two weeks. Karen Steiner went out for two and a half weeks. Nora Sabo was able to go out for three or four weeks by going off payroll (yet maintaining her benefits at taxpayer expense with approval from Caucus leadership). In addition to the regulars, there were many Caucus employees volunteering who had done little or no prior volunteer work. Eric Webb's campaign "volunteer" list

41

contained a column for the Minger campaign, and further study of the List reveals that one hundred seventy-seven Caucus staffers received credit for that campaign.

The Minger campaign is important not only because of the sheer number of Caucus personnel "volunteering" to work on it, but also because that was the time, for some, when they realized the connection between campaign work and bonus money. Gail McDermott, an employee of the Office of Member Services worked on the Minger campaign. She described how she made the connection between her campaign work and a bonus: in September of 2005, while at her legislative desk, she received a summons by telephone or email to go to the Personnel Office. When she got there, other people were present and envelopes were being handed out to all of them. McDermott opened her envelope and found a bonus check for approximately four hundred dollars. She then looked around and noticed the people who were there, obviously in response to the same summons, and who were receiving the same type of envelopes, were the same people that had worked on the Minger campaign. She concluded that they were all receiving bonus checks as a reward for their work on the Minger campaign.

Robert Caton also testified about the great increase in the turnout of volunteers for the Minger campaign, more than he had ever seen before. By this time, Mr. Caton said, people were getting the bonus message. The message was not completely overt, "but it was absolutely laid out that if you wanted to get ahead, going out and working on campaigns was the way to get ahead."

### 3. 2005 Local Elections

The application of Veon's taxpayer funded campaign machine was not limited to legislative elections. In 2005, an off year for legislative elections, there were a number of local elections, in an around Beaver County, in which Veon decided to insert himself.

In one instance, Veon supported an individual named Kim Tesla, a Beaver County judicial candidate, in the Democratic Primary in 2005. Veon, Brett Cott and Annamarie Perretta-Rosepink virtually took over this campaign. The evidence reveals that Veon dedicated much of his district office and his Capitol office staff to this effort. The involvement was not limited to simply providing staff members to do field work on these campaigns. Veon, Cott, Perretta-Rosepink and others were involved in the fundraising, campaign ads and mailers on behalf of this candidate. The evidence reveals that many of

42

the mail pieces created for the "Tesla for Judge" campaign were written and produced in the Capitol by then Veon staffer Stephen Keefer.

Once employees and resources from Veon's Capitol office were sent to Beaver County, Annamarie Perretta-Rosepink frequently supervised and directed the campaign work and applications of these resources.

Veon also dedicated taxpayer funded resources to the candidacy of Joe Schafer for a District Justice position in Beaver County. Again, the involvement of Veon and his resources was extensive and intimate. As in Tesla, the Grand Jury reviewed evidence that included advertisements and mail pieces for Schafer. These mail pieces were glossy color brochures about the candidate and his opponent.

The evidence demonstrates that these campaign brochures were produced in the Capitol by Veon staffer Stephen Keefer. This work was clearly demonstrated by an email, dated April 19, 2005, at 3:02 p.m., from Keefer to Veon, Perretta-Rosepink, and Cott. The email was entitled "Schaffer mail" and stated, in pertinent part: "Here are the pieces for Schaffer. I still need a photo with the fire crew and Joe...the one they sent me was not usable...all the other pieces are ready to roll upon approval." This email was typical of those reviewed by the Grand Jury pertaining to campaign ads and mail pieces produced by Stephen Keefer at the direction of Veon and Cott. Once produced, these "pieces" would be circulated to Veon, Cott and others for review, correction and comment. Once finalized, they would usually be sent to Perretta-Rosepink who would then provide them to the candidates.

The same type of effort was pursued on behalf of the candidacy of Chet Orelli, a Veon district office staffer, who ran for New Castle City Council in 2005. Veon employed his Capitol staff and taxpayer resources in support of Orelli's campaign. He specifically dispatched employees of his Capitol staff to Lawrence County, at taxpayer expense, to do field work for Orelli's campaign.

In another local election, a candidate for Democratic County Commissioner, James Albert, was disliked by Veon. As such, Veon wanted to defeat him but did not want his stance publicly known. Veon directed Brett Cott to set up a political action committee (PAC) called "Citizens for a Better Beaver County" to fund mail pieces and literature against Albert. Veon was the only contributor to this political action committee

43

and it enabled him to send mailings and conduct literature drops against Albert without public disclosure of his actions. Again, the mail pieces and anti-Albert literature were written and produced in the Capitol by Keefer, Cott and Veon. Some of this literature was mailed, at the expense of the PAC, to the voters of Beaver County and some of it was hand delivered to voter's homes by Veon staffers.

Fourteen employees from Veon's Capitol office traveled to the Beaver County area during the primary and/or general elections of 2005 for the conduct of campaign work. None of these individuals were requested to submit leave for their campaign work. The mileage and expenses for all of these trips were paid for by the taxpayers of Pennsylvania. The total cost to the taxpayers, just for the travel expenses, was over $10,000.00.

In the case of the primary election held on May 17, 2005, five of Veon's Capitol office staff: Karen Steiner; Melissa Lewis; Richard Pronesti; Lori Smith; and, Ester Reever, were specifically told by Chief of Staff Jeff Foreman to submit their expenses to the State for payment. An email exchange was submitted into evidence before the Grand Jury that corroborated Foreman's directive. Karen Steiner sent the following email to her supervisor, Jeff Foreman on May 5, 2005, and copied to: Pronesti, Rich; Smith, Lori; Reever, Esther (Wilt); and, Lewis, Melissa:

> "Out of pure curiosity and in order to avoid any more confusion in 626, do you want us to fill out a request for travel approval for the 16th and 17th? If so, what are we going for (we need to put this on the form)" Election Day Activities/campaigning? And then we submit these to you? And then after the fact we'll fill out the other form?"

Jeff Foreman replied, and also copied to Pronesti, Rich; Lori; Reever, Esther (Wilt); Lewis, Melissa:

> "Your trip is to assist at D.O. and attend meetings in the district. Please fill out forms legislatively."

Karen Steiner answered, again copied to Pronesti, Rich; Lori; Reever, Esther (Wilt); Lewis, Melissa:

> "Okay, I understand that."

The Grand Jury also reviewed two memos from Jeff Foreman to Scott Brubaker regarding the payment of travel expenses on election days in 2005. Controller Mary Ann Reese O'Leary testified that Caucus policy disallowed the payment of travel expenses to a legislative district on election days because they would be campaign expenditures. Hence, when Veon staffers submitted travel expenses for travel to the district on primary election day, May 17, 2005, it was immediately questioned. Foreman then wrote a memo stating: "I'm writing to provide reassurance that all travel expenses submitted by staff from this office for that time period are legitimate legislative expenses." He then described "massive" work "concerning Act 72" performed in the district over election day. A very similar letter of "reassurance" was sent by Foreman in regards to travel for the general election on November 8, 2005. As already stated, all expenses were subsequently paid. Veon staffers testified that Foreman was absolutely aware that they did only campaign work on these trips.

## 4. 2006 Elections – *Primary and General*

By the primary season of 2006, the benefits of the "incentive scheme" were being fully realized. This was especially important for Veon who, for the first time in many years, was facing formidable campaign opposition as a result of his votes in favor of the legislative pay raise. As such, unprecedented numbers of "volunteers" were directed to Veon's district on both the primary and general elections.

Veon's Capitol staff, for the most part, were being directed to the re-election efforts. While, as previously mentioned, leave for campaign work was now being required, it remained limited to those acts of obvious and public campaigning. Campaign work performed in the Capitol, or out of the public's view, continued to be performed at taxpayer expense. Also, the leave usually employed for campaign work was compensatory leave. As previously discussed, this type of leave, among Veon staffers, was predominately fraudulent. Indeed, prior to 2006 there had been little to no accumulation of compensatory leave among Veon's capitol staff, yet the same staff members suddenly accrued large amounts of compensatory time for use in the first five months of 2006. For example, electronic leave records of the Caucus revealed that prior to October of 2005 Brett Cott had never accrued a single hour of compensatory time.

45

However, commencing on October 24, 2005, Cott began accruing one to four hours of compensatory time virtually daily leading up to the primary election season of 2006.

Karen Steiner testified before the Grand Jury that she was directed, in early March, 2006 to start a phone bank on behalf of Mike Veon's primary election effort. The phone bank was actually situate in Harrisburg and was staffed by Caucus "volunteers". Steiner testified in detail about the labor involved in coordinating and supervising this phone bank. She testified that this was a highly sophisticated operation that was closely coordinated with campaign workers in the field. At the end of each day "tally sheets" would be prepared for all of the calls and responses. These would then be forwarded, by email, to Veon, Cott, Perretta-Rosepink and others. Steiner testified that throughout this period of time she was spending, on average, sixty percent of her work day working on this campaign phone bank. She was doing this without leave and with the direct knowledge of Veon, Cott, Foreman and others. Starting in September of 2006, Steiner was directed to re-open the phone bank to assist Veon in his general election campaign. She did so with the same level of labor and sophistication. Steiner also provided the Grand Jury with detailed documentation from the primary and general election phone banks that corroborate the sophistication and scale of the operation. Steiner would receive over $15,000.00 in bonuses in 2006.

The abuses of taxpayer resources were by no means limited to Veon's staff. A significant number of Caucus employees spent months during 2006 doing nothing but campaign work. This presentment cannot begin to catalog the individual instances of campaign work by Caucus employees. As such, a few illustrations amply demonstrate the abuses.

As previously discussed Michelle Borlinghaus had started her full time employment with the Caucus in August of 2005. By the time of Veon's primary race, she had already spent significant time on two other campaigns. She testified before the Grand Jury, pursuant to a grant of immunity, that in April of 2006 she was called by Michael Manzo who told her that he and Veon wanted her to go out and work in Veon's district for the remainder of the campaign. This would have been for approximately three weeks. Borlinghaus had told Manzo that she did not believe she had adequate leave, having used all of it on her other campaign work. He told her that he would take care of

46

that. About twenty minutes later, her supervisor, Jen Brubaker, came to her desk and told her that she now had enough leave and could go out and work on the Veon campaign.

Rachel Manzo also exemplified the type of campaign work, in 2006, that resulted in reward and advancement. At the time, Rachel Manzo was the Executive Director of the Tourism Committee for the Minority Democratic Caucus. She was salaried, in 2006, at approximately $78,000.00, with full benefits. By all accounts, including the sworn testimony of her supervisor, former Representative Frank LaGrotta, she had very little work to do in this position. As early as March, she was informing Representative LaGrotta that she would be going to Veon's district to work on his primary campaign. When LaGrotta objected, and pointed out that he also had a primary challenger, Rachel Manzo was able to simply ignore him.

The electronic leave records of the caucus show that she took compensatory leave for the three week period before the primary election. The origins of this compensatory leave are unknown, as is the accuracy of much of her electronic leave records, since all of her written authorizations and leave documents for 2006 have disappeared.[3] LaGrotta further testified that he never asked her to stay late or do anything that warranted compensatory time. He also testified that he never authorized her to accrue comp time and never signed an authorization (as is normal).

A number of witnesses testified that Rachel Manzo was extremely involved in Veon's campaign and had been appointed as the Field Director for Veon's primary. LaGrotta testified that she was gone "at least four to five weeks before the primary" working on Veon's campaign.

After Veon's primary victory, since Representative LaGrotta had been defeated in his primary, she had virtually no legislative work to perform. A variety of witnesses testified that she became heavily involved in various types of campaign work over the summer and early fall of 2006. She assisted with opposition research, petition challenges and the recruitment and assignment of "volunteers" for political endeavors and campaign work. As already discussed, she also shared responsibility with Eric Webb for maintaining the bonus list during this time. In October of 2006, she was dispatched to the

---

[3] Matters pertaining to potential obstruction or destruction of evidence remain part of the Grand Jury's ongoing investigation.

151st Legislative District to assist the campaign of Representative Rick Taylor. The electronic leave records show that she took compensatory leave for the three weeks before that election. From the primary election on May 16th until she went on leave to work on the Taylor campaign, the electronic leave records show only three days of taken leave.

Joseph Tarquinio, a member of the Caucus Information and Technology staff, worked on the Veon campaign in Beaver County. He described how at night, the Veon District Office was turned into a campaign machine. The public assets of the District Office, including copy machine, the computers, and the printers, were all used to create and print campaign material. Members of the Veon campaign team used the copier in the District Office because that copier was a heavy-duty, high-volume copier, unlike the one in the actual Veon campaign office, which could never have handled the high output requirements of the Veon campaign. Using the copier and printers in the District Office, the Veon campaign team went through, as Mr. Tarquinio stated, "tons of supplies." According to Mr. Tarquinio, the campaign workers were printing and copying thousands of pages per day and going through one or two toner cartridges per day. Other employees of the Caucus testified to sending huge amounts of public supplies from Harrisburg to Veon's district office during campaign seasons. In particular, dozens of expensive toner cartridges (costing over $300.00 a piece) for the district office copier were supplied at the request of Annamarie Perretta-Rosepink.

Beth Marietta, a technology trainer in the Information and Technology Office of the Democratic Caucus testified about how she came to work on the Taylor campaign. She testified that she knew Rachel Manzo from having "campaigned with her in the spring of 2006." She said that one day in the fall she received an email from Rachel Manzo "saying that she found out that I was available certain days and could I assist on the campaign." Rachel Manzo was not in Marietta's chain of command and would not, normally, have access to Marietta's work schedule and calendar. Nonetheless, she somehow knew Marrietta's schedule. Marietta responded that she was not available on those days. The next day Rachel Manzo appeared in the information and technology offices and, viewed by Marietta, entered Steve Keefer's office. After Rachel Manzo left Keefer's office, Keefer called in Marietta and asked her why she was not doing any

48

campaigning. Marietta didn't have a lot of leave time because her husband had had neurological surgery and she had to remain close to home and use her time to take care of him. She told him that she did not have any leave time remaining, other than some sick time. He told her:

"Don't worry about that, we need you to campaign. You are going to report to Rachel."

Additionally, he told her to take the unprecedented step of bypassing her direct supervisor and submitting her leave slips directly to Keefer. She subsequently worked five or six days on the Taylor campaign, under the direction of Rachel Manzo, and submitted her slips directly to Keefer. She testified that none of the leave time was ever deducted from her leave balance. She further testified that:

"I felt that if I didn't campaign, especially being called into his office directly, that somehow my job would be affected. He never said, you're going to lose your job, but I just didn't feel right. I just felt pressured as if my job would be on the line if I did not do as directed."

### C. OPPOSITION RESEARCH

Opposition research is the act of conducting extensive research and investigation into the personal and professional lives of political opponents. It is usually conducted for the purpose of preparing a memoranda or "opposition research report," about an actual or prospective political opponent in a legislative district. These memoranda detail the strengths and weaknesses of opponents in an attempt to provide general and specific campaign strategies for defeating these opponents. Over the years, the Caucus relied, almost exclusively, on its employees for the completion of opposition research.

Numerous individuals provided detailed testimony before the Grand Jury about the opposition research effort. This effort could be traced, in the testimony, back nearly twenty years. This testimony was corroborated by the fact that the Office of Attorney General seized twenty boxes from the Caucus Legislative Research Office, pursuant to a search warrant on August 23, 2007, containing hundreds of instances of opposition research and reports dating from 1990 until 2001. All of these reports, filed and

49

organized by legislative district, appeared to be the work of Caucus employees. It should also be noted that three staffers of the Caucus testified to witnessing opposition research filed and maintained in the Legislative Research Office over the years.

For most of those years, the performance of opposition research occurred primarily in the Legislative Research Office. However, starting in 2004, Veon and Michael Manzo attempted to centralize the opposition research efforts in the Office of Member Services (OMS). In early 2005, Eric Webb was appointed as the director of OMS by Veon and Manzo with this understanding. In fact, Webb produced a "confidential" memorandum, which he had sent to Manzo and Veon on February 8, 2005, that detailed his plans for OMS, including the centralization of opposition research. Therein, Webb promised a "more comprehensive, timely, and uniform" preparation of opposition research.

Webb testified that he was held to his promise and, under the direction of Veon and Manzo, opposition research became one of the primary functions of OMS. The staffers in OMS noticed the change. From 2005 through 2006, the core of Webb's OMS full time staff was comprised of Cameron Texter, Paul Martz, Gail McDermott and Nora Sabo. Several testified that in 2004/2005 they simply stopped performing constituent services and became almost exclusively dedicated to opposition research and campaign work. This focus continued through the end of 2006. Former OMS staffer Nora Sabo testified that in 2006 she did nothing other than opposition research and campaign work.

Webb testified that he also prepared flow charts and guidelines for instructing other employees of the caucus on how to successfully conduct opposition research and the preparation of opposition research reports. These guides, entered as evidence before the Grand Jury, demonstrated the length and complexity of this operation.

Properly performed, opposition research requires a search of every public database, media data-base, and public records (such as court records, tax records, property records, etc.), reasonably likely to yield information about an individual. Eric Webb testified that correctly doing opposition research was "way more involved than doing regular campaign work." He stated that it is designed to find "anything useful" about a candidate including all liabilities and strengths. It almost always entailed "a mountain of paper to go through." He described how every courthouse in a legislative

50

district would have to be visited to ascertain if there were any public records pertaining to the candidate. He stated that they even had developed a method to identify what magazine subscriptions were purchased by a candidate.

If the candidate had held prior public office, all votes, minutes, expenses, speeches, etc., would need to be reviewed and distilled in the report. He testified that an opposition research report, properly prepared, would not just identify the pros and cons of each candidate but would identify the important issues in that legislative district and what polling questions would likely assist the Caucus candidate. Another Office of Member Services staffer who testified before the Grand Jury stated:

> "Basically, when you do an opposition research report, to keep it simple, you look at both candidates or all candidates, sometimes there would be multiple candidates, if there was an open seat. To put it bluntly, you look at the good, the bad, and the ugly of each person, their voting history, whether they have any civil suits, whether they have any criminal suits, whether they pay their taxes, what news articles are out there, their work history, and their family history. I mean, it has just about everything that you can find in them, and the person overall; what properties they own, their house, you know, their family, their kids, what college they went to, the whole nine yards. It has everything in it."

Internet searches were a fundamental part of opposition research. A variety of public and private databases would be utilized for the conduct of opposition research. Numerous individuals testified as to the use of the Lexis Nexis database for opposition research purposes. This database is not publicly available and requires a fee for its usage. Lexis Nexis provides online access to over 40,000 legal, news and business sources comprising approximately five billion searchable documents. Pursuant to a subpoena, the Grand Jury obtained the Lexis Nexis records and invoices of the Caucus. The records corroborated the testimony and revealed that thousands of dollars in taxpayer paid Lexis Nexis usage was conducted for campaign purposes.

Access to Lexis Nexis, because of the expense, was limited to a handful of password holders. In the Office of Members Services, Eric Webb, Nora Sabo, Paul Martz and Gail McDermott had Lexis Nexis passwords. Additionally, Brett Cott and Rachel Manzo had passwords. Those with passwords would conduct database searches

51

on candidates and forward their findings to the legislative staffers who were assigned to do the report. Email evidence, much of it provided by the OMS staffers themselves, also corroborates the use of Lexis Nexis. The Grand Jury reviewed a series of emails wherein Lexis Nexis password holders, such as Brett Cott, forwarded search results, by legislative email, for use of Caucus employees conducting opposition research on candidates.

Eric Webb testified that, in the summer of 2006, there was a significant push to conduct large amounts of opposition research and complete opposition research reports. This effort was spearheaded by Michael Manzo and Brett Cott. Webb provided a list, of those he believed were suited to perform opposition research, to Manzo. Manzo then sent an email to each of these employees inviting them to a meeting in the minority Caucus room, in the Capitol, about opposition research. Numerous individuals testified before the grand jury about this meeting. Manzo gave a presentation to the assembled legislative staffers about the importance of the upcoming election in November and the need to complete large amounts of opposition research well before the election.

Eric Webb handed out detailed checklists and guidelines on how to properly conduct the research and write the opposition research reports. Brett Cott also spoke, emphasizing the importance of the work, and providing tips about its conduct. Specific assignments were made to the assembled legislative staffers. Webb testified that approximately twenty-seven legislative district campaigns were assigned for completion. There was no discussion of leave or the need to conduct this work on personal time. Indeed, Manzo specifically instructed that those who had legislative access to Lexis Nexis should conduct searches for those who did not have such access. Webb further testified that all finished reports were sent to him and, following his review, he forwarded them on to Dan Weidemer, the Executive Director of the House Democratic Campaign Committee.

Webb listed, for the Grand Jury, thirty-one individual employees who he remembered were in attendance at this meeting. A number of other individuals testified corroborating that thirty to fifty employees were in attendance at this meeting. Almost all of those in attendance were "Rockstars" of the Caucus and all received bonuses in 2006.

Many Caucus staffers testified before the Grand Jury about their conduct of opposition research in the Capitol on the taxpayer's time. Some testified that they would

52

take leave when conducting "field work" such as at courthouses, outside of the capitol and public locations. However, others testified that they would travel to a legislative district for the purpose of conducting opposition research, but would charge the trip to the state because they would stop and visit a representative's district office in the area. This was done to save the limited funds of the House Democratic Campaign Committee. Almost all who testified about conducting opposition research stated that they did the report preparation at their desks during work hours. They stated that they did so with the knowledge and approval of their supervisors. Webb testified about a conversation with Jen Brubaker about the complexity of some opposition reports wherein she also admitted doing opposition research reports at her desk.

Nora Sabo testified before the Grand Jury about a specific opposition research project, assigned in 2006, directing her and other staffers to conduct opposition research on gubernatorial candidates Lynn Swann and William Scranton. She and several other members of the section did extensive amounts of research on those candidates. Eric Webb testified and corroborated these facts. He testified that the opposition research on Swann and Scranton was done at the specific request of Michael Manzo. The finished work product was subsequently provided by Webb to Manzo.

Opposition research reports, often called "lay of the land" memorandum, are voluminous detailed writings, often upwards of one hundred pages in length. In the course of this investigation, hundreds of these written reports were recovered from the Caucus and from individual staffers. The testimony and records, including evidence recovered by Office of Attorney General computer forensic agents, establish that in 2006 alone, at least sixty of these reports were researched and completed by the Caucus employees. Webb testified that even himself, experienced at this work, required "two solid weeks" to complete "two or three" reports. Another staffer testified that he, alone, researched and wrote twenty to twenty-five opposition reports in 2005 and 2006.

Email evidence substantiates the depth of involvement in opposition research by the employees and supervisors of the Caucus. Emails show the Executive Director of the House Democratic Campaign Committee sending lists of opposition research reports to be completed to Veon, Cott, Manzo, Webb, Jen Brubaker and others. Veon, Manzo, and Cott often became personally involved in directing and reviewing opposition reports.

53

Testimony, records, and emails demonstrate that Mike Veon, Michael Manzo, Brett Cott and Jennifer Brubaker directed, and participated in, the conduct of extensive opposition research by use of taxpayer resources.

## D. NOMINATING PETITION CHALLENGES

In order to appear on an election ballot, candidates must file nomination documents, which consist of petitions on which registered voter signatures, and related voter information, are collected and recorded. The number of signatures required for the nomination document varies, according to the political office being sought, and the political party affiliation of the candidate. In addition to the voter signatures, information pertaining to the candidate, and information regarding, and affidavits of, the individuals who circulate the documents to obtain the signatures must be completed. The manner in which such information is obtained and included on the documents is specifically prescribed by the Pennsylvania Election Code, the law which governs all aspects of elections in Pennsylvania. The nomination documents (which will be referenced hereafter as "petitions") can be challenged in court, after they are filed by the prospective candidates. Such challenges are generally geared toward invalidating entire petition pages, thus excluding the signatures which appear on that particular petition, or invalidating individual voter signatures, by demonstrating that the signatures, or other requisite information, does not conform to the dictates of the Election Code. In either event, the goal is to invalidate enough signatures to bring the number of legitimate signatures below the requisite number for appearance on the ballot. If the challenge is thus successful, the challenged candidate can not appear on the ballot.

Our investigation has found that employees and resources of the House Democrat Caucus historically and routinely were utilized to conduct petition challenges against candidates who were opponents of Caucus incumbents or the Democratic Party. Meetings with employees regarding petition challenges, and the participation of Caucus employees therein, were typically conducted by Brett Cott and Michael Manzo. At the meetings, the employees would receive instructions as to how to review petitions for improprieties. The employees would conduct reviews during regular working hours at their Caucus workplaces, utilizing their Caucus computers to research information on individuals whose names appeared as signators on the petitions, through the Constituent

54

Tracking Service ("CTS"), a program which was designed and intended for legitimate legislative use, and which included voter registration information. The Caucus computers were further utilized to compile and transmit the information which would be used to challenge signatures or petition pages. The Caucus employees were not required to, and did not, take leave for the time spent during their regular work hours on such endeavors.

The two most outstanding examples of misappropriation of taxpayer resources in petition challenges were found in the challenges to the candidacies of Ralph Nader, for President of the United States in 2004, and Carl Romanelli, for the United States Senate in 2006.

## A. Nader Petition Challenge

Ralph Nader was seeking the presidency as an Independent candidate in 2004. Pursuant to the Election Code, Nader needed to obtain 25,697 petition signatures to appear on the ballot. It was generally assumed, in Democratic Party circles, that Nader's appearance on the ballot would be detrimental to Democratic Presidential Candidate John Kerry, since Nader would siphon votes from Kerry. The Election Code provides that challenges to petitions must be filed no later than one week after the petitions are filed.

In light of that time limitation, and the massive amount of work which would be involved in reviewing such a volume of signatures, the Caucus quest to remove Nader from the ballot began before his petitions were even filed. The Nader petition filing consisted of a total of 51,273 signatures, which appeared on 1,183 separate documents.

After the petition pages were obtained, Manzo set in motion the massive endeavor which was required to complete the above-described challenge process. Due to the staggering volume of materials involved, a veritable army of Caucus staffers was enlisted. The petition pages were divided among the staffers in the Capitol complex, the members of Veon's Beaver Falls District Office staff, and a law firm which was ultimately involved in filing the challenge. Manzo directed the day-to-day operation, with assistance from Jeff Foreman, and appointed a staffer who, along with Melissa Lewis from Veon's District Office, coordinated the dissemination of materials and information to the aforementioned law firm. Annamarie Perretta-Rosepink supervised and directed the activities of the Caucus participants in Veon's District Office.

55

As many as fifty Caucus staff members participated in the challenge effort, and contributed a staggering number of man-hours. As stated by Patrick Grill, a Caucus employee, referring to his fellow staffers, "Everybody was working on this." It was virtually a Caucus-wide endeavor. Many of the Caucus employees spent an entire week on it. Melissa Lewis, along with two other members of Veon's District Office, even drove boxes of materials necessary for the challenge filing to Harrisburg, where they were delivered to the challenge attorney. Since the work was being done in Caucus offices, the tradition of not taking leave was, almost invariably, honored. None of the aforementioned supervisors who were directing the operation ever requested or instructed any of the staffers to take leave. The fruits of the Caucus labor was reflected in the challenge petition, which was filed on August 9, 2004. All told, in excess of 34,000 signatures were challenged due to improprieties found during the review process. Ultimately, the challenge was successful, and Nader was kept off the ballot.

Veon lauded the Nader challenge efforts and result in an October 13, 2004 email addressed to the "LAH[4] Staff" and Veon's 22-member Caucus staff. In that email, Veon stated:

> "FYI... great job by our staff! This would never ever have been successful without your work. You have given John Kerry an even better opportunity to win this state... one of the most 5 important states to win this year.
> That is a very significant fact and significant contribution by each one of you to the Kerry for president campaign... you should take great pride in your efforts."

Jeff Foreman expressed similar sentiments in a November 3, 2004 email to Veon staffers, by stating: "...clearly the volunteer effort regarding the challenge to Nader was a critical piece of the Kerry victory in Pa., and our staff, especially the D.O. [District Office] staff, was essential in that effort...". The Nader effort was further acknowledged, and rewarded, by Scott Brubaker, Manzo, Foreman, Brett Cott and Veon, as indicated in the above-described emails regarding the campaign-related 2004 bonuses.

Based upon the evidence presented to us, we have been able to identify, by name, the below-listed individuals who were involved with the Nader challenge. The list is

---

[4] "LAH" stands for "Lend-A-Hand", a purported non-profit run by Veon.

56

certainly not exhaustive. The 2004 yearly salaries of those individuals appear next to their names.

| | | | |
|---|---|---|---|
| 1. | Elizabeth | Bloomburg-Rosentel | $38,038.00 |
| 2. | Eric | Buxton | $48,230.00 |
| 3. | Brett | Cott | $63,362.00 |
| 4. | Rene | Diehl | $50,284.00 |
| 5. | Victoria | DiLeo | $73,268.00 |
| 6. | Barbara | Grill | $69,966.00 |
| 7. | Patrick | Grill | $52,000.00 |
| 8. | Diane | Hain | $56,498.00 |
| 9. | Ralph | Haines | $77,610.00 |
| 10. | Rachel | Hursh-Manzo | $43,628.00 |
| 11. | Stephen | Keefer | $64,584.00 |
| 12. | Justin | Klos | $43,212.00 |
| 13. | Brian | Koch | $41,444.00 |
| 14. | Patrick | Lavelle | $41,694.12 |
| 15. | Wayne | Lesperance | $65,598.00 |
| 16. | Joseph | Lombardi | $42,562.00 |
| 17. | Rashaud | Macon | $36,980.06 |
| 18. | T. Michael | Mullen | $38,610.00 |
| 19. | Mary Ann | O'Leary | $50,700.00 |
| 20. | William | Patton | $67,626.00 |
| 21. | Audrey | Powell | $77,610.00 |
| 22. | Richard | Pronesti | $49,054.20 |
| 23. | Paul | Resch | $56,030.00 |
| 24. | Lisa | Shrauder | $50,102.00 |
| 25. | Kevin | Sidella | $55,016.00 |
| 26. | Karen | Steiner | $32,292.00 |
| 27. | Cameron | Texter | $57,278.00 |
| 28. | Eric | Webb | $45,760.00 |
| 29. | Darlene | Zerbe | $55,120.00 |
| 30. | David | Bliss | $43,524.00 |
| 31. | Jon | Price | $62,920.00 |
| 32. | Melissa | Lewis | $30,758.00 |
| 33. | Chester | Orelli | $30,636.06 |
| 34. | Janet | Nero | $30,000.10 |
| 35. | Jeb | Wagner | $29,276.00 |
| 36. | G.G. | Nesmith | $31,616.00 |

As to the first twenty-nine listed individuals, their Nader efforts merited inclusion in the above-referenced 2004 campaign bonus list compiled by Eric Webb.

The 2004 salaries of the above-referenced supervisory Caucus personnel who were involved in the Nader effort are as follows:

| | |
|---|---|
| Michael Manzo | $ 97,422.00 |
| Jeff Foreman | $103,480.00 |
| Brett Cott | $ 63,362.00 |
| Annamarie Perretta-Rosepink | $ 64,974.00 |

### B. Romanelli Petition Challenge

The Caucus effort to prevent Carl Romanelli from appearing on the ballot as an independent candidate for United States Senator was disturbingly similar to the Nader effort, in scope, methodology, and misappropriation of taxpayer-funded resources.

Once again, the goal was to enhance the electability of the Democratic nominee, Robert Casey, by winnowing from the Election Day field a challenger whose vote tally would likely come at the expense of the Democratic candidate. Romanelli was required to obtain 67,070 signatures. His petitions, which were filed on August 1, 2006, consisted of 3704 petition pages, and contained a total of 94,544 signatures.

Brett Cott assumed the laboring oar in organizing and orchestrating the operation. At his direction, the petition pages were, again, obtained on the date they were filed. The call for "volunteers" was put out in advance, and anticipation, of the nomination filing. The response, as usual, was impressive. An initial meeting held in DeWeese's office drew as many as thirty Caucus staffers. At the meeting, over which Manzo presided, Cott gave the instructions on how to review the petitions and obtain and compile the information to challenge the signatures. Cott also announced that it was very important to "leadership", that is, DeWeese and Veon, that Romanelli not appear on the ballot. The staffers were told "not to worry about leave", but to focus on getting the work on the petition pages done as soon as possible.

The petition pages were delivered, as soon as they were obtained from the Department of State, by a staffer to a conference room in Veon's office. From there, Cott distributed them to, and collected them and the resultant review work product from, the staffers. During the week of the challenge undertaking, there was a veritable parade of Caucus employees in and out of Veon's office, picking up and delivering petition work. Once again, Jeff Foreman assisted in directing the contribution of Veon's office staff, which worked day in and day out on the petitions, while being paid by the taxpayers. One of Veon's staff, in describing what was involved in the undertaking, stated:

"A lot of time and effort. It would just take over you, especially that kind of thing. The secretaries would work on it, too. Really, everybody did. You all had to just take stacks [of petition pages], and give them back to Brett…"

Cott also assumed responsibility for assuring that the Caucus work product was collected, assimilated and transmitted to the challenge attorneys. The challenge court document, which was filed on August 8, 2006, detailed "global" challenges to 1,782 petition pages which contained 45,918 signatures, and a total of 69,692 "individual line" signature challenges. As in the Nader challenge, the Caucus effort succeeded. Romanelli was knocked off the ballot.

### E. THE LCOMM EFFORT

Eric Buxton testified before the Grand Jury under a grant of immunity. He was hired into the Caucus Information and Technology Office in May of 2001. He testified that while working in the Information and Technology Office, he became increasingly interested in electronic means, such as through email, of communicating with large numbers of people. Eventually, his ideas found purchase with Mike Veon, Mike Manzo and Steve Keefer (who, at that time, was a communications specialist on Veon's capitol staff). Sometime in 2003, the Leader's Communications Office (LCOMM) was established by Manzo and Veon. The office was initially staffed with Steve Keefer, Buxton, Wayne Lesperance (another employee of the Information and Technology Office), Barbara Grill (a former press secretary), and William Patton (another former press secretary). Keefer served as the de facto leader of the office. Buxton and Lesperance were the technical experts. Grill and Patton were to serve as the writers for the electronic messages.

Buxton testified that the fundamental idea was to move the message of the Caucus into the electronic age. Grill and Patton, in coordination with leadership and the members, would prepare messages to constituents in particular districts or to voters throughout Pennsylvania. The stated purpose of the office was to relay legislative initiatives and achievements of the Caucus to the people of Pennsylvania, by means of web sites and emails. However, Buxton testified that it was very clear from the beginning that he, Veon, Manzo and Keefer intended to use this operation for campaign purposes. Buxton explained that to effectively send out large numbers of emails, also

known as "blast" emails, email addresses for residents of Pennsylvania must be accumulated.

Initially, the Caucus accumulated emails from tracking those who signed on to the Caucus website. However, this did not result in the accumulation of adequate email addresses. Under the guidance of Buxton, the Caucus began to purchase large numbers of Pennsylvania email addresses from vendors who specialize in such information. Eventually, the Caucus would purchase approximately 900,000 email addresses in the first year of the program. These email addresses cost approximately ten cents per address. Over time, the Caucus would purchase millions of these addresses, all at significant taxpayer expense. Records subpoenaed from the Caucus, by the Grand Jury, verify that millions of email addresses were purchased between 2003 and 2005, at an expense of approximately $1,200,000.00 to the taxpayers.

Buxton explained that it was not enough to simply have the email addresses. These email addresses had to be put into a database in a manner that allowed them to be categorized for use. First, they would need to be categorized by legislative district. This would allow blast emails to be sent that only targeted particular legislative districts. Secondly, to be truly effective, the email addresses needed to be categorized in a manner that allowed certain demographic groups to be targeted. Buxton testified that, for example, they "could identify sportsmen, ethnic codes, age, and income levels." Buxton further testified that by the end of 2004 they had about "15,000 to 20,000 email addresses per legislative district." He further testified that the first use of the system for campaign purposes was in the 2005 special election in the 131st Legislative District, on behalf of Linda Minger. Buxton explained that he rented, under his own name, a server through an outside company. The server was located in Michigan. The server would hide the fact that these campaign emails were being sent from the taxpayer owned Caucus computer system in the capitol. Furthermore, he designed these campaign emails so that they would state they were sent from, and paid for by, the House Democratic Campaign Committee. He testified that this was, in fact, entirely false and was done solely to disguise the fact that these were actually a product of taxpayer resources. The blast emails that were being sent for legislative purposes were sent from the internal Caucus server.

60

Buxton also testified that he did campaign web site work for the House Democratic Caucus and individual members during 2004 and 2005. Indeed, he testified that he set up the entire House Democratic Campaign Committee web site in 2004. He testified that this work was performed while he was employed by the taxpayers. During the same period of time, in 2005, Buxton testified that he began negotiations with Mike Manzo and Steve Keefer to leave the Caucus and start his own company for the purpose of continuing his work for the Caucus on a contract basis. In these negotiations, it was clearly understood that he would be contracting with the Caucus to continue to conduct the surreptitious distribution of campaign blast emails that originated within the capitol.

In August of 2005, his wishes were granted and he was awarded with his first contract with the Caucus. Under the terms of the contract, the Caucus would pay Buxton's company, then called eDemocrats (later renamed Govercom), $10,000.00 a month from September 1, 2005 until the end of 2005. Thereafter, from January 1, 2006 until September 30, 2006, Govercom would be paid $16,875.00 a month. Facially, the terms of the contract appeared to be for legitimate legislative work that would be performed by Govercom. However, as Buxton testified, the contract was for services completely unnecessary to the Caucus. The existing information and technologies staff and equipment was more than sufficient to handle any and all legislative or constituent web sites or blast emails.

Buxton also provided investigators from the Office of Attorney General access to his electronically stored data. In excess of 17,000 emails were forensically recovered from Buxton's computer equipment. A review of these emails by agents of the Office of Attorney General, through the random sampling of hundreds of the emails, failed to establish a single email for legitimate non-campaign purposes. Indeed, every email reviewed was for campaign purposes. Additionally, the emails revealed the direct participation of Michael Manzo, Brett Cott, Mike Veon and other members and employees in the creation and review of campaign emails within the capitol.

The review of the emails also revealed that, with only a few exceptions, virtually all campaign communication with Eric Buxton occurred by use of the taxpayer paid Caucus email system. (One of the few exceptions was minority leader H. William DeWeese who always communicated with Buxton through his campaign email account).

61

The emails also revealed the significant extent to which Stephen Keefer, the Director of the Caucus Office of Information and Technology (from the end of 2005 until November 2007) was involved in Buxton's operation. Keefer directly supervised the remaining LCOMM employees after Buxton's departure.

Buxton testified about the termination of his contract in October of 2007. The Caucus had executed three agreements with Govercom. The first agreement was executed in August of 2005. There was then a written extension of the first contract that covered the period of September 2006 to November of 2006 and then a final contract that covered December of 2006 through November 31, 2007. Buxton testified that the last written contract was terminated because of "ethical" problems for the Caucus. He further testified that about three weeks before its termination, he met with Steve Keefer to negotiate a revised contract for another twelve months. He said that Keefer told him that as far as he was concerned, "this pot is empty."

Buxton testified that, in addition to the monthly payments received pursuant to the contracts, he received several payments from the Caucus for email addresses he supplied to them. Despite the fact that when he started his company he was supplied with hundreds of thousands of email addresses previously purchased by the taxpayers, he eventually began selling his own email addresses for inhabitants of Pennsylvania back to the Caucus.

Pursuant to a subpoena, the Grand Jury acquired the contracts, invoices and records pertaining to the Caucus' relationship with Buxton's companies. These contracts all contain the signatures of Eric Buxton and Caucus leader, H. William DeWeese. However, testimony before the Grand Jury established that DeWeese's signature was signed on these contracts, at the direction of Michael Manzo, by a secretary. It should also be noted that Stephen Keefer's signature appears on two of these contracts as a witness to their execution. In total, the records of the Caucus demonstrate than in excess of $420,000.00 was paid to Eric Buxton's companies between August of 2005 and October of 2007. These taxpayer funds were paid solely for campaign work.

Testimony, records and emails presented to the Grand Jury established that ideas for campaign emails often originated with Cott or Veon. Generally, these ideas would be emailed to Keefer and Barbara Grill. Sometimes these ideas would spark further email

62

discussions or simply the creation of a draft campaign email. Draft campaign emails, especially in prominent election races, were usually circulated for review by Veon, Mike Manzo, Brett Cott and others. Any changes or corrections would then be made. If approved, again, usually by Veon, Manzo or Cott, the email would be sent to Buxton to be formatted into an appropriate template. This template would include a heading and background that would make it appear that the email was being sent by the House Democratic Campaign Committee or an individual candidate's campaign. He would then send the email, with template, back to Barbara Grill for her final review. Once approved by her, Buxton would then be instructed to "blast" the email to the targeted voters. It is clear from the evidence that well over three hundred of these campaign blast emails were created within the capitol and sent by Buxton during 2006.

Bob Caton, Veon's press secretary in 2006, testified that during the summer between the primary and general election in 2006, Veon, Manzo and Keefer became concerned about Buxton's effectiveness. They felt that the campaign blast emails were not being sent out as rapidly as necessary and that updates to campaign web sites were being delayed. He testified that soon after, a new vendor, Gravity Web Media, owned by an individual named James Rossell, appeared and claimed he could do a better job. Caton testified that Rossell came to the capitol and gave a presentation in which he promised he would take care of the campaign web sites and blast emails in a timely and efficient manner.

James Rossell, pursuant to a grant of immunity, testified before the Grand Jury that he had known Michael Manzo and Stephen Keefer from prior campaign consulting work. He testified that they approached him about problems they were having with a vendor, Buxton, and requested ideas for the use of internet technology in campaigns. Rossell testified that he listened to the problems they were having and told them that Buxton was indeed inefficient. Rossell also told them that he could better create and service campaign web sites and send blast emails.

Eventually, Manzo and Keefer told Rossell that they wanted to contract with him to obtain his assistance on campaign websites and blast emails for the Caucus leadership. He testified that, normally, his attorneys would have prepared the contract but they insisted the contract had to be prepared by the Caucus. The subsequent contract made no

63

reference to the performance of any campaign work. Rossell testified that it was very clear, from the very beginning, that his work would not be limited to the language of the contract. Rossell also testified that Keefer often bragged that he had control over a great deal of money without any oversight. Rossell characterized it as:

"the way it was explained to me is that the Senate Republican Caucus or the Senate Democratic Caucus or even the House Republican Caucus did not have their own budgets for information technology, that somehow they were all tied in the regular budget. But it was explained to me that the House Democratic Caucus had its own unique multi seven figure budget which was originally set up and established by Veon and that's obviously how Keefer got the job, because of the relationship with Veon…"

The Controller of the Caucus, Mary Ann Reese-O'Leary, confirmed to the Grand Jury that after Keefer became the Director of Information and Technology, the budget and expenditures for that department were removed from her oversight. She testified that Keefer had a very large budget with near complete independence.

Rossell testified that after receiving three payments under the contract, the Caucus stopped returning his phone calls in the spring of 2007. Bob Caton testified that Gravity Web Media did some very modest work on campaign web sites and was largely unresponsive when asked to do more detailed work on campaign web sites or when requested to send blast emails.

Dan Reese, the Programming Web Supervisor in the Caucus Information and Technology Office, testified that one day Keefer just announced the Caucus had just contracted with Gravity Web Media. Keefer told Reese that Gravity Web Media was going to consult with their office on the design of the Caucus' legislative web site. When Reese protested that the web site was fine and just had been redesigned by his team, Keefer told him that it was out of his control and he had no choice in the matter. Keefer instructed Reese to contact James Rossell. Reese testified that he contacted Rossell "eight or nine times" and that, on each occasion, Rossell was unavailable or could not speak to him about the web site. Reese testified that Gravity Web Media never performed any work on the Caucus' legislative web site. He further testified that he was unaware of any legitimate work ever performed by Gravity Web Media for the Caucus.

64

Pursuant to a subpoena, the contract and invoices for Gravity Web Media were obtained by the Grand Jury from the Caucus. These records demonstrate that $82,550.00 in taxpayer funds was paid to Gravity Web Media between September and November of 2006. These payments were all authorized by Michael Manzo and Stephen Keefer.

## III. THE USE OF TAXPAYER RESOURCES FOR PRIVATE PECUNIARY GAIN

### A. Jeff Foreman's private law practice

While employed as Veon's Chief of Staff, Foreman received the following compensation: in 2004 he was paid a salary of $103,480.00 and a bonus of $8,315.00; in 2005 his salary was $118,352.00 and his bonus was $5,565.00; and, in 2006 he received $126,204.00 in salary and a bonus of $14,815.00.

The grand jury learned from various witnesses that while Foreman was employed as Chief of Staff to Representative Veon, Foreman was also employed as member of a law firm, Foreman & Foreman. The grand jury obtained the daily records from the law firm in regard to the number of hours that Foreman billed, that is, the number of hours that he told his law firm clients that he was working on their cases. He billed those clients at a rate of $200.00 per hour. The grand jury obtained these records for 2004 through 2006.

The Office of Attorney General attempted to compare the hours billed per day with the number of comp time hours that Foreman earned, by day, in 2004, 2005, and 2006. Unfortunately this could not be fully accomplished because Foreman's leave records for 2004 and 2005 are missing.[5]

However, a comparison was made for 2006. Special Agent (SA) Robert Drawbaugh testified that he began with the principle that to earn comp time, an employee first had to work a normal 7.5 hour work day and hours worked beyond that would be comp time hours. Beginning with an example from February 1, 2006, Foreman recorded 4.5 hours comp time, thus spending 12 hours at his legislative duties (7.5 + 4.5 = 12). On that same day, Foreman billed 4.8 hours from his law firm, thus working a total of 16.8

---

[5] Matters pertaining to potential obstruction or destruction of evidence remain part of the Grand Jury's ongoing investigation.

hours on February 1, 2006. This is a long work day but by itself is not indicative of misconduct.

On February 8, 2006, Foreman billed for 8 hours from his law firm and also worked his regular 7.5 hour legislative shift and earned 4 hours comp time, for a total of 19.5 hours. The next day, February 9, 2006, he billed 10.9 hours from his law firm, worked his normal 7.5 hours at the legislature, then earned 3 hours of comp time, thus working a total of 21.4 hours on that day. On February 14, 2006, Foreman billed for 8.7 hours from his private law firm. He also recorded 5 hours comp time on top of his normal 7.5 hour day, thus working 21.2 hours.

Similar working days are recorded throughout 2006. On one hundred and one days, during 2006, Foreman worked 14 or more hours. All together, in 2006, Foreman recorded 1,165 hours working for his law firm. In that same year he worked 1,852.5 regular hours for the legislature, and he earned 841 hours of comp time.

Foreman actually claimed to have worked more than 24 hours on three days in 2006. On June 21, 2006, Foreman billed 12.1 hours from his law firm, put in his 7.5 hour legislative shift, and then earned 5 hours of comp time, thereby working a remarkable 24.6 hours on that day. On June 27, 2006, Foreman billed 15.8 hours from his private law firm, worked his 7.5 hour legislative shift, then earned 4.5 hours comp time, for a total of 27.8 hours. On November 14, 2006, Foreman billed 12 hours from his law firm, worked his 7.5 hour legislative shift, then earned 5.5 hours of comp time, for a total of 25 working hours.

The above-stated working hours seem incomprehensible until the testimony of Michelle Morrow is considered. From 2000 through the end of 2006, Morrow was the secretary and office manager at Foreman & Foreman. She testified that she had very little direct contact with Foreman because he seldom appeared at the office. According to Morrow, "he might have been there for an hour or two or three hours" per week.

Foreman's method of supplying law firm work to Morrow was that when she would arrive at work, she would frequently find his work on her desk. Morrow could then process the work.

Foreman's other method of supplying law firm work required direct contact with Morrow. From his desk at the House of Representatives, Foreman would telephone

66

Morrow and tell her to go to his computer at his law firm desk. There, she would receive a document that he was sending from his legislative computer to his law firm computer. Morrow would accomplish that task, obtain the document and then send the completed work or document to the law firm client. However, at Foreman's specific directive, she would sanitize the document, making sure to remove all traces that the document had originated from the House of Representatives.

From the facts stated above, the grand jury concludes that while he was physically present at his legislative job, Foreman was actually working on his private law firm work, and then supplying that work to his law firm by either dropping it off on Morrow's desk, after hours, or emailing it to Morrow. Thus the taxpayers paid Foreman, in salary, bonus, and compensatory time, to work on his private law firm business.

## B. Veon's Motorcycle Trip to Sturgis, South Dakota

In July 2004, Veon attended the National Conference of State Legislators meeting in Salt Lake City, Utah. Veon and his wife towed their motorcycles to the conference. The Democratic National Convention was scheduled for the following week in Boston, Massachusetts. Veon wanted to attend that convention, and then return west for a motorcycle rally in Sturgis, South Dakota. Veon therefore arranged for Caucus staffers David Bliss and Brett Cott to fly to Salt Lake City, and transport the motorcycles to the rally. While Veon and his wife flew back east, to attend the convention, Bliss and Cott towed the motorcycles, using Veon's truck, to Rapid City, South Dakota, where they were stored in a warehouse owned by International Gaming Technologies (IGT).

All of that was arranged by Veon in advance so that Veon and his wife could fly back to South Dakota and have their motorcycles waiting for them. After delivering the motorcycles, Bliss and Cott flew back home. During the entire trip, neither Bliss nor Cott engaged in any legitimate legislative function. Additionally, neither employee was on leave during this trip. They also did not attend the conference of state legislators. Nevertheless, Veon directed that legislative funds be utilized to pay for Bliss's and Cott's trip expenses. Specifically, Bliss was reimbursed in an amount of $715.97 and Cott was reimbursed $734.17 for their travel expenses.

## C. Angela Bertugli Salary

In the summer of 2004, Angela Bertugli was a 21-year-old college student who was serving an internship for the state representative who represented her home district in western Pennsylvania. One night that summer, in a Harrisburg bar, she met Michael Manzo, who she knew held a powerful position as DeWeese's Chief of Staff. After a few drinks, Manzo asked Bertugli to leave with him. He then took her to his vehicle, in which he had a sexual liaison with Bertugli.

Bertugli next heard from Manzo in December 2004, when Manzo sent a letter conveying condolences regarding the death of Bertugli's father, and offering his assistance to Bertugli. In the spring of 2005, Bertugli contacted Manzo, requesting his assistance in her effort to gain admission to law school. Manzo thereafter contacted Bertugli, when he was in Pittsburgh, and asked Bertugli to meet him for drinks in a Pittsburgh bar. During that meeting, Manzo conveyed the impression to Bertugli that he would exert whatever political clout he had, as DeWeese's Chief of Staff, to assist Bertugli in her law school admission quest. That meeting resulted in another sexual session, this time in Manzo's hotel room.

By August 2005, Bertugli had been accepted into graduate school, and, looking for a job in the political field, had interviewed for a position with a Pittsburgh City Council member. After Bertugli conveyed that information to Manzo, he created an employment position for Bertugli with the Caucus. It was apparent to Bertugli that, inferentially, she was given the job because of her sexual encounters with Manzo. As an ostensible "justification" for the job, Manzo stated that Bertugli would be manning the "Pittsburgh Field Office" for the newly formed House Allegheny County Delegation. Bertugli went through no interview or job application process prior to starting her "employment" with the Caucus, and she was not told what she would be doing. She was simply told by Manzo to report, on September 12, 2005, to an "office" located above a cigar store in Pittsburgh. Not coincidentally, Bertugli thereafter had sexual encounters with Manzo on the majority of occasions that Manzo was in Pittsburgh.

On Bertugli's first day at the cigar store "office", she was met by a member of Representative Veon's staff, who provided her with a key. Upon entering her new work space, Bertugli discovered a dingy, very dirty space containing a television, table, chairs,

68

refrigerator, cabinets, and desk which was adjacent to an area used as a cigar smoking spot, by individuals who came up from the cigar store.

Bertugli was designated as a part-time Caucus employee who was supposed to work three days a week. She was therefore paid at a rate which was equivalent to three-fifths of the salary of a Caucus research analyst, and received full benefits. Her 2005 salary was $21, 091.00. Her tenure at the cigar store location lasted until January, 2006. During her time there, Bertugli was given very few assignments by Manzo. In fact, Bertugli had nothing to do up to 70% of the time. She therefore spent 70% of the time for which she was being paid by the taxpayers doing her schoolwork, or doing nothing at all. Further, the majority of the tasks she received from Manzo were campaign-related, rather than legislative, in nature.

In January, 2006, Bertugli was moved to an office in downtown Pittsburgh. It was only the location that changed. Bertugli continued to spend up to 70% of her paid time doing schoolwork, or nothing. Again, the majority of the remaining 30% of her time was spent on campaign-related tasks. During the spring 2006 primary season, she spent 2 weeks working on the Chelsa Wagner campaign. During the fall 2006 campaign season, Bertugli, at the direction of Manzo, went off the payroll in October, to again work on Wagner's campaign, but retained her benefits. She returned to the Caucus payroll after election day, on November 7, 2006.

Bertugli's yearly salary was increased in 2006 to $29,103.00, which was reflective of a change in her "employment" status to four days a week. She would also receive a total of $7065.00 in bonuses in 2006. Her actual duties, in fact, remained the same. The percentages of schoolwork/idleness and campaign work remained constant until she left the Pittsburgh office in July, 2007. Bertugli's sexual encounters with Manzo, when he was in Pittsburgh, continued as well. Sometime in the spring of 2007, Manzo, during one of his Pittsburgh visits, told Bertugli that he anticipated having to face "legal woes", which might result in his going to jail.

In July, 2007, Manzo arranged for Bertugli to be transferred to the Caucus Legislative Research Office, in the Capitol in Harrisburg. That was to accommodate Bertugli, since she had been accepted to a law school located in Harrisburg. Bertugli's sexual encounters with Manzo continued until November, 2007. In a retrospective

69

review of the above-described events, Bertugli concluded, with certainty, that Manzo hired her because she was having sex with him.

A review of Bertugli's emails revealed both the intimate nature of her relationship with Manzo, as well as the political nature of the endeavors undertaken by Bertugli while she was "employed" in Pittsburgh. One email chain, dated February 6, 2006, involving Manzo, Bertugli, and Scott Brubaker, also reveals the illicit nature of the position created by Manzo for Bertugli. At the beginning of the chain, Manzo states to Brubaker that Bertugli "is getting emails from Jane Niemond about filing some quarterly reports. What is that?" In response, Brubaker says:

> "All district employees are required to complete those reports. A protective measure for the Leader [DeWeese] relative to ghost employee accusations. [A] bit different if Bill [DeWeese] is the supervisor, but a standard procedure nonetheless. It merely asks for an approximation of the percentage of time spent performing various duties – administrative, research, etc."

Brubaker goes on to tell Manzo to have Bertugli complete the report and send it in. Manzo replies: "Ok, I told her to toss it last week because I thought they had her confused with an LA [Legislative Assistant]." Manzo then tells Bertugli: "Tell Jane you need another one because Manzo told you to toss it. Make something up."

Testimony from various witnesses has corroborated the above-referenced testimony and email evidence, in establishing the "ghost" aspects of Bertugli's position. Essentially, that testimony established that Manzo created an unnecessary, useless, non-productive position in an equally wasted location.

As stated above, the initial fictitious rationalization expressed by Manzo to Bertugli for her position involved an office for the Allegheny County Delegation. The staffers for the representative who chaired the Allegheny County Delegation were unaware of the existence, location or staff of such an office. Since the 19 Allegheny County Representatives already had offices, there was absolutely no need for an Allegheny County Delegation office. In fact, no such office ever existed.

Manzo later amended the fiction, and attempted to foist the cigar store location off as a Pittsburgh "regional office" for the House Democratic Caucus. That fallacy was

70

similarly exposed by the evidence. One of DeWeese's Harrisburg office assistants discovered that Bertugli was on the payroll when the assistant saw Bertugli's name on an email list of DeWeese Harrisburg employees. The assistant then asked a fellow DeWeese staffer: "Who is Angela Bertugli, and why is she on our email system?" The co-worker didn't have an answer to either part of that query. When the assistant asked Manzo about Bertugli, Manzo explained that she was working in the Pittsburgh regional office. The assistant, a long-time employee of the Caucus, opined, appropriately: "What is it with this Pittsburgh office? That's not even DeWeese's district." At Manzo's direction, the assistant ordered business cards for Bertugli. When they arrived, the assistant sent two emails to Bertugli. Both went unanswered. When the assistant informed Manzo of that, Manzo took the cards, saying he was going out to see Bertugli, and would deliver them. The assistant, in recognition of the impropriety of the Bertugli/Pittsburgh office, made inquiries of Manzo, and other co-workers, mentioning that the situation "just didn't sit right with me." She got no satisfactory explanation. As stated by that assistant:

"We don't know who works there and I don't know what is going on out there. I don't want to know, but it just didn't seem kosher to me. So, I never asked anybody about it after that. I just let it drop."

Another DeWeese staffer testified that neither he nor any of his co-workers among the leadership staff ever had professional contact with Bertugli or any Pittsburgh regional office. That staffer stated:

"...I never knew anybody who interacted with Angela Bertugli. She – we figured it was a favor. I think she went to college in Pittsburgh, but they gave her the job as a favor."

Yet another Caucus employee only became aware of Bertugli's existence when he met her on one of the many campaign trails he travelled. During the course of his campaign work with Bertugli, he never became aware of what Bertugli did as part of her Caucus employment. The employee, like so many others, saw no need for a Pittsburgh office, and found the whole Bertugli situation "really weird."

## D. Basketball Dinners

Karen Steiner testified for the Grand Jury about her experience with Mike Veon's "basketball dinners." On Tuesday nights Mike Veon, along with other Caucus Members and certain employees, would play basketball. Steiner, along with Melissa Lewis, were

71

tasked with taking food orders from the players, ordering and purchasing food, and arranging it on Veon's conference table in his capitol offices for the returning players. Steiner testified that this was an assigned task and was clearly part of her, and others, employment. Whoever purchased the food would provide the receipts to Cott who would reimburse them.

Records and testimony, presented to the Grand Jury, reveal that these Tuesday night "basketball games" commenced in 2002 and continued until November of 2006. These "dinners" ranged in cost from approximately $100 to, on occasion, almost $300. Steiner testified that the player's food selections varied every week,

"sometimes Mexican, sometimes Italian, sometimes sushi. The sushi bills were astronomical."

All of these dinners were ultimately paid from the Democratic Whip's contingency account with taxpayer funds. A total of the receipts from 2002 to November 2006 establish a total loss to the taxpayers of over $22,000.00. The public payment of these meal expenses did not stop Veon from collecting his full per diem for these same dates. On these dates, Veon collected from the taxpayers per diem payments totaling $10,865.00.

72

## APPENDIX

1.  Jennifer Brubaker: Jennifer Brubaker has served as the Director of the Legislative Research Office for the House Democratic Caucus for over seven years. Her immediate supervisor was Michael Manzo. In 2004, she received a salary of $75,348.00 and a total of $4,185.00 in bonuses. In 2005, she received a salary of $87,178.00 and a total of $5,750.00 in bonuses. In 2006, she received a salary of $94,770.00 and a total of $17,750.00 in bonuses.

2.  Scott Brubaker:    Scott Brubaker served as the Director of Staffing and Administration for the House Democratic Caucus from 2001 until November of 2007. His immediate supervisor was Michael Manzo. In 2004, he was paid a salary of $94,936.00 and a total of $6,250.00 in bonuses. In 2005, he was paid a salary of $112,762.00 and a total of $5,500.00 in bonuses. In 2006, he was paid a salary of $122,564.00 and a total of $15,250.00 in bonuses.

3.  Brett Cott:    Brett Cott served as an Administrative Analyst on former Representative Veon's capitol office staff from 2003 to 2004. He served as Administrative Director to the Minority Whip, again on former Representative Veon's staff in 2005. His immediate supervisor was Mike Veon. From 2006 until November of 2007 he was titled as a Policy Analyst to the Floor Leader. He served on former Representative Veon's staff until November of 2006. Cott was salaried at $63,362.00 in 2004 and received a total of $8,065.00 in bonuses. In 2005, Cott was salaried at $72,592.00 and received a total of $6,065.00 in bonuses. In 2006, Cott was salaried at $87,412.00 and received a total of $25,065.00 in bonuses.

4.  Jeff Foreman: Jeff Foreman was titled as Chief of Staff to the Floor Leader from 2003 until 2004. In 2005 he was titled as Chief of Staff to the Minority Whip (Mike Veon) and since 2006 he has had the title of Chief Counsel to the Minority Whip. While working on Veon's staff, his immediate supervisor was Mike Veon. He served on former Representative Veon's staff until November of 2006. In 2004, Foreman was salaried at $103,480.00 and received a total of $8,315.00 in bonuses. In 2005, Foreman was salaried at $118,352.00 and received a total of $5,565.00 in bonuses. In 2006, Foreman was salaried at $126,204.00 and received a total of $14,815.00 in bonuses.

5.  Stephen Keefer: Stephen Keefer was titled as a Graphic Artist in 2002 on the staff of former Representative Mike Veon. From 2003 to 2004, still on the staff of Veon, he was titled as a Communications Specialist. His immediate supervisor was Jeff Foreman. From 2005 until November of 2007, he served as the Director of Information Technologies for the House Democratic Caucus. In 2004, Keefer was salaried at $64,584.00 and received a total of $3,185.00 in bonuses. In 2005, Keefer was salaried at $82,238.00 and received a total of $5,185.00 in bonuses. In 2006, Keefer was salaried at $89,414.00 and received a total of $17,685.00 in bonuses.

6.  Patrick J. Lavelle: Patrick Lavelle served on the staff of former Representative Mike Veon from 2003 until November of 2006 as a Research Analyst. His immediate supervisor was Jeff Foreman. He continues to be employed by the House Democratic Caucus as a Research Analyst. In 2004, Lavelle was salaried at $41,694.12 and received a total of $4,065.00 in bonuses. In 2005, Lavelle was salaried at $54,470.00 and received a total of $1,065.00 in bonuses. In 2006, Lavelle was salaried at $58,084.00 and received a total of $17,565.00 in bonuses.

7.  Michael Manzo: Michael Manzo served, from 2001 to 2006, as Chief of Staff to the Minority Leader of the House Democratic Caucus. From November of 2006 until November of 2007, he served as the Chief of Staff to the Majority Leader of the House Democratic Caucus. In 2004, he was salaried at $97,422.00 and received a total of $16,712.10 in bonuses. In 2005, Manzo was salaried at $123,916.00 and received a total of $5,750.00 in bonuses. In 2006, Manzo was salaried at $141,102.00 and received a total of $20,250.00 in bonuses.

8.  Rachel Manzo, nee Hursh: Rachel Manzo served as a Research Analyst with the Legislative Research Office of the House Democratic Caucus from 2001 to 2002. From 2003 to 2004, she was titled as a Research Project Manager with the Legislative Research Office. From 2005 to 2006 she served as an Executive Director for the minority chairman of the House Tourism Committee and from November 2006 to present she has served as the Executive Director of the Policy Committee. In 2004, Rachel Manzo was salaried at $43,628.00 and received a total of $2,065.00 in bonuses. In 2005, Rachel Manzo was salaried at $59,696.00 and received a total of $1,065.00 in bonuses. In 2006, Rachel Manzo was salaried at $78,000.00 and received a total of $15,185.00 in bonuses.

9.  Earl Mosley: served, until November of 2007, as Director of Personnel for the House Democratic Caucus. His immediate supervisor was Scott Brubaker. In 2004, he was salaried at $74,282.00 and received a total of $3,445.00 in bonuses. In 2005, Mosley was salaried at $84,240.00 and received a total of $6,195.00 in bonuses. In 2006, Mosley was salaried at $91,572.00 and received a total of $11,445.00 in bonuses

10. Annamarie Perretta-Rosepink: Annamarie Perretta-Rosepink was listed as a Legislative Assistant in former Representative Mike Veon's district office. She was employed in Veon's district office for in excess of ten years. Her immediate supervisor was Mike Veon. In 2004, Perretta-Rosepink was salaried at $64,974.00 and received a total of $3,315.00 in bonuses. In 2005, Perretta-Rosepink was salaried at $72,436.00 and received a total of $380.00 in bonuses. In 2006, Perretta-Rosepink was salaried at $80,158.00 and received a total of $20,380.00 in bonuses.

11. Mike Veon: Mike Veon served as the State Representative from the 14th legislative district for eleven terms from 1985 to the end of 2006. He served as

74

the Democratic Whip for the Democratic Caucus from November 1998 until November 2006.

## EXHIBIT B

**Bill DeWeese/Mike Veon Press Releases**

**Home**

**Learn More**
**Bill DeWeese**
**50th District**
**Pennsylvania**
**Legislative Site**

**Stay Informed**
**E-mail Updates**
**Newsroom**
**Newsroom**
**Archive**
**News Database**

**DeWeese Corner**
**Gallery**
**Guestbook**
**Quotes About**
**Readings**
**Links**
**Word of the Day**

**Get Active**
**Contribute**
**Volunteer**
**Raise Money**

**Voter Information**
**Register**
**Absentee Ballot**
**Legislator Search**

**e-mail Updates!**

name
email
Subscribe ◉
Remove ○

Secure Online Contributions

**FOR IMMEDIATE RELEASE**
**CONTACT: Bill DeWeese ( 717) 979-9864**

Conta

**Print This Article**      Send

## DeWeese equates vote for Nader as support for Bush

**WAYNESBURG, March 2** -- House Democratic Leader Bill DeWeese today issued the following
regarding activist Ralph Nader 's announcement of his candidacy for President.

"Do not be tempted by this or any other third-party candidate. Do not throw away your vote in
solidly behind Senator John Kerry because I believe he is our best chance at beating George Bu
said DeWeese, D-Greene/Fayette/Washington. We cannot afford four more years of misguided
foreign policy under Bush, which is what a vote for Nader ultimately will produce. I call on ever
petitions to put Nader on the ballot in Pennsylvania because we must defeat Bush .

Nader needs 25,697 signatures by Aug. 2 in order to appear on Pennsylvania 's ballot.

DeWeese will contact Pennsylvania Democratic Party Chairman T.J. Rooney and offer to help ra
challenge each and every petition filed by Nader .

"We are not about to allow John Kerry to lose this critical battleground state to George Bush by
fringe, third-party candidate. Ralph Nader has a wonderful record of service as a consumer adv
watchdog, but his time in the national spotlight is now over," DeWeese said.

The House Democratic Leader was the first Pennsylvania elected official to endorse Kerry for Pr
November 2003.

" Senator Kerry is a candidate who is a champion for working families and their hopes for a bet
you to stick with us, and stick with the Democratic Party, so our cause can prevail in 2004," De

Political junkies interested in receiving more information from the Democratic Leader should si
alerts, which are available through his political Web site at www.billdeweese.com .

|back|

© 2004 Bill DeWeese Campaign Committee | Disclaimer
adm

Bill DeWeese Campaign Co

**Home**

**Learn More**
**Bill DeWeese**
**50th District**
**Pennsylvania**
**Legislative Site**

**Stay Informed**
**E-mail Updates**
**Newsroom**
**Newsroom**
**Archive**
**News Database**

**DeWeese Corner**
**Gallery**
**Guestbook**
**Quotes About**
**Readings**
**Links**
**Word of the Day**

**Get Active**
**Contribute**
**Volunteer**
**Raise Money**

**Voter Information**
**Register**
**Absentee Ballot**
**Legislator Search**

Secure Online Contributions                                          Conta

FOR IMMEDIATE RELEASE                          **Print This Article**        **Send**
CONTACT: Bill DeWeese ( 717) 979-9864

### Nader 's petitions scrutinized by PA Democratic leader:

HARRISBURG , Aug. 3 – In sensing an opportunity to help the presidential campaign of John K( Pennsylvania House Democratic Leader Bill DeWeese and Whip Mike Veon are preparing to cha petitions submitted Monday by presidential candidate Ralph Nader .

"This is a lugubrious and nefarious moment in Ralph Nader 's otherwise admirable career of he consumers. But his time has come and gone in the political world. He knows he can't win and i( know his candidacy will only help George W. Bush . That is the essence of our challenge this w( said.

Nader was required to submit nearly 26,000 signatures to the Department of State by Monday a spot on the Nov. 2 state ballot. Challenges to the petitions must be made by Aug. 9.

"We are having volunteers comb through the signatures to make sure the Is are dotted and th( But let's be clear about this. Our efforts this week have nothing to do with Ralph Nader , rather done to prevent a repeat of the 2000 election when Mr. Nader 's campaign drew enough votes enable George W. Bush to win the election. We can't let that happen again," Veon said.

DeWeese and Veon said a July poll by Quinnipiac University supports their cause. It showed K( percent of voter support in Pennsylvania , with Bush at 41 percent and Nader at 5 percent.

Published reports from the weekend also indicate the Nader campaign closed its state headqua protest from dozens of homeless people who claim they were not paid for securing signatures f Other reports suggest Nader 's campaign has accepted assistance gathering signatures from ri( Republican groups in other states.

"By accepting assistance from these organizations, clearly Mr. Nader knows he doesn't have en support on his own. But essentially what he's doing is nothing more than serving as a surrogat Bush 's campaign," Veon said.

In late May, DeWeese started a petition drive of his own through his political Web site www.bill which he asked for signatures encouraging Nader to stay out of the race. To date, nearly 400 p petition.

|back|

e-mail Updates!

name
email
Subscribe ⊙
Remove ○

© 2004 Bill DeWeese Campaign Committee | Disclaimer
adm

Bill DeWeese Campaign Co:

**Home**

**Learn More**
**Bill DeWeese**
**50th District**
**Pennsylvania**
**Legislative Site**

**Stay Informed**
**E-mail Updates**
**Newsroom**
**Newsroom**
**Archive**
**News Database**

**DeWeese Corner**
**Gallery**
**Guestbook**
**Quotes About**
**Readings**
**Links**
**Word of the Day**

**Get Active**
**Contribute**
**Volunteer**
**Raise Money**

**Voter Information**
**Register**
**Absentee Ballot**
**Legislator Search**

**e-mail Updates!**

Secure Online Contributions

**FOR IMMEDIATE RELEASE**
CONTACT: Bill DeWeese ( 717) 979-9864

Conta

Print This Article        Send

### Democratic leaders undeterred by Supreme Court ruling
## DeWeese, Veon confident Nader petitions will quickly be ruled

HARRISBURG, Sept. 21 – Pennsylvania House Democratic Leader Bill DeWeese and Whip Mike
they are undeterred by yesterday's Pennsylvania Supreme Court ruling that will require a full r
presidential candidate Ralph Nader's nominating petitions for access to Pennsylvania's Nov. 2 t

Last month the Commonwealth Court struck Nader's name from the ballot saying he could not
"independent" candidate in Pennsylvania while running as a Reform Party candidate elsewhere.
Court yesterday rejected that ruling and is requiring Commonwealth Court to review the petitio

The Democratic leaders are confident the majority of signatures will be ruled invalid. An intense
volunteers across the state uncovered that some 30,000 of 47,000 signatures on Nader's nomi
were incomplete, invalid or outright forged. The Nader campaign waited until the end of July to
drive then paid people in Philadelphia and other areas of the state to misrepresent themselves
signatures.

"Even a cursory review of Mr. Nader's submission reveals the truth," DeWeese said. "The petiti
in haste then ran afoul of the rules when it was evident the campaign would not obtain the req
valid signatures. Ralph Nader's own lawyer even acknowledged that he is unlikely to qualify for
case because his petitions are rife with error."

Nader's attorney Samuel Stretton told Commonwealth Court in August that of 1,371 signature:
selected for review, about 75 percent appeared to be invalid signatures, people not registered i
required time period or people not registered at the address listed on the petitions.

"This is the most important election of our lifetime, and Ralph Nader should be embarrassed fo
forged and faulty signatures because he could not rise above his own ego," Veon said. "Nader':
the inevitable ruling against him now is threatening the absentee balloting process which has a
motion. It's time to put an end to this farce, quickly, so voters can focus on the real choices the
in the short six weeks that remain before the election."

The Commonwealth Court is expected to begin reviewing the signatures next Monday.

|**back**|

name

email

Subscribe ⦿

Remove ◯

© 2004 Bill DeWeese Campaign Committee | Disclaimer
adm

Bill DeWeese Campaign Co

Conta

**Home**                    **Secure Online Contributions**

**Learn More**              **FOR IMMEDIATE RELEASE**                    · **Print This Article**    **Send**
**Bill DeWeese**            **CONTACT: Bill DeWeese ( 717) 979-9864**
**50th District**
**Pennsylvania**            ## Ralph Nader ruled off PA election ballot
**Legislative Site**        DeWeese/Veon laud court decision that confirms their argument

**Stay Informed**           HARRISBURG, Oct. 13 – Pennsylvania House Minority Leader Bill DeWeese and Whip Mike Veon
**E-mail Updates**          Commonwealth Court's ruling that Independent presidential candidate Ralph Nader fell far shor
**Newsroom**                number of signatures to get on Pennsylvania's election ballot.
**Newsroom
Archive**                   "The Commonwealth Court today verified what we've been saying all along, that the overwhelm
**News Database**           Ralph Nader's signatures acquired in haste were invalid or otherwise fraudulent," DeWeese saic
                            ruling, Pennsylvania counties can go about the business of preparing and sending their ballots
**DeWeese Corner**          and voters can concentrate on the real choice they have to make on November 2."
**Gallery**
**Guestbook**               DeWeese and Veon helped to organize volunteers across the state to review the petitions Nade
**Quotes About**            submitted in early August. The review uncovered that some 30,000 of 47,000 signatures on Na
**Readings**                petitions were incomplete, invalid or outright forged.
**Links**
**Word of the Day**         The Nader campaign waited until the end of July to start the petition drive then paid people in I
                            other areas of the state to misrepresent themselves, as reported by several media, in order to
**Get Active**              Nader also relied on help from Republicans who are not supporters of Nader but who are eager
**Contribute**             away from John Kerry in a key battleground state.
**Volunteer**
**Raise Money**             "Ralph Nader should be embarrassed for submitting such forged and faulty signatures because
                            above his own ego," Veon said. "Thankfully, the Commonwealth Court also saw through Nader'
**Voter Information**       subvert Pennsylvania's democratic process and ruled appropriately. It's time to put the matter
**Register**                about the business of electing our next president."
**Absentee Ballot**
**Legislator Search**       The Democratic leaders said the strong opinion from President Judge James Gardner Colins shc
                            Nader to give up his futile fight. Colins wrote, "I am compelled to emphasize that this signature
                            process was the most deceitful and fraudulent exercise ever perpetrated upon this court. The c
**e-mail updates!**         candidates, through their representatives (not their attorneys), shocks the conscience of the cc

name                        "Ralph Nader should heed the Court's strong words both in the interest of his reputation and th
                            democratic process," Veon said. "To pursue and appeal would be a lesson in futility, and damag
email                       absentee balloting process which has already been set in motion. It's time to put an end to this
Subscribe ⦿                 DeWeese and Veon said the ruling also means that votes that would have been siphoned from
Remove ○                    stay where they belong, with the Democratic ticket. The leaders also urged Pennsylvania reside
                            to the Bush campaign's use of fear to win re-election and seriously consider the facts on his mi
▮▮▮▮                        and domestic issues.

                            "This is the most important election of our lifetime, and we want to make sure John Kerry is ele
                            middle class will once again have a voice in public policy," DeWeese said. "John Kerry is the or
                            candidate who is a champion for working families and their hopes for a better future. Now that
                            rightfully off Pennsylvania's ballot, I once again urge voters to stick with us, and stick with the
                            so the issues important to Americans, important to Pennsylvanians, can prevail."


                            |back|


© 2004 Bill DeWeese Campaign Committee | Disclaimer
adm                                                    Bill DeWeese Campaign Co

**Home**

**Learn More**
**Bill DeWeese**
**50th District**
**Pennsylvania**
**Legislative Site**

**Stay Informed**
**E-mail Updates**
**Newsroom**
**Newsroom**
**Archive**
**News Database**

**DeWeese Corner**
**Gallery**
**Guestbook**
**Quotes About**
**Readings**
**Links**
**Word of the Day**

**Get Active**
**Contribute**
**Volunteer**
**Raise Money**

**Voter Information**
**Register**
**Absentee Ballot**
**Legislator Search**

**Secure Online Contributions**

Conta

**FOR IMMEDIATE RELEASE**
CONTACT: Bill DeWeese ( 717) 979-9864

**Print This Article**      Send

## PA stays Blue despite repeated Bush visits
## DeWeese/Veon weigh Nader factor

**HARRISBURG, Nov. 5 –** House Democratic legislative leaders Bill DeWeese and Mike Veon sa
win in Pennsylvania was bolstered by their efforts to have Ralph Nader removed from the ballo
State.

DeWeese and Veon said a quick look at Tuesday's results shows their efforts regarding Nader r
Pennsylvania's final tally. In the 2000 election, Nader received 103,000 votes in the state, whil
won by 130,000.

"As in 2000, the venerable consumer crusader Ralph Nader thought he would play the spoiler a
Presidential election. However, this year we could not sit idly by as G.O.P. partisans attempted
voting public by creating a fraudulent third-party campaign for Mr. Nader. And in the end, our
name from the ballot proved successful for John Kerry in Pennsylvania," DeWeese said.

In August, DeWeese and Veon helped to organize a corps of volunteers across the state to revi
Nader's campaign submitted. Careful inspection revealed that about two out of three signature
nominating petitions were incomplete, invalid or outright forged. Some of the help for Nader's
came from Republican operatives who only wanted to take votes away from Kerry in a key batt

"It is ironic that for years Ralph Nader was the voice of the average working man; always stick
rights of individuals and demanding that greedy corporations play by the rules. Yet, when it ca
own petitions for the highest office in the land, he decided that the rules should not apply to hi
"We are thankful that the courts affirmed that basic principle that the rules do matter."

"While it seems that Ohio has become the Florida of 2000, our hard work regarding Ralph Nade
promoting the core issues of Senator Kerry's candidacy, helped to prevent the Commonwealth
a blue state to a red Bush state. And all of this despite 44 visits from George W. Bush," DeWee

Veon concluded: "Pennsylvanians went into the voting booth and recognized that John Kerry st
fairness, not just tax breaks for the wealthy. He wanted affordable health care for everyone, nc
highest bidders. Unfortunately, the Bush-Cheney campaign of fear and demagoguery manipula
the country into believing their spin."
|**back**|

**e-mail Updates!**

name
email
Subscribe ⦿
Remove ○

© 2004 Bill DeWeese Campaign Committee | Disclaimer
adm

Bill DeWeese Campaign Co