**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **RALPH NADER, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civil Action No.: 1:08-cv-00589-RMU** |
| | : | |
| **DEMOCRATIC NATIONAL** | : | |
| **COMMITTEE, et. al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

<u>**PLAINTIFFS' OPPOSITION AND RESPONSE TO**</u>
<u>**DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**</u>

**INTRODUCTION**

Defendants Democratic National Committee ("DNC"), Kerry-Edwards 2004, Inc. and John Kerry (together, the "Kerry Defendants") and Reed Smith, LLP have each filed separate motions to dismiss Plaintiffs' Amended Complaint. For the sake of efficiency and as a convenience to the Court, Plaintiffs address all three motions in this one Opposition and Response. Plaintiffs begin by identifying specific allegations in the Amended Complaint that Defendants fail to address, each of which creates a question of fact that precludes dismissal. Plaintiffs then address the following issues that Defendants raise: 1) whether the doctrine of res judicata bars Plaintiffs' claims; 2) whether the *Noerr-Pennington* doctrine bars Plaintiffs' claims; 3) whether Plaintiffs allege a) a violation of constitutional rights and b) "state action" for purposes of Section 1983; 4) whether Plaintiffs allege a conspiracy; and 5) whether Plaintiffs' claims are time-barred. To the extent that Defendants rely upon and incorporate arguments made in the related actions before this Court, Plaintiffs likewise incorporate their prior responses to those arguments

herein. In addition, as an aid to the Court's scrutiny of allegations in the Amended

Complaint, Plaintiffs rely upon the affidavit of Plaintiffs' counsel, which was submitted

on June 27, 2008, and which includes as exhibits several documents referenced in the

Amended Complaint.[1]

## FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

In February 2004, DNC Chairman Terry McAuliffe publicly stated on national

television that the Democratic Party could not win the 2004 presidential election if voters

were permitted the choice of voting for a competing candidate. "We can't afford to have

Ralph Nader in the race," Mr. McAuliffe declared. Am. Comp. ¶ 2. Thus, when Mr.

Nader announced his candidacy, the DNC and its allies resorted to the courts to

accomplish what they believed themselves to be incapable of achieving at the polls. In

eighteen state courts, Defendants and their co-conspirators challenged the right of Mr.

Nader and his running mate, Peter Miguel Camejo (hereinafter, "Nader-Camejo"), to run

as candidates for public office, filing a total of twenty-four complaints against them. Am.

Comp. ¶ 3. "We wanted to neutralize his campaign by forcing him to spend money and

resources defending these things," said Toby Moffett, who was in charge of recruiting

Defendants' lawyers, "but much to our astonishment we've actually been more successful

than we thought we'd be in stopping him from getting on [state ballots] at all." Am.

Comp. ¶ 67. Defendant Kerry approved of and, through his agents, paid staff and lawyers

recruited by Kerry-Edwards 2004, Inc., directly participated in this effort. Am. Comp. ¶¶

64, 70.

---

[1] Each document referenced in Plaintiffs' Amended Complaint is included in the appendix of a related complaint Plaintiff Ralph Nader filed against these Defendants and others with the Federal Election Commission on May 30, 2008, which the FEC assigned Matter Under Review number 6021. To avoid any

Defendants knew that unless they interfered, Mr. Nader would qualify for most state ballots, as he had done in the 2000 presidential election, and that litigation alone would be insufficient to stop him. Am. Comp. ¶ 72. Defendants therefore organized and conducted campaigns of harassment, intimidation and sabotage that were specifically intended to prevent the Nader-Camejo Campaign from complying with state election laws, and to manufacture grounds for Defendants' otherwise baseless litigation. Am. Comp. ¶ 72. Pursuant to this effort, Nader-Camejo nomination conventions were disrupted and infiltrated under false pretenses, causing them to fail. Am. Comp. ¶¶ 72-75. Nader-Camejo nomination petitions were systematically sabotaged by people who signed thousands of fake names, crossed names out or otherwise took measures to invalidate the petitions. Am. Comp. ¶¶ 72-75. Nader-Camejo petitioners were also subpoenaed, ordered to attend depositions and falsely threatened with large civil fines, criminal conviction and lengthy prison sentences. Am. Comp. ¶¶ 73-74. One Nader-Camejo petitioner, a grandmother with a heart condition, was "up all last night with worry" after receiving such threats from two private investigators who appeared on her doorstep. Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. A.

Based on these and other facts set forth in the Amended Complaint, Plaintiffs allege that Defendants violated their constitutional rights by conspiring to restrain their participation as qualified candidates and voters in the 2004 presidential election. Specifically, Plaintiffs allege the following:

1. Defendants conspired with the specific intent of preventing Mr. Nader and Mr. Camejo from gaining ballot access as qualified candidates in the 2004 presidential election by using groundless and abusive litigation and other

---

possible prejudice to Defendants, Plaintiffs file the attached affidavit in lieu of the FEC complaint, and will submit a copy of such complaint only upon the Court's request.

means to cause them financial injury and bankrupt their campaign, Am. Comp. ¶¶ 1, 4, 50, 56, 67, 71;

2. Defendants conspired with the specific intent of preventing Mr. Nader and Mr. Camejo from gaining ballot access as qualified candidates in the 2004 presidential election by sabotaging their nomination papers and otherwise obstructing their compliance with state election laws, Am. Comp. ¶¶ 6-8, 72-76;

3. Defendants conspired with the specific intent of denying Plaintiff-voters' right to vote for qualified candidates in the 2004 presidential election by preventing Mr. Nader and Mr. Camejo from gaining ballot access despite their qualification and in violation of their rights under state and federal law, Am. Comp. ¶¶ 1, 8, 67, 71.

4. Defendants conspired with the specific intent to cause Plaintiffs personal financial injury and, in furtherance of such conspiracy, fraudulently procured and continue to pursue enforcement of a groundless and unprecedented money judgment against Plaintiffs, in violation of Plaintiffs' right to due process and pursuant to an apparently criminal conspiracy for which 12 co-conspirators face multiple criminal charges. Am. Comp. ¶¶ 90-102; 105.

In short, Defendants conspired to deprive Plaintiffs of their freedom of speech, petition and assembly precisely when such rights are most valuable – during a federal election. As the Fourth Circuit recently held, "both the First Amendment and 42 U.S.C. § 1983 exist in significant part to deter the kind of deeds perpetrated by defendants on election day." *Rossignol v. Voorhaar*, 316 F.3d 516, 526 (4th Cir. 2003) (conspiracy to suppress political criticism in electoral arena actionable under Section 1983). Plaintiffs' claims thus fall in a long line of cases in which disenfranchised minorities and dissident groups turn to the federal courts for vindication of their constitutional rights. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449 (1958) (African-Americans); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ("subversive persons"); *De Jonge v. State of Oregon*, 299 U.S. 353 (1937) (communists).

Defendants predictably object to Plaintiffs' allegations, and go to great lengths to convey the impression that *they*, rather than Plaintiffs, are the aggrieved parties in this action. *See*, *e.g.*, Kerry Mem. at 2 ("This is the third suit…"); Reed Smith Mem. at 1 ("This…is the *fourth* iteration…"); DNC Mem. 08-0589 (June 5, 2008) at 2 ("This is at least the fifth complaint…"). Such histrionics are neither relevant nor warranted. Defendants filed *twenty-four* groundless and abusive complaints against Plaintiffs virtually simultaneously in eighteen states during the 2004 presidential election, Am. Comp. ¶¶ 3-4; Defendants engaged in sabotage, harassment and intimidation to restrain Plaintiffs' participation in that election, Am. Comp. ¶¶ 72-76; and Defendants continue to pursue groundless and abusive claims more than *four years* after they first sued Plaintiffs, by attaching Mr. Nader's personal bank accounts in satisfaction of a judgment that Defendant Reed Smith procured fraudulently, in violation of its ethical obligation to disclose that it was representing a presiding judge, and in clear violation of Plaintiffs' right to due process. Am. Comp. ¶¶ 10, 94-100. Defendants' hyperbole notwithstanding, their pretensions to victimhood simply do not square with the facts.

This action was commenced on October 30, 2007, when Plaintiffs filed suit in the Superior Court of the District of Columbia, alleging state law claims for abuse of process, malicious prosecution and civil conspiracy, as well as federal claims under 42 U.S.C. § 1983. On October 31, 2007, Plaintiffs filed a related action against different defendants in the Eastern District of Virginia. On November 27, 2007, Defendants removed this case from the Superior Court. Thereafter, Plaintiffs discovered new evidence that employees of the state of Pennsylvania had participated in Defendants' conspiracy and received taxpayer-funded compensation for their efforts. Plaintiffs therefore filed an amended

complaint in this Court on January 23, 2008, dismissing their federal claims without prejudice in order to consolidate them, together with the allegations based on the newly discovered evidence, in the Eastern District of Virginia. Without ruling on the merits of Plaintiffs' motion to amend, however, the Eastern District of Virginia transferred that action to this Court on March 7, 2008. Accordingly, to promote judicial economy and to avoid unnecessary motions practice, Plaintiffs re-filed their federal claims in the instant action on April 4, 2008.

On July 21, 2008, Plaintiffs filed the Amended Complaint, which incorporates allegations included in a Grand Jury Presentment that Pennsylvania Attorney General Tom Corbett released on July 10, 2008. These allegations directly implicate Defendant Reed Smith as a key participant in a criminal conspiracy to use taxpayer funds, employees and resources to deny the Nader-Camejo candidacy listing on Pennsylvania's 2004 general election ballot. The 75-page Presentment (attached to the Amended Complaint as "Exhibit A") describes a "pattern of illegal conduct in which millions of dollars in taxpayer funds were misdirected to campaign efforts," including the aforementioned enterprise, which the conspirators referred to as the "Nader effort". Presentment at 1, 6. Pursuant to the Grand Jury investigation, Attorney General Corbett charged 12 individuals, including those who helped orchestrate the so-called "Nader effort", with multiple counts of criminal conspiracy, theft and conflict of interest. Am. Comp. ¶¶ 11-13, 85, 90, 105; Presentment at 54-58. In announcing these charges, the Attorney General emphasized that the Grand Jury investigation is ongoing, and that more arrests are expected. Am. Comp. ¶ 13.

Although the Grand Jury Presentment refers to Reed Smith only as "a law firm" that filed the challenge to Nader-Camejo's Pennsylvania nomination papers, the record of the challenge proceedings, which lists no fewer than 17 Reed Smith attorneys as counsel to the nominal challengers, leaves little doubt that this "law firm" is none other than Reed Smith, LLP. *See In re: Nomination Paper of Nader*, 860 A.2d 1 (Pa. 2004). The Presentment also makes clear that Defendant Reed Smith prepared and filed its challenge in direct cooperation with and in direct reliance upon as many as 50 employees of the Commonwealth of Pennsylvania, who were working at the direction of their supervisors, on taxpayer time, using taxpayer resources and receiving taxpayer-funded compensation for their work. Presentment at 54-58. Specifically, Reed Smith attorneys divided their labor on the challenge with two teams of state employees; Reed Smith attorneys coordinated the dissemination of materials relevant to the challenge with such state employees; Reed Smith attorneys had two regular, designated contacts among such state employees; and at least one Reed Smith attorney received boxes of documents necessary for filing the challenge directly from such state employees. Presentment at 55-56.

The Presentment thus constitutes compelling new evidence to support Plaintiffs' allegations that Defendants conspired under color of law, for the benefit of the Kerry Defendants, to restrain Plaintiffs' lawful participation as qualified candidates and voters in the 2004 general election. Presentment at 54-58; *see* Am. Comp. ¶ 1-4; 11-12. As the Grand Jury found, "It was generally assumed, in Democratic Party circles, that Nader's appearance on the ballot would be detrimental to Democratic Presidential Candidate John Kerry," and thus, "the quest to remove Nader from the ballot began before his petitions were even filed." Presentment at 55. In response to this new evidence, Defendant DNC

filed a one-page memorandum in support of its motion to dismiss the Amended

Complaint, in which it claims, irrelevantly, that its Pennsylvania co-conspirators are not

formal subsidiaries of the DNC. DNC. Mem. at 1. Defendant Reed Smith and the Kerry

Defendants each filed memoranda "substantially similar" to those filed in support of their

prior motions to dismiss, in which they rely on the same arguments while attempting to

minimize the significance of the Grand Jury's findings of criminality in connection with

their conspiracy. Reed Smith Mem. at 1; Kerry Mem. at 1.

Meanwhile, Defendant Reed Smith continues to assert its claim to $61,638.45 in

Mr. Nader's personal bank accounts, which the firm attached on July 17, 2007, in an

effort to collect a Pennsylvania state court judgment ordering Mr. Nader and Mr. Camejo

to pay $81,102.19 in litigation costs. Am. Comp. ¶ 102. Reed Smith insists upon its right

to collect these funds, even though *the judgment is the product of an allegedly criminal*

*conspiracy financed by funds and resources misappropriated from the taxpayers of*

*Pennsylvania*, Presentment at 54-58, and even though Reed Smith procured the judgment

in proceedings during which, among other improprieties, *the firm was simultaneously*

*appearing before (as the true party in interest) and representing (as defense counsel in*

*an ethics probe) the presiding Chief Justice who voted to affirm judgment in Reed Smith's*

*favor*.[2] Am. Comp. ¶ 94. Therefore, on August 4, 2008, Plaintiffs Nader and Camejo filed

a petition in the Pennsylvania Commonwealth Court to set aside the judgment based upon

the foregoing evidence of criminal misconduct and impropriety.

Defendants have not cited any authority for their view that Reed Smith may

simultaneously represent and appear before a judge as the true party in interest seeking to

collect a money judgment from Plaintiffs, without disclosing such representation on the record, nor can they. Reed Smith's conduct plainly violates the ethical obligations of law firms and lawyers under such circumstances. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 07-449 (2007) (requiring law firm to disclose or withdraw from such representation). Nevertheless, Defendants have maintained this indefensible position for more than *one year* since Reed Smith froze Mr. Nader's personal funds. Indeed, Defendants maintain this position even though it clearly contradicts numerous decisions of the Supreme Court of the United States, which hold that, where such impropriety destroys the appearance of impartiality, due process requires vacatur. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 865 n.12 (1988) ("to perform its high function in the best way, justice must satisfy the appearance of justice") (citations omitted); *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process"); *Klapprott v. United States*, 335 U.S. 601, 615 (1949) ("Fair hearings are in accord with elemental concepts of justice").

Defendant Reed Smith seeks to diminish the impact of its misconduct by claiming to act "on behalf of their clients" in seeking to enforce its unprecedented judgment against Mr. Nader. Reed Smith Mem. at 5. Presumably, Reed Smith is referring to the individuals who nominally filed the challenge to Nader-Camejo's Pennsylvania nomination papers. Regardless, this claim not only contradicts Plaintiffs' allegations, but also Reed Smith's own prior representations. Specifically, on February 1, 2007, Reed Smith partner Efrem Grail wrote in a letter to counsel for Mr. Camejo that "the partners in my law firm…are the holders of the judgment against your client Peter Camejo, and

---

[2] Further improprieties warranting vacatur are set forth in detail in the motion to vacate that Plaintiffs filed in the Superior Court of the District of Columbia on November 7, 2007, a copy of which Plaintiffs filed

also against Ralph Nader." Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. B. In a separate

email sent on February 11, 2007, Attorney Grail writes, "We will…begin collection of

our judgment against Mr. Nader." *See id.* Clearly, therefore, Reed Smith is acting on its

own behalf, as the true party in interest seeking to seize Mr. Nader's personal funds.

      This fact is particularly significant because Reed Smith's two co-Defendants in

this action are also important clients of the firm. Defendant DNC and Defendant Kerry

both retained Reed Smith in matters arising from the 2004 general election, and

Defendant Kerry's wife, Teresa Heinz Kerry, "is still a major and active client." Am.

Comp. ¶¶ 14, 103-104. Reed Smith's conduct on its own behalf to seize Mr. Nader's

personal funds in satisfaction of an unprecedented and wrongfully procured judgment

thus supports Plaintiffs' allegation that such conduct constitutes ongoing activity in

furtherance of Defendants' conspiracy. Am. Comp. ¶¶ 108, 112. On May 10, 2007, Mr.

Nader personally notified Defendant Kerry that Reed Smith was taking steps to enforce

this judgment, and that "it is unclear whether Reed Smith is pursuing this matter because

you, Teresa and the Democratic National Committee have been their clients." Am. Comp.

¶ 115; Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. C. On January 17, 2007, Mr. Nader also

informed DNC Chairman Howard Dean of Reed Smith's conduct, as well as the fact that

the DNC, under former Chairman McAuliffe, had retained Reed Smith during the 2004

general election. Am. Comp. ¶¶ 113-114. Reed Smith nevertheless continues to pursue its

ongoing acts in furtherance of Defendants' conspiracy.

## **ARGUMENT**

    **I.**    **Defendants' Attempt to Deny or Ignore Allegations in the Amended Complaint Is Insufficient as a Matter of Law to Support Their Motions.**

with this court on March 31, 2008. *See Nader*, 07-2136, Docket No. 44.

In clear violation of the standard governing motions to dismiss under Federal Rule of Civil Procedure 12(b), Defendants seek to persuade the Court to reject Plaintiffs' allegations wholesale, and to accept their own factual assertions and legal conclusions instead. It is beyond dispute, however, that Defendants may not prevail on a motion to dismiss merely by denying allegations in the Complaint. *See Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007). Defendants purport to rely on *Twombly*, but that case expressly reaffirms the well-settled principle that Plaintiffs' allegations must be "taken as true" at this stage of proceedings. *Twombly*, 127 S. Ct. at 1965. In *Twombly*, the Supreme Court held that, to state a claim for conspiracy (under the Sherman Act), a complaint must include "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 1965-66. The Court emphasized, however, that it was not imposing "a probability requirement at the pleading stage," and that a well-pleaded complaint "may be supported by showing *any set of facts* consistent with the allegations." *Id.* at 1965, 1969 (emphasis added) (citations omitted). Plaintiffs have pled such facts. Defendants' attempt to dispute these facts is therefore insufficient as a matter of law to support dismissal, and their motions must be denied for this reason alone. *See id.*

### A.  Defendants Fail to Establish Grounds for Dismissal Under Rule 12(b)(6).

Defendants' failure to establish grounds for dismissal under Rule 12(b)(6) is apparent on the face of their memoranda. At most, Defendants attempt to deny particular allegations in the Amended Complaint, and in many cases Defendants do not even attempt to do that. Specifically, Defendants: 1) *deny* allegations that they conspired to bankrupt the Nader-Camejo Campaign; 2) *ignore* allegations that they engaged in sabotage and other unlawful acts; 3) *deny* allegations that they conspired to deprive

Plaintiff-voters' right to vote for qualified candidates in a federal election; and 4) *ignore* allegations that they committed a fraud upon the court and violated Plaintiffs' right to due process pursuant to their participation in an allegedly criminal conspiracy to deny Nader-Camejo ballot access in Pennsylvania. Even if Defendants' assertions were plausible – and they are not – they would only raise questions of fact that must be resolved in Plaintiffs' favor, precluding dismissal under Rule 12(b)(6). *See Twombly*, 127 S. Ct. at 1966 (*quoting Neitzke v. Williams*, 490 U. S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations"); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1086 (D.C. Cir. 1998) (quotation marks omitted).

### 1. Defendants Fail to Address Allegations that They Conspired to Bankrupt the Nader-Camejo Campaign, Precluding Dismissal.

Plaintiffs allege:

"Defendants…conspired…to bankrupt the 2004 independent presidential campaign of Plaintiffs Ralph Nader and Peter Miguel Camejo…[by] using unfounded litigation to harass, obstruct and drain [the] campaign of resources, deny [the candidates] ballot access and effectively prevent [them] from running for public office." Am. Comp. ¶ 1.

Plaintiffs further allege:

Defendants' "admitted purpose for bringing these lawsuits…was not to vindicate valid legal claims, but rather to bankrupt Nader-Camejo's campaign by forcing the candidates to spend their limited resources of time, talent and money on the defense of unfounded lawsuits." Am. Comp. ¶ 4.

Plaintiffs further allege:

"Defendants…conspired to and did in fact…engage in other unlawful conduct in an effort to bankrupt the Nader-Camejo Campaign and terminate Nader-Camejo's candidacy during the 2004 presidential election," Am. Comp. ¶ 15, and

"Defendants' … efforts to bankrupt the Nader-Camejo Campaign produced its intended effect." Am. Comp. ¶ 107.

In response, Defendant DNC asserts that "The costs of defending [Defendants'] lawsuits] were a necessary by-product of our legal system," and "paying litigation costs are the expected consequences of those cases." DNC Mem. 07-2136, 23-24. Defendant DNC also asserts that "the law requires a challenge to be initiated in each state," *id.*, and "there is no constitutional right to be free of such challenges." McAuliffe Mem. 08-00428 at 11. The Kerry Defendants do not address the allegation, except to concede that Defendants caused the Nader-Camejo Campaign "to expend resources during ballot access litigation." Kerry Mem. at 12. Defendant Reed Smith likewise fails to address the allegation, except to assert that Defendants filed ""good-faith" lawsuits challenging the Nader-Camejo nomination papers." Reed Smith Mem. at 16.

In short, Defendants deny the allegation that they intended to bankrupt the Nader-Camejo Campaign. At most, therefore, Defendants raise a question of fact regarding their subjective intent, which must be resolved in Plaintiffs' favor, precluding dismissal under Rule 12(b)(6). *See Twombly*, 127 S. Ct. at 1966; *Browning*, 292 F.3d at 242; *Caribbean Broad. Sys. Ltd.*, 148 F.3d at 1086.

> **2. Defendants Fail to Address Allegations that They Conspired to Sabotage and Unlawfully Obstruct the Nader-Camejo Campaign's Effort to Comply with State Election Laws, Precluding Dismissal.**

Plaintiffs allege:

Defendants "organized and conducted campaigns of harassment, intimidation and sabotage to prevent the Nader-Camejo Campaign from complying with election laws in several states, and to manufacture grounds for the Conspirators' subsequent lawsuits." Am. Comp. ¶ 6.

Specifically:

Defendants "engaged in a coordinated effort to disrupt two Nader-Camejo nominating conventions…causing them to fail," Am. Comp. ¶ 74; "sabotaged Nader-Camejo's petitions under false pretenses by signing thousands of fake names," Am. Comp. ¶ 75; engaged in acts "intended to harass and intimidate [Nader-Camejo] petitioners and prevent them from collecting signatures," Am. Comp. ¶¶ 6-7; "hired private investigators to visit petitioners' homes and warn them that they were the subject of a "background check" the investigators were conducting," Am. Comp. ¶ 73; hired lawyers "to subpoena 27 different petitioners…with demands…so unreasonable and burdensome that compliance would have prevented petitioners from doing anything else – including collecting signatures," Am. Comp. ¶ 73, and hired lawyers to "falsely threaten[] petitioners with "conviction of a felony with a fine of up to $100,000 or prison for up to five years,"" Am. Comp. ¶ 74.

Plaintiffs further allege:

Defendants' "campaign of harassment, intimidation and sabotage was decisive to the success of their litigation against Nader-Camejo," and "Nader-Camejo would have been [on state ballots] but for the Conspirators' unlawful interference." Am. Comp. ¶ 76.

Defendants completely fail to address the foregoing allegations. Defendant DNC ignores them entirely, while the Kerry Defendants only offer a general assertion that "defendants who petition the government for redress of grievances, including through litigation in court, are immune from liability for such activity under the First Amendment." Kerry Mem. at 10. Defendant Reed Smith similarly asserts that "Any conduct by Defendants that contributed to Nader-Camejo's absence from general election ballots – i.e., by revealing Nader-Camejo's ballot ineligibility – did not violate Plaintiffs' First Amendment rights." Reed Smith Mem. at 19.

In short, Defendants assert that they are immune from liability for all conduct in furtherance of their conspiracy, but fail to address allegations that such conduct was unlawful and not subject to First Amendment protections. Defendants' failure to address such allegations thus raises a question of fact that precludes dismissal under Rule

12(b)(6). *See Twombly*, 127 S. Ct. at 1966; *Browning*, 292 F.3d at 242; *Caribbean Broad. Sys. Ltd.*, 148 F.3d at 1086.

> ### 3. Defendants Fail to Address Allegations that They Conspired to Deprive Plaintiff-Voters' Right to Vote for Qualified Candidates in a Federal Election, Precluding Dismissal.

Plaintiffs allege:

Defendants "conspired…to deny Plaintiff-voters and others the choice of voting for [Nader-Camejo]," Am. Comp. ¶ 1, with the specific intent "to suppress the candidates' speech and the Plaintiff-voters' rights of association," Am. Comp. ¶ 67, "by denying voters their free choice of candidates in the 2004 presidential election," Am. Comp. ¶ 71.

Plaintiffs further allege:

Defendants "engaged in acts…specifically intended to prevent Nader-Camejo from complying with state election laws." Am. Comp. ¶ 72.

Plaintiffs further allege:

"Defendants…succeeded in draining Nader-Camejo's campaign of time, money and other resources, and in preventing them from gaining ballot access in several states, thereby denying voters in these states the choice of voting for them, as was their intent." Am. Comp. ¶ 8.

In response, Defendant DNC asserts that "merely resorting to the courts and being on the winning side of a [ballot access] lawsuit does not make [Defendants] responsible for depriving a plaintiff of his rights." DNC Mem. 08-0589 (June 5, 2008) at 5. The Kerry Defendants assert that "There is no constitutional right to have one's candidate of choice appear on the ballot if that candidate does not fulfill state ballot access requirements." Kerry Mem. at 13. Defendant Reed Smith asserts that "Plaintiffs wanted Nader-Camejo to appear on general election ballots despite Nader-Camejo's failure to satisfy state requirements." Reed Smith Mem. at 18-19.

In short, Defendants deny the allegation that they intended to deprive Plaintiff-voters' right to vote for *qualified* candidates, as opposed to candidates who did not qualify for state ballots. At most, therefore, Defendants raise a question of fact regarding their subjective intent, which must be resolved in Plaintiffs' favor, precluding dismissal under Rule 12(b)(6). *See Twombly*, 127 S. Ct. at 1966; *Browning*, 292 F.3d at 242; *Caribbean Broad. Sys. Ltd.*, 148 F.3d at 1086.

### 4. Defendants Fail to Address Allegations that They Conspired to Cause Plaintiffs Financial Injury By Committing a Fraud Upon the Court, Precluding Dismissal.

Plaintiffs allege:

"Defendants…conspired…with the specific intention of causing Plaintiffs financial injury and other damages and violating their constitutional rights. Defendants…did in fact cause such damages, and they continue to cause such damages by pursuing their unfounded and abusive litigation to the present day," Am. Comp. ¶ 15.

Specifically:

Defendants seek "to collect payment from Mr. Nader and Mr. Camejo personally on an unprecedented judgment ordering the candidates to pay $81,102.19 in litigation costs [that] was…fraudulently procured by virtue of Reed Smith's undisclosed representation of a presiding judge…[and which] appears to be the direct result of a criminal conspiracy. Nevertheless, having previously induced Mr. Camejo to pay $20,000 to settle its claim, Reed Smith currently seeks to condemn $61,638.45 from Mr. Nader's personal bank accounts, which the firm attached over one year ago, and which remain frozen. Am. Comp. ¶ 108.

Plaintiffs further allege:

"During the proceedings [in which Defendant Reed Smith procured its unprecedented judgment], Reed Smith never disclosed several ties the firm had with Justices of the court…[that] would have provided grounds for Nader-Camejo to seek the Justices' disqualification." Am. Comp. ¶ 94.

Specifically:

"[W]hile this case was before the Pennsylvania Supreme Court, Defendant Reed Smith began representing the Chief Justice as his defense counsel in an ethics

investigation," among other improprieties.[3] Am. Comp. ¶ 10. "Reed Smith's concealment of its ties with the Pennsylvania Supreme Court Justices thus constitutes a fraud upon the court, because the firm induced its judgment in a manner that deprived Nader-Camejo of the opportunity to move for the Justices' disqualification, in violation of basic principles of fairness, impartiality and due process. Am. Comp. ¶ 97.

Once again, Defendants completely fail to address the foregoing allegations. Defendant DNC and the Kerry Defendants ignore them entirely. Defendant Reed Smith asserts only that Pennsylvania's ballot access requirements have been held constitutional, but cites a case that does not address the provision under which Reed Smith procured its unprecedented judgment. Reed Smith Mem. at 18 (*citing Rogers v. Corbett*, 468 F.3d 188 (3rd Cir. 2006)). More important, Reed Smith makes *no attempt* to address the allegation that, pursuant to its participation in an allegedly criminal conspiracy, the firm committed a fraud upon the court and violated Plaintiffs' right to due process in procuring its unprecedented judgment from a court presided over by a Chief Justice whom the firm was simultaneously representing as defense counsel in an ethics probe.

In short, Defendants ignore allegations that they committed a fraud upon the court and violated Plaintiffs' right to due process in furtherance of their conspiracy. Defendants' failure to address such allegations thus raises a question of fact that precludes dismissal under Rule 12(b)(6). *See Twombly*, 127 S. Ct. at 1966; *Browning*, 292 F.3d at 242; *Caribbean Broad. Sys. Ltd.*, 148 F.3d at 1086.

## B.  Defendants Fail to Establish Grounds for Dismissal Under Rule 12(b)(1).

Defendants also fail to establish grounds for dismissal under Rule 12(b)(1). As an initial matter, this Court clearly has subject matter jurisdiction to hear Plaintiffs' constitutional claims, 28 U.S.C. § 1331; 42 U.S.C. § 1983, and only Defendant DNC

---

[3] *See supra* n.2.

moves for dismissal under Rule 12(b)(1). While Defendant DNC offers no argument in support of its motion, Plaintiffs nevertheless bear the burden of establishing jurisdiction. *See Best v. United States*, 2007 U.S. Dist. LEXIS 88028 *4 (D.D.C. 2007). Accordingly, the Court may properly subject Plaintiffs' allegations of "jurisdictional facts" to closer scrutiny under Rule 12(b)(1) than is warranted under Rule 12(b)(6). *See Macharia v. United States*, 334 F.3d 61, 64 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

As an aid to the Court's scrutiny, Plaintiffs' counsel submitted an affidavit on June 27, 2008, which includes documents and materials referenced in the Amended Complaint that support and confirm Plaintiffs' allegations. Pl. Cnsl. Affdvt., Docket Nos. 17-19. For example, contrary to Defendant DNC's claim during the 2004 general election that it was not funding Defendants' litigation against Plaintiffs, FEC reports filed after the election confirm that the DNC retained several law firms that initiated such litigation, including Defendant Reed Smith. Am. Comp. ¶¶ 62, 69, 103-104; Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. D. In addition, Maine Democratic Party Chair and DNC official Dorothy Melanson admitted under oath in a legal proceeding that DNC officials ordered her to file suit against the Nader-Camejo Campaign and retained her law firm. Am. Comp. ¶ 62; Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. E. Finally, an email DNC employee Caroline Adler sent to DNC staff contained an attachment entitled "Script for Nader Petition Signers," which DNC employees used as a guide when calling to investigate Nader-Camejo petitioners. Am. Comp. ¶ 63; Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. F. The electronic document's properties indicate that DNC and Kerry-

Edwards Campaign consultant Jack Corrigan authored this document, further confirming the DNC's primary role in orchestrating and executing Defendants' conspiracy. *See id.*

Defendant Kerry also denied involvement in Defendants' litigation during the 2004 general election and claimed that, while he respected other Democrats' efforts to force Nader-Camejo from the race, he would never ask another candidate to abandon an election bid. Am. Comp. ¶ 50. In fact, however, Caroline Adler, the DNC staffer who circulated the Jack Corrigan-authored "Script for Nader Petition Signers" to DNC staff, states in the biography on her former employer's website that she worked for "the legal team of the Kerry campaign in Washington, D.C." Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. F. In addition, an email from Kerry-Edwards 2004, Inc. deputy national director for northern New England Judy Reardon indicates that Ms. Reardon herself drafted a complaint and coordinated with the Democratic Party officials and attorneys who filed it against Plaintiffs, including New Hampshire Democratic Party Chair and DNC official Kathleen Sullivan. Am. Comp. ¶ 64; Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. G. Finally, several lawyers that sued Plaintiffs in at least three more states (New Mexico, Ohio and Pennsylvania) were members of "Lawyers for Kerry," a group Defendant Kerry-Edwards 2004, Inc. recruited through a sign-up form on its website, www.johnkerry.com. Am. Comp. ¶¶ 64, 70; Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. H. This sign-up form states that "We may provide your contact information to the Democratic National Committee for ballot protection efforts," thus providing further confirmation of direct coordination between the Kerry-Edwards campaign, the DNC and the lawyers who pursued Defendants' litigation against Plaintiffs. *See id.*

As a final example of the documentation supporting allegations in the Amended Complaint, Plaintiffs have already noted that, while Defendant Reed Smith claims to have attached Mr. Nader's personal bank accounts "on behalf of their clients," Reed Smith partner Efrem Grail previously confirmed in two separate emails that Reed Smith seeks to enforce its unprecedented judgment on its own behalf. Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. B. Furthermore, while Reed Smith insists that Plaintiffs fail to plead specific facts from which to infer an agreement between the law firm and its co-defendants, Reed Smith heretofore has studiously avoided mention of the fact that *Defendant DNC retained Reed Smith during the 2004 General Election. Compare* Reed Smith Mem. 08-0589 (June 6, 2008) at 10-13 *with* Am. Comp. ¶¶ 103-104; *see* Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. D. Having finally conceded this fact – which, after all, is a matter of public record – as well as the fact that Defendant John Kerry retained the firm in at least one matter arising during or from the 2004 general election, Reed Smith now claims that these facts do not "provide a basis for inferring a conspiracy" among the firm and its co-Defendant clients. Reed Smith Mem. at 14. In support of this new claim, Reed Smith cites one decision from a Maryland state court for the proposition that its clients' "conspiratorial conduct cannot be imputed to the law firm." *Id.* It is too plain for argument, however, that Reed Smith's representation of its co-Defendants establishes a "set of facts" to support an inference of agreement among these parties. Indeed, the applicable ethical rules require Reed Smith to obtain its co-Defendant clients' informed consent before undertaking representation that might be adverse to their interests. MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7, 1.8 (2002). Moreover, there is no need to "impute" conspiratorial conduct from Defendant DNC or Defendant John Kerry to

Defendant Reed Smith, because the Grand Jury Presentment makes painstakingly clear that Reed Smith was a key participant in the allegedly criminal conspiracy to deny Nader-Camejo ballot access in Pennsylvania. Am. Comp. ¶ 105; Presentment at 54-56. Accordingly, Plaintiffs have pleaded and specified sufficient facts to support their allegations that Reed Smith joined Defendants' conspiracy pursuant to an agreement with its clients and co-Defendants, the DNC, Kerry-Edwards 2004, Inc. and John Kerry.

The foregoing discussion makes clear that Plaintiffs have supported their allegations of jurisdictional facts with sufficient "competent proof" to withstand dismissal under Rule 12(b)(1). *See Debt Buyers' Association v. Snow*, 2006 WL 598143 (D.D.C. 2006) (*quoting McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 188-89 (1936). Plaintiffs have done so, moreover, without the benefit of *any opportunity* for discovery. As Justice Ruth Bader Ginsburg emphasized in an opinion written for the Circuit Court of Appeals for the District of Columbia, a ruling on jurisdictional facts is "premature in the absence of any discovery." *Edmond v. United States Postal Service General Counsel*, 953 F.2d 1398, 1401 (D.C. Cir. 1992) (Ginsburg, J. concurring); *see also Macharia*, 334 F.3d at 64 (affirming dismissal "*following completion of jurisdictional discovery*") (emphasis added). Because dismissal prior to the opportunity for Plaintiffs to pursue discovery relating to jurisdictional facts is "improper" and "error [that] warrants correction," Defendant DNC's motion to dismiss under Rule 12(b)(1) must be denied. *Edmond*, 953 F.2d at 1401.

## II.    The Doctrine of Res Judicata Does Not Bar Plaintiffs' Claims.

Defendants' contention that res judicata bars this action is a red herring. Having had their day in eighteen different courts, Defendants would like to deny Plaintiffs their

day in this one Court. As Defendants concede, however, res judicata is an affirmative

defense that generally must be raised in a defendants' answer, and not in a motion to

dismiss. *See Hemphill v. Kimberly-Clark Corporation*, 530 F. Supp. 2d 108, 111 (D.D.C.

2008). Defendants attempt to avoid this obvious impediment by claiming that they may

assert res judicata in a motion to dismiss "where all relevant facts are shown by the

court's own records." Kerry Mem. at 5, *citing Hemphill*, 530 F. Supp. 2d at 111. But

*Hemphill* only underscores the reasons why res judicata fails as an affirmative defense in

the instant case. In *Hemphill*, the Court gave preclusive effect to two final judgments that

had been affirmed by the Federal Circuit Court of Appeals. *See Hemphill*, 530 F. Supp.

2d at 109-111. In the instant case, by contrast, a key "relevant fact" is plainly missing –

namely, the existence of a final judgment. *Id.* at 111; *see Taylor v. Blakey*, 490 F.3d 965,

970-78 (D.C. Cir. 2007) (defense of res judicata depends upon entry of final judgment by

court of competent jurisdiction). Defendants suggest that the Order of this Court entered

on May 27, 2008 is res judicata as to the instant action. *See Nader v. DNC*, Civ. No. 07-

2136, Docket. No. 53 (D.D.C. 2008). The Court's own records show, however, that this

Order is on appeal and is not a final judgment. *See id.*, Docket No. 55. Therefore, the

Order cannot support an affirmative defense of res judicata. *See Hemphill*, 530 F. Supp.

2d at 111; *Taylor*, 490 F.3d at 970-78.

Even if the Court were to entertain Defendants' premature assertion of an

affirmative defense in their motions to dismiss, res judicata would still be unavailing to

them in the instant case. As Defendants well know, key facts on which Plaintiffs'

Amended Complaint relies did not exist until July 10, 2008, *after* Plaintiffs filed the

action that Defendants claim bars this action. In addition, in that prior action the Court

expressly reserved judgment on the legal issues raised in this action. Therefore, neither claim preclusion nor issue preclusion bars Plaintiffs' claims.

### A. Claim Preclusion Does Not Bar Plaintiffs' Claims.

The D.C. Circuit has consistently held that "Res judicata does not bar parties from bringing claims based on material facts that were not in existence when they brought the original suit." *Apotex v. Food & Drug Administration*, 393 F.3d 210, 218 (D.C. Cir. 2004) (*citing Drake v. Federal Aviation Admin.*, 291 F.3d 59, 66 (D.C. Cir. 2002); *see Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 78-79 (D.C. Cir. 1997); *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984). As the Court explained in *Drake*, "The doctrine does not bar a litigant from doing in the present what he had no opportunity to do in the past." *Drake*, 291 F.3d at 67. That is the case here: Plaintiffs' claims in the instant action rely on "material facts that were not in existence" until July 10, 2008 – namely, the criminal indictment of as many as 12 state employees who participated in Defendants' conspiracy. *Apotex*, 393 F.3d at 218; *see* Comp. ¶¶ 76, 81. Plaintiffs filed their original Complaint in the instant action on April 4, 2008, after receiving notice that state actors in Pennsylvania had joined Defendants' conspiracy, and Plaintiffs filed the Amended Complaint on July 21, 2008, to include allegations arising from the indictment of such state actors. These newly discovered material facts, as Plaintiffs discuss more fully *infra*, are independently sufficient to support their claims under 42 U.S.C. § 1983. Therefore, even if Plaintiffs did file claims under Section 1983 in a prior related action, the claims in the instant action would not be barred. *See Brown v. Paulson*, 541 F. Supp. 2d 379, 384 (D.D.C. 2008) (Urbina, J.) ("claim not precluded if

supporting facts were not yet in existence") (*citing Velikonka v. Ashcroft*, 355 F. Supp. 2d 197, 201-02 (D.D.C. 2005)).

Defendants' claim preclusion argument boils down to their objection to Plaintiffs' decision to file a new action, rather than to move for leave to amend their prior action, upon discovery of the material facts on which the instant action rests. Defendants' procedural qualms, however, are not sufficient to support their conclusions of law. This Court has expressly rejected Defendants' view that Plaintiffs' decision to file a new action rather than a motion for leave to amend in an existing action can support application of claim preclusion. *See Velikonka*, 355 F. Supp 2d at 202 ("The law in this Circuit does not require constant amendments each time plaintiff learns of a new action"). The Court's rationale applies with particular force where, as here, Plaintiffs have never received a "full and fair opportunity" to litigate the claims in question. *See id.* at 201-02 (*citing Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 481 n.22 (1982) (holding that "full and fair opportunity" language applies to res judicata as well as collateral estoppel). Without question, therefore, claim preclusion does not bar Plaintiffs litigating claims arising from and supported by the criminal indictment of Defendants' Pennsylvania co-conspirators on July 10, 2008. *See id.*; *Apotex*, 393 F.3d at 218 (*citing Drake*, 291 F.3d at 66); *Stanton*, 127 F.3d at 78-79; *Page*, 729 F.2d at 820.

Accordingly, claim preclusion does not bar Plaintiffs' claims.

B. **Issue Preclusion Does Not Bar Plaintiffs' Claims.**

As discussed more fully *infra* with respect to the *Noerr-Pennington* doctrine, issue preclusion also does not bar Plaintiffs' claims. First, no court in the District of Columbia has ever considered Plaintiffs' Section 1983 claims on the merits, so "there is

no possibility that issue preclusion would bar them." *Stanton*, 127 F.3d at 77. This is

because, as a matter of law, "the lack of merits consideration defeats any application of

issue preclusion." *Id.* at 78. That is the case here: the Court's prior decision on the merits

of Plaintiffs' tort claims simply does not address the merits of Plaintiffs' Section 1983

claims in the instant action. To the contrary, in its prior decision the Court expressly

reserved consideration of Plaintiffs' Section 1983 claims and the issues related thereto.

*See Nader*, 07-2136, Mem. Op. at 31 n.19 (reserving consideration of Plaintiffs'

allegations "that the defendants orchestrated campaigns of "harassment, intimidation and

sabotage," with the specific intention of preventing Nader-Camejo from complying with

state election laws"). Indeed, the Court made clear that it had reserved consideration of

such allegations precisely because Plaintiffs did not raise them "in the context of any

specific underlying *tort*." *Id.* (emphasis added). Thus, Plaintiffs have never had *any*

opportunity to litigate their claim that Defendants violated their constitutional rights by

engaging in the alleged conduct. "One general limitation the Court has repeatedly

recognized is that the concept of collateral estoppel cannot apply when the party against

whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate

that issue in the earlier case." *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (*citing Montana*

*v. United States*, 440 U.S. 147, 153 (1979); *Blonder-Tongue Laboratories, Inc. v.*

*University of Illinois Foundation*, 402 U.S. 313, 328-329 (1971)).

Accordingly, issue preclusion does not bar Plaintiffs' claims.

### III.    The *Noerr-Pennington* Doctrine Does Not Bar Plaintiffs' Claims.

Defendants seek to invoke the protection of the United States Constitution to

shield themselves from liability for engaging in a nationwide conspiracy to prevent

Plaintiffs, who are their political competitors, from participating as qualified candidates and voters in the 2004 presidential election. Am. Comp. ¶¶ 1-15. Defendants claim that the First Amendment protects all conduct in furtherance of such conspiracy, that they are therefore immune from liability under 42 U.S.C. § 1983, and that this Court has already so held. Reed Smith Mem. at 14-17; Kerry Mem. at 10-11. Defendants are wrong on all counts.

In its previous decision on the merits of Plaintiffs' state law tort claims, the Court expressly reserved judgment on Plaintiffs' allegations that Defendants "orchestrated campaigns of harassment, intimidation and sabotage, with the specific intention of preventing Nader-Camejo from complying with state election laws." *Nader*, No. 07-2136, Mem. Op. at 31 n.19. The Court's rationale for reserving judgment on these allegations is obvious, for to include them in its holding, the Court would have had to conclude, as a matter of law, that:

1. The First Amendment protects acts in furtherance of Defendants' conspiracy to bankrupt and force Plaintiffs from a federal election by means of groundless and abusive litigation in eighteen states nationwide;

2. The First Amendment protects acts in furtherance of Defendants' conspiracy to prevent Plaintiffs from complying with state election laws by sabotaging their nomination papers, disrupting their nomination conventions and hiring attorneys and private detectives to make false threats of fines and incarceration against their campaign staff and volunteers; and

3. The First Amendment protects acts in furtherance of Defendants' conspiracy to deprive a discrete class of voters their right to vote for a qualified candidate in a federal election.

Clearly, the Court did not hold *any* of the above. *See id.* at 22-31. Instead, the Court expressly indicated that its holding did not encompass Plaintiffs' allegations that Defendants conspired to restrain Plaintiffs' lawful participation in the 2004 general

election by means of the unlawful acts set forth in paragraphs 67-71 and 236 of the

Amended Complaint in that action. *See id.* at 31 n.19. Likewise, the Court did not hold

Defendants immune from liability for the allegedly criminal misconduct in connection

with their conspiracy in Pennsylvania – nor could it have, since the allegations arising

from the Grand Jury Presentment were not before the Court. Am. Comp. ¶ 105.

Defendants are simply wrong, therefore, to claim that the Court held the foregoing

conduct to be protected under the *Noerr-Pennington* doctrine.

In keeping with their strategy of ignoring allegations that they cannot defend,

Defendants nevertheless insist that the First Amendment provides them with blanket

immunity for all conduct in furtherance of their conspiracy – even, apparently, for

unlawful conduct and conduct specifically intended to restrain *Plaintiffs*' First

Amendment rights. *Compare* Reed Smith Mem. at 14-17; Kerry Mem. at 10-11 *with* Am.

Comp. ¶¶ 6, 8, 67, 72-76, 91-92, 105. Defendants do not cite any authority for this

contention, nor can they. As the Supreme Court has stated, such conduct "cannot acquire

immunity by seeking refuge under the umbrella of "political expression."" *Cal. Motor*

*Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972).

For the same reason, Defendants cannot claim immunity for their misconduct in

fraudulently procuring their unprecedented judgment in the Pennsylvania proceedings,

nor for their ongoing effort to enforce that judgment, which now appears to be the

product of a criminal conspiracy. *See id.*; Am. Comp. ¶¶ 94-97, 101-02, 105. Just as

*Noerr-Pennington* immunity does not extend to "substantive evils" such as the unlawful

acts by which Defendants conspired to restrain Plaintiffs' lawful participation in the 2004

general election, neither does the doctrine protect "forms of illegal and reprehensible

practice which may corrupt the administrative or judicial processes," such as Defendant Reed Smith's undisclosed representation of a judge it was appearing before as a party in interest seeking a money judgment. *Cal. Motor Transp. Co.*, 404 U.S. at 513; *see* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 07-449 (2007). The Supreme Court's ruling on this point could not be more clear: "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *Id.*

Accordingly, the *Noerr-Pennington* doctrine does not shield Defendants from liability for acts in furtherance of their conspiracy to restrain Plaintiffs' lawful participation as qualified candidates and voters in the 2004 general election, nor from liability for acts in furtherance of their effort to procure and collect a money judgment by means of an allegedly criminal conspiracy. Am. Comp. ¶¶ 6, 8, 67, 72-76, 91-92, 105.

## IV. Plaintiffs State a Claim Under Section 1983.

To prevail on their motions to dismiss, Defendants must prove that Plaintiffs fail, as a matter of law, to allege a constitutional violation or the requisite element of "state action" under 42 U.S.C. § 1983. Defendants cannot carry this burden. The Amended Complaint specifically alleges that Defendants conspired to restrain Plaintiffs' lawful participation as qualified candidates and voters in the 2004 general election, and that state actors jointly engaged with Defendants in acts in furtherance of the conspiracy. Am. Comp. ¶¶ 11-12, 79-80, 85, 105. These allegations well exceed the liberal pleading requirements to withstand dismissal under Rule 12(b). *See Robinson v. King*, 629 F. Supp. 546, 553 (D.D.C. 1986) (bare allegations of Section 1983 violation, "unsupported by any facts, are nonetheless sufficient to weather [a] motion to dismiss") (citations

omitted); *International Action Center v. United States of America*, 2002 U.S. Dist.

LEXIS 4614, *3-4 (D.D.C. 2002) (to state claim under Section 1983, "[a]

complaint…need not allege all that a plaintiff must eventually prove") (citation omitted);

*see also Chandler v. Welch and Associates, Inc.*, 533 F. Supp. 2d 94 (D.D.C. 2008) (court

must "grant plaintiffs the benefit of all inferences that can be derived from the facts

alleged") (citations omitted). Therefore, Defendants' motions must be denied.

### A.  Plaintiffs Allege a Violation of Their Constitutional Rights Sufficient to State a Claim Under Section 1983.

Plaintiffs allege that Defendants conspired to restrain their lawful participation as

qualified candidates and voters in the 2004 general election. Am. Comp. ¶¶ 1, 4, 6-8, 50,

56, 67, 71-76. Defendants' conspiracy thus targeted "two different, although overlapping,

kinds of rights – the right of individuals to associate for the advancement of political

beliefs, and the right of qualified voters, regardless of their political persuasion, to cast

their votes effectively." *Anderson v. Celebreeze*, 460 U.S. 780, 787 (1983) (*quoting

Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)); *see Burson v. Freeman*, 504 U.S. 191,

199 (1992) (recognizing constitutional right "to vote freely for the candidate of one's

choice") (*quoting Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Therefore, Plaintiffs allege

a violation of their constitutional rights that is actionable under Section 1983. *See

Rossignol*, 316 F.3d at 526.

Defendants' assertions to the contrary are, as Plaintiffs have shown, nothing more

than an evasion. *See supra*, pp. 9-13. For example, Defendants do not even attempt to

address Plaintiffs' allegations that they engaged in conduct that was specifically intended

to prevent Mr. Nader and Mr. Camejo from complying with state election laws, and to

manufacture grounds for Defendants' otherwise baseless legal claims. Am. Comp. ¶¶ 6-8,

71-76. Instead, Defendants note that the Constitution does not guarantee candidates the

right to "unfettered access" to state ballots, nor the right to be elected to public office.

Kerry Mem. at 12; Reed Smith Mem. at 18. But Plaintiffs have never asserted either of

these "rights" – much less that Defendants violated them. Rather, Plaintiffs allege that

Defendants conspired to prevent them from participating as *qualified* candidates and

voters in a federal election, Am. Comp. ¶¶ 1, 4, 6-8, 50, 56, 67, 71-76, and that this

conspiracy violated Plaintiffs' rights to associate for political purposes and to cast their

votes freely for the qualified candidates of their choice. *See Anderson*, 460 U.S. at 787;

*Burson*, 504 U.S. at 199. Even Defendants do not dispute these allegations.

      Accordingly, Plaintiffs allege constitutional violations sufficient to support their

claims under Section 1983.

### B. Plaintiffs Allege "State Action" Sufficient to State a Claim Under Section 1983.

Based on evidence newly discovered in December 2007, Plaintiffs allege:

"[M]any of the operatives that [Pennsylvania House Democratic leaders] Mr. DeWeese and Mr. Veon recruited to join Defendants' conspiracy were actually paid employees of the state of Pennsylvania, who received taxpayer-funded compensation for their effort to remove Nader-Camejo from Pennsylvania's ballot." Am. Comp. ¶¶ 80.

Specifically:

"[S]tate employees…[received] bonuses based on time they spent…in getting presidential candidate Ralph Nader off the presidential ballot." Am. Comp. ¶ 80. Further, emails and spreadsheets indicate that "a list of year-end bonuses was based on…election work that encompassed, "specials, general, Nader effort." Am. Comp. ¶ 80. "The "Nader effort" is an apparent reference to a Democratic project to challenge the ballot petitions of the independent presidential candidate, who [Democrats] feared would peel away votes from Democratic nominee Sen. John F. Kerry." Am. Comp. ¶ 80.

Plaintiffs further allege:

"[M]ore than 100…"volunteers" [who] worked on the case "holed up in Reed Smith conference rooms" … were actually employees of the state of Pennsylvania, who received taxpayer-funded compensation for their joint effort, in concert with Defendants and co-Conspirators, to remove Nader-Camejo from Pennsylvania's ballot." Am. Comp. ¶ 84.

Finally:

"The so-called "objectors" – registered voters named in the case caption – received logistical support from the state House Democratic committee in organizing volunteers. [Reed Smith Attorney Daniel] Booker said his friend, state Rep. H. William DeWeese, D-Greene, Democratic leader in the state House of Representatives, knew of the project and thought it a valuable one." Am. Comp. ¶ 90.

These allegations, which are significantly supported and enlarged upon by allegations in the Grand Jury Presentment, Am. Comp. ¶ 105, are independently sufficient to support a pleading of "state action" for purposes of Section 1983. This is because, "State employment is generally sufficient to render the defendant a state actor." *West v. Atkins*, 487 U.S. 42, 49 (1988) (*quoting Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, n.18 (1982)). In addition, private defendants who are "willful participant[s] in joint activity with the State or its agents" themselves act "under color" of law for purposes of Section 1983. *Lugar*, 457 U.S. at 941 (quoting *United States v. Price*, 383 U.S. 787, 794 (1966). By pleading that Defendants willfully participated in joint activity with employees of the state of Pennsylvania, therefore, Plaintiffs plead sufficient facts to establish the element of state action. *See West*, 487 U.S. at 49; *Lugar*, 457 U.S. at 941.

In its motion to dismiss Plaintiffs' Complaint, Defendant DNC acknowledged that the foregoing allegations are sufficient to establish the element of state action under Section 1983. *See* DNC Mem. 08-589 (June 5, 2008) at 5 ("A private actor may be subject to liability under § 1983 if he or she willfully collaborated or conspired with an official state actor in the deprivation of the federal right") (citation omitted). In its motion

to dismiss the Amended Complaint, however, Defendant DNC reverses course and asserts that such allegations do not establish that Defendants acted under color of law for purposes of Section 1983. DNC Mem. at 1-2. Defendant DNC offers no legal authority to support its new position, nor any explanation for its reversal. Regardless, the allegations in the Grand Jury Presentment make clear that Defendants' state employee co-conspirators were in fact acting as agents of the state when they joined Defendants' conspiracy. *See, e.g.,* Presentment at 4 ("It was clearly understood by all these employees that *the campaign work in question was part of their public employment and not something to relegate to after work hours or personal time*") (emphasis added). Accordingly, these allegations are sufficient to establish state action – and Defendants' liability – under Section 1983. *See West*, 487 U.S. at 49; *Lugar*, 457 U.S. at 941.

The Kerry Defendants claim that they "do not concede" that Plaintiffs allege sufficient facts to establish state action, but they make *no attempt* to explain why the foregoing allegations fail to do so. Kerry Mem. at 15 n.4. Instead, the Kerry Defendants attempt to absolve themselves by asserting that Plaintiffs do not allege that they were directly involved in the Pennsylvania proceedings. *Id.* at 15. This assertion is not relevant. All co-conspirators are vicariously liable for all acts in furtherance of the conspiracy, *see Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983), and liability attaches whether or not a particular conspirator planned, participated or even knew about a particular wrongful act in furtherance of the conspiracy. *See Hobson v. Wilson*, 737 F.2d 1, 51-52 (D.C. Cir. 1984). Nevertheless, the assertion is also false. Plaintiffs specifically allege that Defendant Kerry's paid agent directly participated in at least one lawsuit conspirators filed against the Nader-Camejo Campaign, Am. Comp. ¶ 64; Pl.

Cnsl. Affdvt., Docket Nos. 17-19, Ex. G, and that Defendant Kerry-Edwards 2004, Inc. recruited several lawyers who filed three additional lawsuits, including at least one lawyer, William S. Gordon, who is listed as counsel of record to the nominal challengers in the Pennsylvania proceedings. Am. Comp. ¶¶ 64, 70; Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. H. Moreover, Defendant Reed Smith, which dedicated no fewer than 17 attorneys and "thousands of hours" to Defendants' Pennsylvania challenge, apparently represents Defendant Kerry and his wife Teresa Heinz Kerry on an ongoing basis. Am. Comp. ¶¶ 14, 90, 103. Therefore, before undertaking Defendants' Pennsylvania litigation in cooperation with parties who publicly proclaimed, "Our goal is to help elect John Kerry the next President of the United States," Am. Comp. ¶ 81, Defendant Reed Smith would have been required to consult with and obtain consent from its client, Defendant John Kerry. *See* MODEL RULES OF PROFESSIONAL CONDUCT Rules 1.7, 1.8 (2002). Accordingly, the Kerry Defendants cannot avoid liability under Section 1983 merely by attempting to dispute the set of facts connecting them to Defendants' conspiracy.

Defendant Reed Smith claims that Plaintiffs fail to allege "state action" for two reasons: "First, Reed Smith does not act under color of law simply by working alongside public employees. Second, the mere fact that some volunteers were legislative aids does not make them state actors." Reed Smith Mem. at 21. To support these claims, Reed Smith suggests that the state employees working in its conference rooms may have been working in a personal capacity, and that allegations in the Grand Jury Presentment support this conclusion. *Id.* at 22. Not so. The Presentment eliminates any doubt that Defendants' state employee co-conspirators were working in their official capacities as employees of the state. *See supra*, pp. 31-32. Indeed, these state employees received

checks directly from the Pennsylvania Treasury specifically to compensate them for their work on the so-called "Nader effort". Presentment at 5-6, 7-8, 56-58.

Reed Smith also notes that financial assistance by the state does not necessarily transform a private actor into a state actor. Reed Smith Mem. at 22. This is not relevant. Defendants' state employee co-conspirators are state actors by virtue of their employment by the state, and acts done by those employees in connection with their employment, for which the state specifically compensates them, constitute action under color of state law. *See West*, 487 U.S. at 49; *Lugar*, 457 U.S. at 941. It is no defense that such acts may have been illegal, as Reed Smith suggests, because conduct that violates Section 1983 often violates criminal statutes, and the original purpose of Section 1983 was to provide a civil remedy for such conduct. *See generally Rossignol*, 316 F.3d at 526-27 (discussing history and purpose of Section 1983).

As this Court recently noted, "A state employee performing an official duty acts pursuant to state authority, and therefore acts under the color of law," *Maniaci v. Georgetown University*, 510 F. Supp. 2d 50, 68 (D.D.C. 2007) (*citing Screws v. United States*, 325 U.S. 91, 107-08 (1945), and "even if a state employee does not act with the actual authority of the state, but merely purports to exercise its authority, he may be held liable for constitutional deprivation pursuant to Section 1983. *Id.* (*citing Griffin v. Maryland*, 378 U.S. 130, 135 (1964)). The test in such cases is "whether there is sufficiently close nexus between the State and the challenged action…so that the action of the latter may be fairly treated as that of the State itself." *Id.* (*quoting Jackson v. Metro. Edison Co.,* 419 U.S. 345, 351 (1974)). Here, where the allegations in the Amended Complaint establish that the state of Pennsylvania specifically compensated its

employees for their work on the "Nader effort," in concert with Defendants and "holed up in Reed Smith conference rooms," that test is met. Am. Comp. ¶¶ 80, 85, 105.

Accordingly, Plaintiffs allege "state action" for purposes of Section 1983.[4]

### V.    Plaintiffs Allege Facts Sufficient to State a Claim for Conspiracy.

Plaintiffs have already summarized the wealth of allegations and facts compelling the conclusion that Defendants conspired to restrain Plaintiffs' lawful participation as qualified candidates and voters in the 2004 general election. *See supra*, pp. 15-18. These allegations are supported by reference to Defendants' own email records and campaign finance reports, as well as court records and other reliable sources. *See* Pl. Cnsl. Affdvt., Docket Nos. 17-19, Ex. D,F,G. Accordingly, Plaintiffs' allegations that Defendant DNC retained several law firms that sued Plaintiffs, including Defendant Reed Smith, and that Defendants John Kerry and Kerry-Edwards 2004, Inc., through their paid agents, staff and lawyers, directly participated in lawsuits filed against Plaintiffs in several states, including Pennsylvania, constitutes a "set of facts" sufficient to support an inference of agreement among these Defendants. *Twombly*, 127 S. Ct. at 1969; *see Mandelkorn v. Patrick*, 359 F. Supp. 692, 697 (D.D.C. 1973) (recognizing the "inherent difficulties in the pleading of a conspiracy, [which] by its very nature…involves agreements and questions of intent not accessible to the Plaintiff").

Such inference is hardly necessary, however, because the Amended Complaint also includes detailed allegations regarding the formation of Defendants' conspiracy. Specifically, Plaintiffs allege that "the leaders of the conspiracy met privately to discuss

---

[4] Plaintiffs incorporate herein, as an alternative basis for establishing state action, their argument that Defendants were engaged in a public function in challenging the Nader-Camejo nomination petitions. *See Nader v. McAuliffe*, Civ. No. 08-0428, Plaintiffs' Response in Opposition to Defendants' Motions to

their plans on July 26, 2004, at the Four Seasons Hotel in Boston," and that the DNC paid

for this meeting. Am. Comp. ¶ 51. Plaintiffs identify particular individuals among

"approximately three dozen people" who attended the meeting. Am. Comp. ¶ 51.

Plaintiffs also provide specific details about what was discussed, and even direct quotes

from attendees, indicating their conspiratorial intent. Am. Comp. ¶¶ 52-58. These

allegations regarding the nature and purpose of the conspiracy – to restrain Plaintiffs'

lawful participation as qualified candidates and voters in the 2004 general election – are

further supported by the Grand Jury's finding that in Pennsylvania, the "quest to remove

Nader from the ballot began before his petitions were even filed." Presentment at 55.

Thus, the allegations in the Amended Complaint well exceed the *Twombly* requirement

that a complaint must include "enough factual matter (taken as true) to suggest that an

agreement was made." *Twombly*, 127 S. Ct. at 1965-66.

Moreover, as Plaintiffs have previously noted, Defendant Reed Smith was a key

participant in an allegedly criminal conspiracy to deny the Nader-Camejo candidacy

ballot listing in Pennsylvania, *see supra*, pp. 17-18; Presentment at 54-58, while at the

same time, Reed Smith's clients and co-Defendants were engaged in litigation in other

states, as part of a coordinated nationwide effort to deny the Nader-Camejo candidacy

ballot listing in as many states as possible. Am. Comp. ¶¶ 58-66. Under these

circumstances, Defendant Reed Smith was bound to obtain informed consent from

Defendant DNC and Defendant John Kerry before undertaking Defendants' Pennsylvania

litigation, which compels the conclusion that Defendant Reed Smith did so pursuant to an

---

Dismiss (April 18, 2008). Additionally, Defendants' use of attachment proceedings in the District of
Columbia constitutes alternative grounds for establishing state action. *See Lugar*, 457 U.S. 922.

agreement with its clients and co-Defendants. MODEL RULES OF PROFESSIONAL CONDUCT, Rules 1.7, 1.8 (2002).

Accordingly, Plaintiffs plead facts sufficient to support their conspiracy claims.

**VI.     Plaintiffs' Claims Are Not Time-Barred.**

This Court has already concluded, consistent with the great weight of authority, that dismissal of Plaintiffs' claims on the ground that they are barred by the statute of limitations would be improper. *Nader*, 07-2136, Mem. Op. at 22 (*citing Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). Plaintiffs thus rely on the Court's prior ruling on this issue and rely on their previous response to Defendants' assertions that Plaintiffs' claims are time-barred. Plaintiffs add, however, that evidence on which the claims in this action substantially rely – namely, that employees of the state of Pennsylvania directly participated in Defendants' conspiracy – was newly discovered no earlier than December 2007. Am. Comp. ¶ 80. Furthermore, the Amended Complaint substantially relies upon allegations in a Grand Jury Presentment that was not made public until July 10, 2008. These allegations are independently sufficient to support the element of "state action" under 42 U.S.C. § 1983. *See supra*, pp. 30-34. On these alternative grounds, therefore, the statute of limitations does not bar Plaintiffs' claims. *See Richards v. Mileski*, 662 F.2d 65 (D.C. Cir. 1981) (dismissal of Section 1983 claim on statute of limitations grounds improper twenty-three years after wrongful termination, where involvement of state actor was concealed for twenty-two years).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss should be denied.

Dated: August 11, 2008                    Respectfully Submitted,

                                          /s/ Oliver B. Hall
                                          _____

                                          Oliver B. Hall
                                          D.C. Bar No. 976463
                                          1835 16th Street, N.W.
                                          Washington, D.C. 20009
                                          (617) 953-0161
                                          oliverbhall@gmail.com
                                          *Counsel for Plaintiffs*

Bruce Afran, Esquire
10 Braeburn Drive
Princeton, NJ 08540
*Of Counsel*

Mark R. Brown, Esquire
303 East Broad Street
Columbus, OH 43215
*Of Counsel*

Carl J. Mayer, Esquire
Mayer Law Group, LLC
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
*Of Counsel*

Gonzalez & Leigh, LLP
Matt Gonzalez, Esquire
G. Whitney Leigh, Esquire
Bryan Vereschagin, Esquire
Two Shaw Alley
San Francisco, CA 94105
*Of Counsel*

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RALPH NADER, et al.,** | : |
| | : |
| **Plaintiffs** | : |
| | : |
| **v.** | :   **Civil Action No. 08-00589-RMU** |
| | : |
| **DEMOCRATIC NATIONAL COMMITTEE,** | : |
| **et al.** | : |
| | : |
| **Defendants.** | : |
| | : |

**[PROPOSED] ORDER**

IT IS ORDERED that the motions to dismiss the amended complaint pursuant to

Fed. R. Civ. P. Rules 12(b)(1) and 12(b)(6), filed by Defendants Democratic National

Committee, Kerry-Edwards 2004, Inc., et al, and Reed Smith, LLP are hereby denied.


Dated:                                      _____

                                            RICARDO URBINA
                                            United Stated District Court Judge

39

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of August 2008, I electronically served a copy of the

foregoing Opposition and Response to Defendants' Motions to Dismiss the Amended

Complaint and Proposed Order by means of the Court's CM/ECF system upon the

following parties:

Joseph E. Sandler
D.C. Bar No. 255919
John Hardin Young
SANDLER, REIFF & YOUNG
50 E Street, S.E. #300
Washington, D.C. 20003

*Attorneys for Defendant Democratic*
*National Committee*


Mark E. Elias
D.C. Bar No. 442007
PERKINS COIE
607 14th St., N.W.
Washington, D.C. 20005

*Attorneys for Defendants Kerry-Edwards*
*2004, Inc. and Senator John Kerry*


Douglas K. Spaulding
D.C. Bar No. 936948
REED SMITH, LLP
1301 K Street N.W.
Suite 1100 – East Tower
Washington, D.C. 20005

*Attorneys for Defendant Reed Smith, LLP*

                                        /s/ Oliver B. Hall
                                        Oliver B. Hall